## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TNB USA INC., | 18 Civ. _____ |
| *Plaintiff*, | |
| v. | **COMPLAINT** |
| FEDERAL RESERVE BANK OF NEW YORK, | |
| *Defendant*. | |

Plaintiff TNB USA Inc. ("TNB"), in support of its Complaint against Defendant the Federal Reserve Bank of New York ("FRBNY"), alleges and states the following:

## NATURE OF THIS ACTION

1.      TNB brings this action for a declaratory judgment, injunctive relief, and a prompt hearing to compel the FRBNY to comply with its statutory obligations and open a "Master Account" for TNB, a state-chartered bank based in Connecticut.

2.      TNB was founded in 2016 by individuals with many decades of experience in financial services.  "TNB" stands for "the narrow bank", and its business model is indeed narrow.  TNB's sole business will be to accept deposits only from the most financially secure institutions, and to place those deposits into TNB's Master Account at the FRBNY, thus permitting depositors to earn higher rates of interest than are currently available to nonfinancial companies and consumers for such a safe, liquid form of deposit.

3.      TNB's board of directors and management have devoted more than two years and substantial resources to preparing to open their business, including undergoing a rigorous review by the State of Connecticut Department of Banking ("CTDOB").  The CTDOB has now granted

TNB a temporary Certificate of Authority ("CoA") and is fully prepared to permit TNB to operate on a permanent basis.

4.    However, to carry out its business—indeed, to function at all—TNB needs access to the Federal Reserve payments system.

5.    In August 2017, therefore, TNB began the routine administrative process to open a Master Account with the FRBNY.  Typically, the application procedure involves completing a one-page form agreement, followed by a brief wait of no more than one week.  Indeed, the form agreement itself states that "[p]rocessing may take 5-7 business days" and that the applicant should "contact the Federal Reserve Bank to confirm the date that the master account will be established."

6.    This treatment is consistent with the governing statutory framework.  Concerned by preferential access to Federal Reserve services by large financial institutions, Congress passed the Depository Institutions Deregulation and Monetary Control Act of 1980 (the "Act").  Under the applicable provision of the Act, 12 U.S.C. § 248a(c)(2), all FRBNY services "shall be available" on an equal, non-discriminatory basis to any qualified depository institution that, like TNB, is in the business of receiving deposits other than trust funds.

7.    TNB did not receive the standard treatment mandated by the governing law.  Despite Connecticut's approval of TNB—as TNB's lawful chartering authority—and the language of the governing statute, the FRBNY undertook its own protracted internal review of TNB.  TNB fully cooperated with that review, which ultimately concluded in TNB's favor.  At the same time, the FRBNY also apparently referred the matter to the Board of Governors of the Federal Reserve System (the "Board") in Washington, D.C.

8.      In December 2017, TNB was informed orally by an FRBNY official that approval would be forthcoming—only to be called back later by the same official and told that the Board had countermanded that direction, based on alleged "policy concerns."

9.      TNB's principals thereafter met with staff representatives of the Board, as well as the President of the FRBNY, to explain that there was no lawful basis to reject TNB's application for a Master Account.  On information and belief, the FRBNY and its leadership agreed with TNB and were prepared to open a Master Account.

10.     Though TNB had satisfactorily completed the FRBNY's diligence review, the Board continued to thwart any action by the FRBNY to open TNB's Master Account, reportedly at the specific direction of the Board's Chairman.

11.     Having delayed the process for nearly one year—effectively preventing TNB from doing business—the FRBNY has repeatedly refused either to permit TNB to open a Master Account or to state that the FRBNY will ultimately do so.

12.     The FRBNY's conduct is in open defiance of the statutory framework, its own prior positions, and judicial authority.  *See Fourth Corner Credit Union v. Fed. Reserve Bank of Kan. City*, 861 F.3d 1052, 1071 (10th Cir. 2017) ("The plain text of § 248a(c)(2) indicates that nonmember depository institutions are entitled to purchase services from Federal Reserve Banks. To purchase these services, a master account is required.  Thus, nonmember depository institutions . . . *are entitled to master accounts*.") (Bacharach, J.) (emphasis added).

13.     Further, the FRBNY's actions, especially in the context of other recent conduct by the Board,[1] have the effect of discriminating against small, innovative companies like TNB and

---

[1]  *See, e.g.*, Liz Hoffman & Lalita Clozel, *Morgan Stanley, Goldman Got Help from Fed on Stress Tests*, Wall St. J. (July 2, 2018), https://www.wsj.com/articles/wall-street-gets-the-friendlier-fed-its-been-waiting-for-1530558419.

privileging established, too-big-to-fail institutions—the very dynamic that led Congress to pass the Act in the first place.

14.     TNB therefore brings this action for a prompt declaratory judgment that it is entitled to a Master Account.

## PARTIES

15.     Plaintiff TNB is a bank, authorized by the State of Connecticut, that is prepared to engage in the business of receiving deposits other than trust funds, with its principal place of business at 25 Marshall Street, Suite 2D, Norwalk, Connecticut 06584.

16.     Defendant the FRBNY is one of the twelve Federal Reserve Banks of the United States, with its principal place of business at 33 Liberty Street, New York, New York 10045.  It is a corporate instrumentality of the United States, created by Congress, with its own board of directors.

## JURISDICTION AND VENUE

17.     This Court has original subject matter jurisdiction under 12 U.S.C. § 632, which provides that "all suits of a civil nature at common law or in equity to which any Federal Reserve bank shall be a party shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits"; 28 U.S.C. § 1331 because this is a civil action "arising under the Constitution, laws or treaties of the United States"; and 28 U.S.C. § 2201(a) because there is an "actual controversy" requiring the Court to declare the "rights and other legal relations" of TNB, an "interested party."  Under Rule 57 of the Federal Rules of Civil Procedure ("FRCP"), the court may order a speedy hearing of this action.

18.     This Court has personal jurisdiction over the FRBNY under N.Y. C.P.L.R § 302 because the FRBNY (i) transacts business within New York, where its principal place of business is located; and (ii) owns, uses, or possesses real property situated in New York.

19.     Venue in this district is proper under 28 U.S.C. §§ 1391(b)(1) & (2) because the FRBNY has its principal place of business in this district, where a substantial part of the events or omissions giving rise to the claims at issue occurred.

## FACTUAL BACKGROUND

**A.      The FRBNY Must Provide a Master Account to Any Qualified Depository Institution**

20.     Before 1980, the Federal Reserve payments system was an unequal regime. Large commercial banks that were members of the Federal Reserve established Automated Clearinghouse ("ACH") networks—cartels, essentially—through which they exercised effective monopoly control over access to the developing national electronic payments system.[2]

21.     These member banks paid nothing for Federal Reserve Bank services but used the ACHs to charge non-members for access to the same services under opaque pricing regimes.

22.     Smaller, emergent financial institutions such as the thrift industry[3]—potential agents of innovation—were at a substantial competitive disadvantage.

23.     In 1977, the United States Department of Justice ("DOJ") brought a pair of antitrust lawsuits against the California and Rocky Mountain ACHs.  The DOJ alleged that the ACHs, by denying thrift institutions direct access to the Federal Reserve payments system, had unlawfully restrained trade to economically benefit ACH members.

---

[2] *See* A. Kuprianov, *The Monetary Control Act and the Role of the Federal Reserve in the Interbank Clearing Market*, Econ. Rev. (July/Aug. 1985), https://www.richmondfed.org/-/media/richmondfedorg/publications/research/economic_review/1985/pdf/er710403.pdf.

[3] A thrift institution obtains most of its funds from the individual savings of members of the public and may take several forms, including a savings and loan association, a mutual savings bank, or a credit union.

24.     The DOJ won both antitrust suits and established a right of access to the Federal Reserve payments system for thrift institutions.

25.     Following those victories, Congress went further and enacted the Act, creating a right of access to the Federal Reserve payments system for all depository institutions that meet certain basic qualifications.[4]

26.     The Act ensured that pricing for Federal Reserve services would be transparent. The Board was required to "publish . . . a set of pricing principles" and "to put into effect a schedule of fees for such services which is based on those principles."  12 U.S.C. § 248a(a).

27.     The fee schedule explicitly covers numerous Federal Reserve Bank services— services essential to any depository institution, and all of which require a Master Account—as well as "any new services which the Federal Reserve System offers".  *Id.* § 248a(b).

28.     Critically, the Act commands that "services covered by the fee schedule ***shall be available*** to nonmember depository institutions".  *Id.* § 248(c)(2) (emphasis added).

29.     That language is plain and mandatory:  the Federal Reserve Banks must, without exception, provide services to all "depository institutions"—defined to include any state bank "engaged in the business of receiving deposits other than trust funds", as TNB is prepared and authorized to do.  *See* 12 U.S.C. § 461(b)(1)(A)(i) (citing *id.* § 1815).

---

[4] *See, e.g.*, *Fourth Corner*, 861 F.3d at 1072–73 ("[T]he legislative history supports the widespread agreement that the 1980 Deregulation and Monetary Control Act entitles every nonmember depository institution to Federal Reserve services.") (collecting authorities) (Bacharach, J.).

30.     More than one federal circuit judge has interpreted the Act to mean just what it says: equal access to Federal Reserve Bank services for all qualified depository institutions.[5]

31.     The Board[6] and the FRBNY itself[7] have long taken the same view.

32.     "A master account is, put simply, a bank account for banks.  It gives depository institutions access to the Federal Reserve System's services, including its electronic payments system. . . . Without such access, a depository institution is nothing more than a vault." *Fourth Corner*, 861 F.3d at 1053 (Moritz, J.) (citation and internal formatting omitted).[8]

---

[5]  *See Fourth Corner*, 861 F.3d at 1068 (the Act "unambiguously entitled all nonmember depository institutions to a master account"); *Greater Buffalo Press, Inc. v. Fed. Reserve Bank of N.Y.*, 866 F.2d 38, 40 (2d Cir. 1989) (the Act required that "check clearing services were now to be made available to all banks"); *Jet Courier Servs., Inc. v. Fed. Reserve Bank of Atlanta*, 713 F.2d 1221, 1222–23 (6th Cir. 1983) (same).

[6]  *See, e.g.*, Bd. of Governors of the Fed. Reserve Sys., Policies: The Federal Reserve in the Payments System (1990) ("Federal Reserve payment services are available to all depository institutions"), *available at* http://www.federalreserve.gov/paymentsystems/pfs_frpaysys.htm; *see also* Bd. of Governors of the Fed. Reserve Sys., Policies: Standards Related to Priced-Service Activities of the Federal Reserve Banks (1984) ("The Monetary Control Act of 1980 [ ] has expanded the Federal Reserve's role by requiring the Federal Reserve to provide its services to all depository institutions on an equitable basis"), *available at* http://www.federalreserve.gov/paymentsystems/pfs_standards.htm.

[7]  *See, e.g.*, Fed. Reserve Bank of N.Y., Annual Report: 1980, at 35 (1981) ("The Monetary Control Act will have a significant effect on this and other Reserve Banks' services. To date, these services, such as check collection, wire transfers of funds and securities, coin and currency, and securities safekeeping, have been offered mainly to member banks and without charge.  Beginning in 1981, these services will be available equally to all depository institutions and at a fee."), *available at* https://fraser.stlouisfed.org/files/docs/historical/frbny/1980_frb_newyork.pdf.

[8]  In *Fourth Corner*, the Federal Reserve Bank of Kansas City ("FRBKC") had refused to open a Master Account for a Colorado credit union that planned to provide banking services to marijuana-related businesses whose operations violated federal law, "effectively crippling the Credit Union's business operations."  861 F.3d at 1053 (per curiam).  FRBKC and the credit union have since reached a compromise allowing the credit union to open a Master Account. Lalita Clozel, *Fed Backs Marijuana-Focused Credit Union*, Wall St. J. (Feb. 5, 2018), https://www.wsj.com/articles/fed-backs-marijuana-focused-credit-union-1517870188.

33. Master Accounts, therefore, are undoubtedly a Federal Reserve Bank service

subject to the Act's mandate of equal access:  "all services offered by the Federal Reserve

System are conditioned on the issuance of master accounts."  *Id.* at 1068–69 (Bacharach, J.)

(citing Fed. Reserve Banks, Operating Circular No. 7, Book-Entry Securities Account

Maintenance and Transfer Services ¶¶ 3.19, 3.21, & 5.2 (eff. June 30, 2016)).

34. Without equal access to Master Accounts, there simply cannot be equal access to

Federal Reserve Bank services.

35. Important policy concerns underlie the Act's mandate of equal access.

36. Equal access promotes competition by leveling the field for all depository

institutions—small and large, new and established.

37. Equal access also promotes federalism by ensuring equality of opportunity among

national- and state-chartered banks—many of them small community banks that "allow credit to

flow to individuals and businesses, even in remote areas of our country."[9]

## B.    Formation of TNB

38. TNB was founded in 2016 by its President Eugene Park, a 30-year finance veteran

whose foresight and efforts to forestall disaster at AIG Financial Products before the Great

Recession of 2008 were described in Michael Lewis's best-seller *The Big Short*.[10]

---

[9] Esther L. George, President & CEO, Fed. Reserve Bank of Kan. City, Perspectives on 150 Years of Dual Banking, Address at the Conference of State Bank Supervisors, State-Federal Supervisory Forum, Savannah, Ga. (May 22, 2012), *available at* https://www.kansascityfed.org/publicat/speeches/2012-george-ga-csbs-05-22.pdf.

[10] *See, e.g.*, Michael Lewis, The Big Short: Inside the Doomsday Machine 86 (W.W. Norton & Co. 1st ed. 2010) ("The first person inside AIG [ ] to awaken to the madness of his firm's behavior, and sound an alarm, was . . . Gene Park."); *id.* at 88 ("By the time Joe Cassano invited Gene Park to . . . the meeting in which he would be 'promoted' to the job of creating even more of these ticking time bombs [i.e., credit default swaps on U.S. subprime mortgage loans], Park knew he wanted no part of it.  If he was forced to take the job, he said, he'd quit.").

39.     TNB's Chairman and Chief Executive Officer is James McAndrews, a former 28-year employee of the Federal Reserve System, most recently as executive vice president and head of the Research and Statistics Group at the FRBNY from 2010 through early 2016.

40.     TNB's Chief Technology Officer and Head of Operations is James Calcagno, a technologist and operations specialist trained at the Massachusetts Institute of Technology.

41.     TNB's Chief Financial Officer is Dean Melchior, a 30-year finance veteran with a degree from the Wharton School of Business who has worked at several prestigious financial services firms.

42.     TNB's board of directors is required to be at least 50 percent independent, and includes Darrell Duffie, the Dean Witter Distinguished Professor of Finance at the Stanford University Graduate School of Business, and Gary Gorton, the Frederick Frank Class of 1954 Professor of Management and Finance at the Yale School of Management.

43.     Under its bylaws, TNB is restricted to a single business activity: providing ultra-safe depository services for institutional money market investors.

44.     TNB's business plan is to hold 100 percent of its assets derived from customer deposits as Federal Reserve Bank balances, earning interest at the "interest on excess reserves" ("IOER") rate.  TNB will pay interest to its depositors at a slightly lower rate, thereby earning a modest profit.

45.     TNB will make no other investments with depositors' money and will offer no other services; its sole function is to pay interest on deposits in a simple, transparent, and virtually risk-free manner, and to safely return deposited funds on demand.

46.     At a time when the Federal Reserve System has encouraged financial institutions to reduce the complexity of their operations and ensure that their risk is well controlled, TNB will do precisely those things.

47.     TNB does not need, and has not sought, insurance from the Federal Deposit Insurance Corporation ("FDIC") because TNB's customer base will be limited to large institutional money market investors, for whom the $250,000 insurance limit would be immaterial.  Foregoing FDIC insurance has the added benefit of further reducing TNB's costs, so that it can pass along the savings to its customers.

**C.      TNB Applies for a State Charter**

48.     To operate legally as a bank and obtain a Master Account, TNB was required to obtain a state or federal charter.  In July 2016, TNB began discussions with the CTDOB concerning its application for a state charter.

49.     Over the course of the next year, the CTDOB conducted a rigorous diligence process, assessing all aspects of TNB's planned operations and business model.  One reason for that thoroughness was that, as explained above, TNB planned to forego FDIC insurance and therefore would not be regulated by the FDIC.  Instead, the CTDOB would be TNB's chartering authority and regulator, as provided under relevant state and federal law.

50.     In August 2017, the CTDOB issued TNB a temporary CoA, which set forth several conditions TNB was required to meet before the CTDOB would issue a final CoA.

51.     Most of the CTDOB's conditions were within TNB's sole power to address.

52.     One, however, was not:  the CTDOB asked for evidence that the FRBNY would open a Master Account for TNB.

### D.      TNB Applies for a Master Account

53.      The "application" for a Master Account is a single-page form agreement, requiring only basic information about the applicant, including contact information for company representatives, and an officer's signature.

54.      The application process is typically routine; the application form itself states that processing "may take 5-7 business days."

55.      By August 2017, TNB had all the information it needed to apply for a Master Account with the FRBNY except an American Bankers Association ("ABA") routing number issued by Accuity, the ABA's official Registrar of Routing Numbers.

56.      Accuity's application for a routing number is almost as short as the application for a Master Account.  The only eligibility requirements are that the applicant be chartered and "eligible to maintain an account at a Federal Reserve Bank".

57.      The Accuity application states that it takes approximately two weeks to process, and "will be forwarded to the Federal Reserve in [the applicant's] district for verification".

58.      TNB submitted a routing number application to Accuity in August 2017, providing a copy of its temporary CoA and stating that it was eligible to maintain a Federal Reserve Bank account.

59.      As TNB expected, Accuity forwarded TNB's routing number request to the FRBNY for verification that TNB would be eligible to maintain a Master Account.

60.      After weeks passed with no verification from the FRBNY that TNB was eligible for an account, TNB discussed its routing number request with an attorney for the FRBNY.  The attorney explained that the delay in verification was due to the CTDOB's issuance of a "temporary" CoA; the FRBNY would not open TNB's Master Account without proof of a final

CoA.  The attorney also informed TNB that the FRBNY requires an institution to have at least $500,000 in deposits to obtain a Master Account, and TNB did not yet have any deposits.

61.     TNB explained to the FRBNY attorney that it faced a "chicken-or-egg" problem, in that the CTDOB required evidence that the FRBNY would establish a Master Account for TNB before it would issue a final CoA, and TNB's application for a routing number—which was necessary in order to obtain a Master Account—was being held up because TNB did not have a final CoA.

62.     The FRBNY attorney agreed to inform Accuity that TNB would be eligible for a Master Account with the FRBNY on issuance of a final CoA from the CTDOB and maintenance of $500,000 in deposits.  Accuity issued a routing number to TNB in October 2017.

63.     The FRBNY attorney informed TNB that the FRBNY would have to conduct due diligence before it would open a Master Account because TNB would not be insured and regulated by the FDIC.  The attorney advised TNB to hold off on submitting the Master Account application form until after the FRBNY completed its diligence.

64.     As explained below, the FRBNY's diligence review ultimately concluded in TNB's favor.  The FRBNY identified no operational risks precluding TNB from opening a Master Account.

65.     The FRBNY's diligence process began in September 2017, when TNB received a series of document and information requests from the FRBNY.  TNB provided prompt and comprehensive responses.

66.     The FRBNY continued to make new requests through early November 2017, focusing on creditworthiness and anti-money laundering issues.  Again, TNB provided complete and timely responses.

67.     TNB was confident that the FRBNY would find no basis to deny a Master Account application, given the rigorous year-long process it had already been through with the CTDOB and the fact that TNB's business plan was straightforward and virtually riskless.  TNB's confidence was well placed, and the FRBNY did not identify any operational basis to deny a Master Account to TNB.

68.     The FRBNY completed its diligence in early November 2017.  An attorney for FRBNY informed TNB that the FRBNY was prepared to communicate to the CTDOB that TNB would be permitted to open a Master Account following the issuance of a final CoA from the CTDOB and the maintenance of $500,000 in non-trust deposits (which TNB has lined up).  That communication should have been sufficient for the CTDOB to issue TNB's final CoA, and for TNB to receive its Master Account.

69.     But the FRBNY also informed TNB that the Board had become aware of TNB's intention to apply for a Master Account and wanted time to consider the potential effects of TNB's business model.

70.     TNB waited weeks for word of the Board's deliberations.  In early December 2017, the FRBNY informed TNB that it expected the Board would sign off on TNB's Master Account the following week.  But later that same day the FRBNY told TNB that it had been contacted by the Board and that TNB *should not* expect approval any time soon.

71.     The FRBNY did not provide a specific reason for the Board's delay, but TNB's principals understood that it related to the impending replacement of the Board's Chairperson. The Board's staff was unwilling to decide on TNB's Master Account until the new Chairperson was seated.

72.     On February 1, 2018—little more than a week after the Board's new Chairperson was confirmed by the Senate—the President and CEO of the FRBNY and its General Counsel informed TNB in a telephone call that the Board had raised "policy concerns" regarding TNB's application.  They indicated they were pessimistic that the Board would allow the FRBNY to issue a Master Account to TNB.

73.     Although there was no legal basis for the FRBNY to deny TNB's Master Account application because of the Board's "policy" concerns, TNB immediately worked to schedule a meeting with the Board's staff to discuss, and hopefully resolve, those concerns.

74.     On February 14, 2018, TNB's principals and legal advisors met in Washington, D.C. with several members of the FRBNY and the Board's staff, including its General Counsel. TNB and its representatives responded fully to the questions posed—but the staff said only that it would continue its analysis.

75.     On March 27, 2018, unable to reach the Board's decision-making authorities, TNB convened another meeting with the FRBNY, providing a point-by-point response to all policy concerns expressed by the Board staff during the February 14, 2018 meeting.  The FRBNY's representatives were sympathetic to TNB's arguments and said they would convey them to the Board's Chairperson and staff.

76.     As weeks went by with still no decision, TNB suspected the Board and the FRBNY understood that they had no legal basis to refuse a Master Account application by TNB and intended to get around TNB's statutory entitlement by delaying the process until TNB finally gave up.  TNB had no intention of doing so.

77.     On April 26, 2018, TNB submitted to the Board and the FRBNY a comprehensive written response to each and every policy concern previously raised by the Board.

78.     On April 27, 2018, having fully undergone the due diligence review overseen by the FRBNY, TNB formally filed the application to request a Master Account.

79.     To date, the FRBNY has refused to act on TNB's application, or to inform the CTDOB that it is prepared to open a Master Account for TNB.

80.     TNB's temporary CoA expires by its terms in early 2019.

**E.      TNB's Business Complements the Board's Policies**

81.     Though the FRBNY has no legal basis to withhold TNB's Master Account because of the Board's "policy concerns"—the only basis for rejection that the FRBNY has given after months of review and delay—those concerns in any event are baseless.

82.     TNB's business—if it has ***any*** effect on the broader economy, which is highly doubtful—will only augment the effectiveness of the Board's monetary policy by reinforcing the policy tools that the Federal Reserve System uses to influence interest rates.

83.     "The effective federal funds rate is the interest rate at which depository institutions—banks, savings institutions (thrifts), and credit unions—and government-sponsored enterprises borrow from and lend to each other overnight to meet short-term business needs."[11]

84.     The Board does not control the federal funds rate directly; instead, the Federal Open Market Committee ("FOMC") sets a target range, which "has varied widely over the years in response to prevailing economic conditions."[12]

---

[11]  Bd. of Governors of the Fed. Reserve Sys., The Federal Reserve System: Purposes and Functions 23 (10th ed. 2016), *available at* https://www.federalreserve.gov/aboutthefed/files/pf_complete.pdf.

[12]  *Id.*

85.     The target federal funds rate serves as a benchmark for "everything from credit card and auto loan rates to certificate of deposit yields"; its influence on the broader U.S. and global economy is profound.  It is "arguably the most important interest rate in the world."[13]

86.     Typically, the effective federal funds rate—the value-weighted median of what borrowers in the market pay—lies in the target range, which is the FOMC's intention.[14]

87.     The Federal Reserve System has a variety of policy tools to influence the effective federal funds rate, including the IOER program.

88.     Since 2008, Congress has permitted Federal Reserve Banks to pay IOER: interest on excess reserves deposited with the Federal Reserve Banks, at a rate set by the Board.

89.     The Board has the authority, under appropriate circumstances, to adjust the IOER rate.  "By raising or lowering . . . the IOER rate[ ], the Federal Reserve can change the attractiveness of holding excess balances and thus affect the federal funds rate and other short-term market interest rates."[15]

90.     The IOER rate incentivizes banks to lend at no less than the IOER rate.  There is no reason for a bank to withdraw excess reserves from the Federal Reserve Banks only to earn lower interest rates.

91.     In addition, the IOER rate provides an incentive for banks to borrow funds at rates that lie below the IOER rate, as they can earn the difference between the IOER rate and their

---

[13]  Alex Harris, *The Fed's Fight for Control of Its Key Interest Rate: Quick Take*, Bloomberg (June 10, 2018), https://www.bloomberg.com/news/articles/2018-06-10/the-fed-s-fight-for-control-of-its-key-interest-rate-quicktake

[14]  *Id.*

[15]  Bd. of Governors of the Fed. Reserve Sys., The Federal Reserve System: Purposes and Functions 40 (10th ed. 2016), *available at* https://www.federalreserve.gov/aboutthefed/files/pf_complete.pdf.

borrowing rate on the amounts borrowed.  Some Federal Reserve Bank account holders, such as the Federal Home Loan Banks, are not permitted under applicable laws and regulations to earn interest on reserves.  As a result, they tend to be willing to lend reserves for a positive interest rate that may lie below the IOER rate.

92.     Because of these factors, the federal funds rate has settled strictly below the IOER rate in recent years, a period in which the supply of reserve balances has been ample.

93.     But the IOER program has not produced all its intended effects.

94.     In publicly advocating the adoption of the legislation that permits the payment of IOER, members of the Board expressed the belief that banks—particularly smaller banks acting in a competitive fashion—would pass on IOER earnings to their depositors.[16]  IOER would consequently provide an opportunity for those smaller banks to compete with the larger incumbent banks.

95.     Yet a significant and persistent gap has existed, and continues to widen, between the IOER rate and the interest rates paid by banks—particularly large banks—to their depositors.

96.     This trend affects not only commercial depositors, but also individual Americans, as underscored by testimony before Congress earlier this year:

> The issue came up as House Financial Services Committee Chairman Jeb Hensarling sparred with Fed Chairman Jerome

---

[16]  *See, e.g.*, Comments on H.R. 1585 and Regulatory Streamlining: Hearing Before the Subcomm. on Financial Institutions and Consumer Credit of the H. Committee on Banking and Financial Services (1999) (statement of Laurence H. Meyer, Governor, Bd. of Governors of the Fed. Reserve Sys.) ("In the long run, the benefits of the proposed legislation will likely be distributed rather widely among bank customers.  The biggest winners should be small businesses that currently earn no interest on their checking accounts.  They will gain from the interest earned and from being able to relax procedures used to hold to a minimum the size of their checking account deposits.  Larger firms will benefit as well, in part by saving on some sweep fees."), *available at* https://www.federalreserve.gov/boarddocs/testimony/1999/19990512.htm

> Powell . . . .  Hensarling was complaining about the interest the Fed pays banks.  "You pay 150 basis points [as the IOER rate], constituents are getting 10," the Texas Republican said.
>
> "Retail deposits as you know are sticky on the way up—they generally come up with a lag," Powell replied.
>
> That's reflected in the data.  In January, the average rate on a 12-month certificate of deposit with a $10,000 minimum was just 0.29%—only 10 basis points higher than the lowest level during the current economic expansion.  Other deposit rates are similarly scant.[17]

97.     Further evidence of the lack of pass-through to depositors of the IOER rate is seen in the reports of the FDIC's weekly national rates.  For example, the FDIC recently reported that jumbo deposits—$100,000 or more—on average earned eight basis points (0.08 percent) from savings accounts, and five basis points (0.05 percent) from checking accounts, while the Federal Reserve Banks pay 195 basis points (1.95 percent) as the IOER rate.[18]

98.     TNB is committed to a business plan that would, at the margin, push against these disheartening outcomes for savers and depositors by more efficiently and effectively transmitting rising Federal Reserve interest rates to TNB depositors, such as money market funds.  This would in fact support the Board's stated policy intentions for the IOER program.

99.     TNB's business objective is to attract customers who wish to receive a more competitive rate on safe deposits.  If successful, TNB will place competitive pressure—primarily

---

[17] Steve Goldstein, *Savers Haven't Benefited During This Fed Rate-hike Cycle, Powell Admits*, MarketWatch (Feb. 28, 2018), https://www.marketwatch.com/story/savers-havent-benefited-as-the-fed-has-jacked-up-rates-powell-admits-2018-02-27.

[18] Fed. Deposit Ins. Corp., Weekly National Rates and Rate Caps - Weekly Update (Aug. 27, 2018), https://www.fdic.gov/regulations/resources/rates/; *see also* Stephen Gandel, *Guess Who's Getting Richer from Higher Rates? (Probably Not You)*, Bloomberg (Aug. 2, 2018), https://www.bloomberg.com/view/articles/2018-08-02/big-banks-not-savers-get-payday-from-higher-rates.

on large banks—to raise depository interest rates for all depositors, including small businesses and consumers.

100.    TNB will do so by passing on to its customers most of its IOER earnings, improving both the efficiency and fairness of the administration of the payment of IOER. Because TNB's clients will include widely-held money market mutual funds, those benefits could accrue not only to commercial depositors, but also to individual Americans.

101.    Consequently, TNB's business model will, if anything, only enhance the efficacy of IOER as a policy tool, reinforcing its effect on the broader market, and thereby supporting the Federal Reserve System's efforts to keep the effective federal funds rate within the target range.

102.    Ironically, the Board, the FOMC, and the FRBNY have made a very similar effort through at least two programs: the Overnight Reverse Repurchase Agreement Facility ("ON RRP")[19] and the Foreign Repo Pool ("FRP").[20]

103.    *First*, the ON RRP facility was established by the FOMC as a supplementary policy tool to help control the effective federal funds rate by passing on interest to a wider group of participants, including money market funds, broker-dealers, and Federal Home Loan Banks— that is, not only to banks eligible to receive IOER.  As the Board has explained,

> [i]n an ON RRP operation, an eligible financial counterparty provides funds to the Federal Reserve in exchange for Treasury

---

[19]  Bd. of Governors of the Fed. Reserve Sys., Policy Tools: Overnight Reverse Repurchase Agreement Facility (Jan. 3, 2018), https://www.federalreserve.gov/monetarypolicy/ overnight-reverse-repurchase-agreements.htm.

[20]  Fed. Reserve Bank of N.Y., About the New York Fed: Services for Central Banks and International Institutions (Apr. 2018), https://www.newyorkfed.org/aboutthefed/fedpoint/fed20; *see also* Katy Burne, *Use of Fed's Foreign Repo Program Grows*, Wall St. J. (Feb. 21, 2016), https://www.wsj.com/articles/use-of-feds-foreign-repo-program-grows-1456081097 (explaining that foreign government-related institutions' use of a Federal Reserve overnight-lending program has surged, while the use of a domestic one has declined along with U.S. market interest rates).

securities on the Federal Reserve's balance sheet and is paid the ON RRP rate; the following day, the funds are returned to the counterparty and the securities are returned to the Federal Reserve. In general, any counterparty that is eligible to participate in ON RRP operations should be unwilling to invest funds overnight with another counterparty at a rate below the ON RRP rate.[21]

104.    Participants in the ON RRP include money market funds and Federal Home Loan Banks that are ineligible to receive IOER and otherwise receive relatively low rates of deposit interest from other banks.

105.    Through the ON RRP facility, the FRBNY sells a government security to a money market fund or other eligible participant and simultaneously agrees to buy the security back the next day at a specified interest rate, which is currently set at twenty basis points below the IOER rate.

106.    It is important to note that the FRBNY and other Federal Reserve Banks are credit risk free; therefore, the credit risk of lending to the FRBNY through the ON RRP facility is not reduced by the proffering of the security in the facility.  The credit risk assumed by a lending participant would be the same if the participant simply deposited funds with the FRBNY. Instead, the use of the securities allows the FRBNY to offer the overnight ON RRP facility to non-depositories by qualifying such transactions as an "open market operation," one of the limited types of securities transactions in which the Federal Reserve Banks are permitted to participate.[22]

---

[21]  Bd. of Governors of the Fed. Reserve Sys., The Federal Reserve System: Purposes and Functions 51 (10th ed. 2016), *available at* https://www.federalreserve.gov/aboutthefed/files/pf_complete.pdf.

[22]  Bd. of Governors of the Fed. Reserve Sys., Credit and Liquidity Programs and the Balance Sheet (Apr. 4, 2018), https://www.federalreserve.gov/monetarypolicy/bst_openmarketops.htm.

107.    The ON RRP offering rate—the maximum the FRBNY is willing to pay to money market funds and other participants—sets a floor for the federal funds rate.  If a higher interest rate is available through the ON RRP facility than what is offered by a bank, money market funds and other participants will place more funds in the ON RRP facility, thereby buoying the federal funds rate by reducing the supply of funds lent into the private federal funds market.[23]

108.    The ON RRP facility is essentially a "public option" that is intended, with the IOER rate, to bolster the Federal Reserve System's degree of control over the federal funds rate.

109.    TNB's business model will serve an almost equivalent economic function, albeit on a vastly smaller scale.  TNB will provide a very safe overnight investment to its depositors like the one provided by the Federal Reserve via its ON RRP facility.

110.    Yet TNB, even though it is a depository institution, is being denied the ability to deposit with the FRBNY, unlike the participants in the ON RRP facility, who can invest securely on an overnight basis with the FRBNY even though they are ineligible for a Master Account.

111.    *Second*, TNB's business is also consistent with the FRP—a facility the FRBNY currently operates for foreign central banks.

112.    Through the FRP, the FRBNY accepts cash balances from foreign central banks and pays an interest rate through overnight securities that is usually very close to the market rate for U.S. Treasury repo transactions.  Recently, that rate has also been close to the IOER rate.

113.    There is no reported cap to the amount of funds the FRBNY is willing to accept under the FRP, and in June 2018 it held $240 billion in FRP-related funds—orders of magnitude above the likely amount of deposits that TNB will hold.

---

[23]  Bd. of Governors of the Fed. Reserve Sys., The Federal Reserve System: Purposes and Functions 51 (10th ed. 2016), *available at* https://www.federalreserve.gov/aboutthefed/files/pf_complete.pdf.

114.     TNB would serve an almost equivalent economic function by providing a very safe overnight investment—albeit, again, on a far smaller scale.  TNB would accept deposits from the same foreign central banks eligible for the FRP, in competition with the FRBNY.

115.     Thus, allowing TNB to operate will provide a socially valuable competitive force both to large too-big-to-fail banks and to the public sector.  TNB will provide to eligible depositors a form of liquid, safe deposit at a highly competitive rate tied to the IOER rate.

116.     In fact, by denying TNB a master account, the FRBNY is effectively limiting competition for its ON RRP and FRP facilities.

117.     Additionally, by denying TNB a master account, the FRBNY is providing an advantage to certain foreign banks through its FRP program that it will not provide to TNB, a domestic state-chartered bank.

118.     Because of the statutory requirement that the FRBNY provide services on a non-discriminatory basis, the FRBNY does not possess the power to limit competition in this fashion.

119.     In all events, the FRBNY (and the Board) have many lawful tools to monitor and influence the business plan pursued by TNB, and TNB has consistently expressed its willingness to work cooperatively with them.

## COUNT ONE
### Declaratory Judgment Under 12 U.S.C.§ 248a(c)(2)

120.     Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

121.     An actual controversy exists within this Court's jurisdiction concerning the interpretation and application of 12 U.S.C. § 248a(c)(2) and related statutes, regulations, and policy pronouncements, such that the Court should declare the rights of TNB.

122.     The FRBNY is legally required to provide its services, including and especially the maintenance of a Master Account, to all "depository institutions"—defined to include any bank, like TNB, "engaged in the business of receiving deposits other than trust funds"—on an equal and non-discriminatory basis.  12 U.S.C. § 461(b)(1)(A)(i) (citing *id.* § 1815).

123.     The FRBNY has refused to provide a Master Account to TNB notwithstanding the statutory command that it do so.  Moreover, the FRBNY's reasons for this refusal defy logic and are contrary to the very policy goals that it seeks to promote.

124.     Accordingly, Plaintiff seeks a declaration from this Court that TNB is entitled to open a Master Account with the FRBNY.

## REQUEST FOR RELIEF

WHEREFORE, TNB requests judgment against the FRBNY as follows:

a)   a declaratory judgment that TNB is entitled to a Master Account with the FRBNY;

b)   an order directing the FRBNY to open a Master Account on behalf of TNB;

c)   an order providing for a speedy hearing under Rule 57 of the FRCP;

d)   costs, fees, and other expenses under the Equal Access to Justice Act, 28 U.S.C.

§ 2412; and

e)   any other and further relief the Court deems just and proper.


Dated: New York, New York
          August 31, 2018

Respectfully submitted,

DEWEY PEGNO & KRAMARSKY LLP

Thomas E.L. Dewey
David S. Pegno
Anders W. Pauley
777 Third Avenue – 37th Floor
New York, New York 10017
Tel.: (212) 943-9000
Fax:  (212) 943-4325
E-mail:  tdwey@dpklaw.com
          dpegno@dpklaw.com
          apauley@dpklaw.com

*Attorneys for Plaintiff TNB USA Inc.*