UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
                                 :

TNB USA INC.,                           :

                 :

          Plaintiff,        :

                 :

     - against -         :      Civ. No. 18 Civ. 7978 (ALC)

                 :

FEDERAL RESERVE BANK OF NEW YORK,  :

                 :

         Defendant.      :

                 :
--------------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT FEDERAL RESERVE BANK OF NEW YORK'S MOTION TO DISMISS

Michele Kalstein
Michael M. Brennan
Federal Reserve Bank of New York
33 Liberty Street
New York, New York 10045
*Counsel for Defendant*
*Federal Reserve Bank of New York*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................iii

PRELIMINARY STATEMENT .....................................................................1

BACKGROUND .........................................................................................3

    A.    The Federal Reserve and Its Policy Mandates ...............................3

    B.    TNB's Pending Application for a Master Account......................6

    C.    TNB Seeks an Injunction Compelling the New York Fed to Open a
    Master Account for It Despite the Fact that Its Application
    Remains Under Review ..............................................................9

ARGUMENT .............................................................................................10

I.    THE COURT SHOULD DISMISS THE COMPLAINT FOR
    LACK OF STANDING BECAUSE TNB HAS NOT SUFFERED
    AN INJURY IN FACT ........................................................................10

II.    THE COURT SHOULD DISMISS THE COMPLAINT BECAUSE
    TNB'S CLAIM IS NEITHER CONSTITUTIONALLY NOR
    PRUDENTIALLY RIPE .....................................................................11

III.    THE COURT SHOULD EXERCISE ITS DISCRETION UNDER
    THE DECLARATORY JUDGMENT ACT AND DECLINE JURISDICTION
    OVER TNB'S ACTION BECAUSE IT IS CONTRARY TO
    THE PUBLIC INTEREST .................................................................13

IV.    THE COMPLAINT SHOULD BE DISMISSED FOR FAILING
    TO STATE A CLAIM TO RELIEF BECAUSE THE FEDERAL RESERVE
    ACT DOES NOT ENTITLE TNB TO A MASTER ACCOUNT...........................14

    A.    The Opening of Master Accounts Is Discretionary Under the FRA...............15

        1.    Section 13 of the FRA Permits Federal Reserve Banks to
        Reject Deposits—and Thus Deposit Account
        Requests—from Depository Institutions ..............................15

        2.    TNB Is Wrong that FRA Section 11A Overrides
        the Discretion Mandated by FRA Section 13......................18

B.     TNB'S Reading of Section 11A Would Create an Impermissible Conflict Here within the FRA's Statutory Scheme.........................................23

CONCLUSION..........................................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                                            **Page(s)**

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967) ........................................................ 12

*Ahmed v. Cissna*, 327 F. Supp. 3d 650 (S.D.N.Y. 2018) ........................................... 12

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................................... 14

*Chevron Corp. v. Naranjo*, 667 F. 3d 232 (2d Cir. 2012) ......................................... 15

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ................................................ 10

*Comm. for Monetary Reform v. Bd. of Governors of Fed. Reserve Sys.*,
    766 F.2d 538 (D.C. Cir. 1985) ........................................................................ 3-4

*Corbin v. Fed. Reserve Bank of N.Y.*, 475 F. Supp. 1060 (S.D.N.Y. 1969),
    *aff'd* 629 F.2d 233 (2d Cir. 1980) ..................................................................... 24

*Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357 (2d Cir. 2003) .............................. 13

*Eccles v. Peoples Bank of Lakewood Vill., Cal.*, 333 U.S. 426 (1948) ..................... 13

*Fasano v. Fed. Reserve Bank of N.Y.*, 457 F.3d 274 (3d Cir. 2006) ......................... 3

*Farmers' & Merchants' Bank of Monroe, N.C. v. Fed. Reserve
    Bank of Richmond, VA*, 262 U.S. 649 (1923) ................................................. *passim*

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ......................... 23

*Fed. Reserve Bank of Bos. v. Comm'r of Corps. & Taxation of the
    Commonwealth of Mass.*, 499 F.2d 60 (1st Cir.1974) ..................................... 25

*First Agric. Nat'l Bank v. State Tax Comm'n*, 392 U.S. 339 (1968) ......................... 3

*Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33 (2008) ................ 19

*Forest Grove School Dist. v. T.A.*, 557 U.S. 230 (2009) ........................................... 17

*Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City*,
    861 F.3d 1052 (10th Cir. 2017) ....................................................................... *passim*

*Greater Buffalo Press, Inc. v. Fed. Reserve Bank of N.Y.*,
    866 F.2d 38 (2d Cir. 1989) .......................................................................... 20, 22

*Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564 (1982) ...................................................21, 25

*Jet Courier Servs., Inc. v. Fed. Reserve Bank of Atlanta,*
713 F.2d 1221 (6th Cir. 1983) .......................................................................................22

*Lichtenstein v. Cader*, 13 Civ. 2690(LAK)(JLC),
2013 WL 4774717 (S.D.N.Y. Sept. 6, 2013)....................................................................4

*Marchi v. Bd. of Coop. Educ. Svcs.*, 173 F.3d 469 (2d Cir. 1999) .......................................13

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007)..................................................10

*Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682 (2d Cir. 2013) ..................................11

*N.Y. Civil Liberties Union v. Grandeau*, 528 F.3d 122 (2d Cir. 2008)................................12

*Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.,*
712 F.3d 705 (2d Cir. 2013)...........................................................................................14

*Puello v. Bureau of Citizenship & Immigration Svcs.*, 511 F.3d 324 (2d Cir. 2007) ...........20

*Simmonds v. INS*, 326 F.3d 351 (2d Cir. 2003) .............................................................12, 13

*Stafford v. Briggs*, 444 U.S. 527 (1980) .............................................................................25

*Starr Int'l Co. v. Fed. Reserve Bank of N.Y.*, 906 F. Supp. 2d 202 (S.D.N.Y. 2012),
*aff'd* 742 F.3d 37 (2d Cir. 2014) ...............................................................................3, 24

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998)................................................10

*Texas Dep't of Hous. and Cmty. Affairs v. Inclusive Communities Project,*
135 S. Ct. 2507 (2015)...................................................................................................17

*Vullo v. Office of the Comptroller of the Currency*, 17 Civ. 5374 (NRB),
2017 WL 6512245 (S.D.N.Y. Dec. 12, 2017) ..................................................*passim*

*United States v. Katz*, 271 U.S. 354 (1926) ........................................................................25

*United States v. Rowland*, 826 F. 3d 100 (2d Cir. 2016) ...............................................15, 16

*U.S. Ecology, Inc. v. U.S. Dep't of Interior*, 231 F.3d 20 (D.C. Cir. 2000)..........................10

*Weinstein v. Albright*, 261 F.3d 127 (2d Cir. 2001)............................................................16

*Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995) .................................................................14

**Statutes**

12 U.S.C. § 221 *et seq*....................................................................................2, 15

12 U.S.C. § 225a ...............................................................................................4

12 U.S.C. §§ 241-252 .......................................................................................18

12 U.S.C. § 248a .......................................................................................*passim*

12 U.S.C. § 248(k) .............................................................................................4

12 U.S.C. § 263 ..................................................................................................5

12 U.S.C. § 325 ..................................................................................................4

12 U.S.C. § 338 ..................................................................................................4

12 U.S.C. §341 (Seventh) .................................................................................23

12 U.S.C. §§ 341-364 ...................................................................................15, 18

12 U.S.C. § 342 .........................................................................................*passim*

12 U.S.C. §§ 343-352 .........................................................................................4

12 U.S.C. § 461 ..................................................................................................5

12 U.S.C. § 461(b)(1)(A) ...................................................................................7

12 U.S.C. § 461(b)(7) .........................................................................................4

12 U.S.C. 461(b)(12) ..........................................................................................6

12 U.S.C. § 625 ..................................................................................................4

12 U.S.C. § 1844(c) ...........................................................................................4

12 U.S.C. § 3105 ................................................................................................4

12 U.S.C. § 5325 ................................................................................................4

12 U.S.C. § 5365 ................................................................................................4

28 U.S.C. § 248a(a)...........................................................................................18

28 U.S.C. § 248a(d) ...................................................................................18

28 U.S.C. § 2201 ........................................................................................2

28 U.S.C. § 2201(a) ..................................................................................13

Emergency Economic Stabilization Act of 2008, Pub. L. 110–343,
    122 Stat. 3765 (2008)...........................................................................6

Financial Services Regulatory Relief Act of 2006, Pub. L. 109-351,
    120 Stat. 1966 (2006)...........................................................................6

H.R. Rep. No. 63-69 (1913).......................................................................16

Monetary Control Act of 1980, Pub. L. 96-221, 94 Stat. 132 (1980)....................................16

**Regulations**

12 C.F.R. pt. 201 .......................................................................................4

12 C.F.R. pt. 204 .......................................................................................5

12 C.F.R. § 265.2 .......................................................................................4

**Other Authorities**

*Interest on Reserves and the Fed's Balance Sheet*; Hearing Before the
    H. Committee on Financial Services, Subcommittee on Monetary Policy and
    Trade Committee, 2016 WL 2895161 (May 17, 2016) ...................................6

Federal Reserve Operating Circular No. 1 (Accounting Relationships)
    (eff. Feb. 1, 2013), *available at* https://frbservices.org/assets/resources/rules
    -regulations/020113-operating-circular-1.pdf................................................5, 23

G. Selgin, *The Skinny on the Narrow Bank*, Alt-M (Sept. 10, 2018),
    https://www.alt-m.org/2018/09/10/the-skinny-on-the-narrow-bank/ .............................8

S. Cecchetti & K. Schoenholtz, *Pitfalls of a Reserves-only Narrow Bank*,
    Money & Banking (Sept. 24, 2018), https://www.moneyandbanking.com/
    commentary/2018/9/24/pitfalls-of-a-reserves-only-narrow-bank...................................8

Regulation D: Reserve Requirements of Depository Institutions, *available at*
    https://www.federalreserve.gov/newsevents/pressreleases/files/bcreg
    20190306a1.pdf ....................................................................................................*passim*

*The Federal Reserve System: Purposes and Functions* (10th ed. 2016),
    *available at* https://www.federalreserve.gov/aboutthefed/files/pf_
    complete.pdf...........................................................................................................*passim*

## PRELIMINARY STATEMENT

Plaintiff TNB USA Inc. ("TNB") asks the Court for a declaratory judgment and an injunction compelling Defendant Federal Reserve Bank of New York (the "New York Fed"), an operating arm of the nation's central bank, to accept deposits from TNB so that it can arbitrage a critical interest rate the Federal Reserve uses to fulfill its statutory mandate to set and execute United States monetary policy.  Congress authorized Federal Reserve Banks to start paying this interest—known as interest on excess reserves ("IOER")—in 2008 to help stabilize the nation's economy in the wake of the financial crisis.  TNB seeks to open a deposit account at the New York Fed not so that it can engage in the typical business of banking, but solely so that TNB can park the funds of its wealthy, institutional depositors in the account and pass TNB's IOER earnings on to them, after taking a cut for itself.

The Federal Reserve has serious concerns that TNB's novel business model could interfere with its ability to carry out its policy mandates to maintain financial stability and promote a healthy economy.  Specifically, the business model would give investors access to the IOER rate currently available only to certain banks, which could limit the rate's effectiveness as a policy tool and have other negative consequences, including amplifying financial crises and increasing the costs of consumer borrowing.  These concerns—which the Federal Reserve has discussed with TNB while TNB's application for an account at the New York Fed remains under review—continue to be evaluated by the Federal Reserve.  However, notwithstanding the ongoing nature of that review, TNB brought this action seeking to cut off the Federal Reserve's consideration of its application and force the New York Fed to accept its deposits.  TNB is not entitled to the relief it seeks as a matter of law for at least four independent reasons.

*First*, the Complaint should be dismissed under Federal Rule 12(b)(1) for lack of subject matter jurisdiction because TNB does not have standing to bring this action.  TNB's application

for an account at the New York Fed is *still under consideration*.  TNB thus has suffered no injury in fact, the core component of a justiciable controversy.

*Second*, TNB's premature claim of a hypothetical harm that may or may not occur in the future—the denial of its application—also renders the Complaint subject to dismissal under Federal Rule 12(b)(1) on both constitutional and prudential ripeness grounds.  The case law in this Circuit makes clear that disputes concerning pending applications, like TNB's here, ripen into controversies capable of adjudication if, and only if, they are ultimately denied—which has indisputably not occurred.

*Third*, the Court should decline to exercise its discretion under the Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201, to hear this request for a declaratory ruling because the relief TNB seeks is wholly incompatible with the public interest.  The Court should not use its discretionary power to entertain a DJA action that would serve the for-profit interests of an individual litigant while prematurely foreclosing the Federal Reserve's consideration of TNB's application and the impact it could have on matters of national public concern.

*Fourth*, the Complaint is subject to dismissal pursuant to Federal Rule 12(b)(6) because the basis for TNB's requested injunction—a declaration that Section 11A of the Federal Reserve Act ("FRA"), 12 U.S.C. § 248a, entitles TNB to a deposit account at the New York Fed—rests on a fundamental misreading of the FRA.  Both the text and legislative history of the FRA, 12 U.S.C. § 221 *et seq.*, make clear that Federal Reserve Banks have discretion over whether to accept deposits from banks, and thus have discretion to deny deposit account requests such as the application submitted by TNB.  This express grant of discretion is set forth in FRA Section 13, 12 U.S.C. § 342—as interpreted by the United States Supreme Court—not in Section 11A, which is directed to the Board of Governors of the Federal Reserve System (the "Board of Governors")

and concerns only the pricing of specified services provided to certain depository institutions.

Even assuming *arguendo* that Section 11A generally obligated Federal Reserve Banks to open deposit accounts—which it plainly does not—Section 11A still would not require the New York Fed to open an account for TNB here.  In the judgment of the Federal Reserve, there is a material risk that TNB's business model could interfere with the Federal Reserve's ability to carry out its statutory policy mandates contained elsewhere in the FRA.  Under basic principles of statutory construction, one provision of the FRA cannot be interpreted so as to prevent the Federal Reserve from complying with other provisions of the same statute.

For each of these reasons, the Court should dismiss the Complaint in its entirety.

## BACKGROUND

### A.  The Federal Reserve and Its Policy Mandates

The Federal Reserve System, the nation's central bank, was established in 1913 pursuant to the FRA.  It consists of the Board of Governors, the Federal Open Market Committee ("FOMC"), and twelve Federal Reserve Banks spread across the country, including the New York Fed.  *Fasano v. Fed. Reserve Bank of N.Y.*, 457 F.3d 274, 278 (3d Cir. 2006).  The Board of Governors is a federal agency and Federal Reserve Banks are federal instrumentalities that act as the "monetary and fiscal agents of the United States."  *First Agric. Nat'l Bank v. State Tax Comm'n,* 392 U.S. 339, 356 (1968) (Marshall, J., dissenting).

Among other things, the FRA directs the Federal Reserve to serve the public interest by providing the nation with a stable financial system and by setting and implementing monetary policy.  *Starr Int'l Co. v. Fed. Reserve Bank of N.Y.*, 906 F. Supp. 2d 202, 232 (S.D.N.Y. 2012), *aff'd* 742 F.3d 37 (2d Cir. 2014) (FRA entrusts Federal Reserve with maintaining stability of financial system); *Comm. for Monetary Reform v. Bd. of Governors of Fed. Reserve Sys.*, 766

F.2d 538, 539 (D.C. Cir. 1985) (one "principal function[] of the Federal Reserve is the conduct of monetary policy, the aim of which is to promote national economic goals through influence on the availability and cost of bank reserves, bank credit, and money").

     *Financial Stability Mandate*:  Pursuant to the FRA, the Federal Reserve "promotes the stability of the financial system and seeks to minimize and contain systemic risks through active monitoring and engaging in the U.S. and abroad."  *The Federal Reserve System: Purposes and Functions* ("*Purposes & Functions*") at 1, *available at* https://www.federalreserve.gov/aboutthefed/files/pf_complete.pdf.[1]  The Federal Reserve accomplishes this by, among other things, supervising certain financial institutions to ensure that they act in a safe and sound manner, *see* 12 U.S.C. §§ 248(k), 325, 338, 625, 1844(c), 3105, 5325, 5365; 12 C.F.R. § 265.2; *Purposes & Functions* at 1, and serving as a lender of last resort to financial institutions to ensure a liquid banking system.  *See* 12 U.S.C. §§ 343-352, 461(b)(7); 12 C.F.R. pt. 201.  The Federal Reserve also works to promote a sound and well-functioning financial intermediation system—the process performed by banks of taking in funds from depositors and lending them out to borrowers.  *Purposes & Functions* at 56-57.  If financial intermediation is disrupted in times of stress, the adverse impact is felt throughout the entire economy.  *Id.* at 56.

     *Monetary Policy Mandate*:  Since 1977, the Federal Reserve has operated with a mandate from Congress "to promote effectively the goals of maximum employment, stable prices, and moderate long term interest rates." 12 U.S.C. § 225a.  As a practical matter, this is accomplished by the FOMC and the Board of Governors setting goals for monetary policy, and

---

[1] In considering a motion to dismiss, courts may consider documents subject to judicial notice, including public documents and records of government agencies.  *Lichtenstein v. Cader*, 13 Civ. 2690 (LAK) (JLC), 2013 WL 4774717, at *2 (S.D.N.Y. Sept. 6, 2013).  The documents cited by the New York Fed in this Motion other than the Complaint are judicial opinions or public documents subject to judicial notice.

the Federal Reserve Banks implementing those goals.  *See* 12 U.S.C. §§ 263(a), (b); *see also* TNB Complaint ("Compl.") ¶¶ 82-91.[2]

A central component of the Federal Reserve's monetary policy toolkit is reserves—liquid assets that depository institutions maintain at Federal Reserve Banks, including in the form of deposits held in accounts referred to as "master accounts."  *See* Federal Reserve Operating Circular No. 1 (Account Relationships) ("OC 1") at ¶ 1.0 (describing master accounts), *available at* https://frbservices.org/assets/resources/rules-regulations/020113-operating-circular-1.pdf.  The Federal Reserve sets a minimum amount of reserves that depository institutions must maintain against certain of their liabilities, known as required reserves.  *See* 12 U.S.C. § 461; 12 C.F.R. pt. 204.  However, depository institutions may elect to maintain reserves beyond the required amount, which are referred to as excess reserves.

One way the Federal Reserve carries out its monetary policy mandate is by seeking to influence the rate at which depository institutions lend these excess reserves to each other overnight, known as the federal funds rate.  Compl. ¶¶  82-89.  Because the federal funds rate serves as a benchmark for interest rates in private markets, such as mortgage rates, "its influence on the broader U.S. and global economy is profound."  *Id*. ¶ 85.  The Federal Reserve sets a target for the federal funds rate, then uses policy tools to influence the supply of reserves so that the effective federal funds rate meets the target rate.  *Id*. ¶¶ 84, 87.

A critical tool the Federal Reserve uses to influence the effective federal funds rate is the "IOER rate"—the rate that Federal Reserve Banks pay to depository institutions on excess reserves.  *Id.* ¶ 87.  "By raising or lowering the interest rate paid on excess reserves (the IOER

---

[2] The New York Fed is the sole Federal Reserve Bank that conducts open market operations (the central bank's purchase and sale of securities in the open market), which is one tool used by the Federal Reserve in the implementation of monetary policy.  *Purposes & Functions* at 35.

rate), the Federal Reserve can change the attractiveness of holding excess balances and thus affect the federal funds rate and other short-term market interest rates." *Purposes and Functions* at 40. *See also* Compl. ¶¶ 87-91, 108. This in turn helps the Federal Reserve System achieve its broader employment and inflation goals.

Congress originally authorized the Federal Reserve to start paying IOER as of 2011 in order to enhance its implementation of monetary policy. *See* Title II of the Financial Services Regulatory Relief Act of 2006, Pub. L. 109-351, 120 Stat. 1966, 1968-69 (Oct. 13, 2006); codified at 12 U.S.C. § 461(b)(12); *Interest on Reserves and the Fed's Balance Sheet*, Comm. on Fin. Servs., Subcomm. on Monetary Policy and Trade Comm. Hearing, 2016 WL 2895161 (May 17, 2016) (describing IOER as "a new and powerful tool for conducting monetary policy"). However, Congress accelerated the effective date by three years during the financial crisis to better allow the Federal Reserve to address conditions in credit markets. Emergency Economic Stabilization Act of 2008, Pub. L. 110–343, 122 Stat. 3765, 3796 (2008).

### B. TNB's Pending Application for a Master Account

To open a master account at the New York Fed, a depository institution must submit an application and receive approval from the New York Fed. *See* Compl. ¶ 78. This is consistent with the FRA's permissive language in Section 13 stating that Federal Reserve Banks "*may*"— rather than must—receive deposits from depository institutions, 12 U.S.C. § 342 (emphasis added).[3] For an entity like TNB that is uninsured and has no federal supervisor, the New York Fed conducts, among other things, a diligence review to determine whether the opening of a master account would pose any risks for the Federal Reserve. *See* Compl. ¶¶ 10, 63. Even if

---

[3] Section 13 states in relevant part: "Any Federal reserve bank may receive from any of its member banks, or other depository institutions, and from the United States, deposits of current funds in lawful money, national-bank notes, Federal reserve notes, or checks, and drafts, payable upon presentation, or other items, and also, for collection, maturing notes and bills." *Id.*

approval is obtained and a master account is opened, the New York Fed retains the right to terminate the master account at its discretion at any time.  OC 1 at ¶ 2.10.

On April 27, 2018 TNB, a prospective state-chartered depository institution, Compl. ¶¶ 1, 15, applied to the New York Fed for a master account, *id.* ¶ 78.[4]  During the review of TNB's application, it became apparent that TNB is not a standard bank that would engage in financial intermediation by both accepting deposits and making loans.  Rather, TNB has a novel business model that would focus solely on using deposits from wealthy institutional investors to arbitrage the IOER rate for TNB's personal profit.  Specifically, TNB would receive funds from its investors and deposit them at the New York Fed, where TNB would earn IOER and pass on to its investors the bulk of interest earned on those funds, after taking a cut for itself.  *Id.* ¶¶ 43-45, 47.

Given the novelty of TNB's business model, the New York Fed consulted the Board of Governors, which "wanted time to consider the potential effects" of that business model before action was taken on TNB's application.  *Id.* ¶ 69.  TNB acknowledges that Board of Governors staff have discussed in detail with TNB the Federal Reserve's policy concerns, although TNB fails to describe those concerns in its Complaint.  *Id.* ¶¶ 72-75, 77.

Since TNB submitted its application, the Federal Reserve has been closely evaluating the significant policy concerns that its business model raises.  Most recently, on March 6, 2019, the Board of Governors issued an advance notice of proposed rulemaking ("ANPR") that expresses

---

[4] Section 19 of the FRA, 12 U.S.C. § 461(b)(1)(A), defines "depository institution" to include, *inter alia*, an "insured bank" or "any bank which is eligible to make application to become an insured bank" under Section 5 of the Federal Deposit Insurance Act.  TNB concedes that it "has not sought" FDIC insurance, Compl. ¶ 47; *see also id.* ¶ 49, and it is therefore not an insured bank.  TNB also may not be "eligible" to apply for insurance, given its business plan and proposed capital structure.  For the purposes of this Motion only, the New York Fed accepts as true TNB's allegation that it is a depository institution.  *Id.* ¶ 110.  The New York Fed does not waive, but expressly preserves, its right to challenge TNB's claimed status as a depository institution later in this or in any other proceeding.

the Board of Governors' policy concerns about entities with narrowly focused business models

("Pass-Through Investment Entities" or "PTIEs") that, like TNB, would take deposits from

institutional investors and invest all or substantially all of the proceeds in balances at Federal

Reserve Banks.  *See* ANPR (Regulation D: Reserve Requirements of Depository Institutions,

*available at* https://www.federalreserve.gov/newsevents/pressreleases/files/bcreg20190306a1.

pdf).[5]  The ANPR seeks public comment on potential ways to minimize the risks associated with

such business models.  ANPR at 13-16.

   Among the concerns expressed in the ANPR are that entities with TNB's business model

have "the potential to complicate the implementation of monetary policy."  *Id.* at 6.  Such entities

could potentially attract a large quantity of deposits and maintain very large balances at Federal

Reserve Banks.  This high demand for Federal Reserve Bank balances could require the Federal

Reserve to accommodate this demand by expanding its balance sheet and the supply of reserves,

which could complicate "the FOMC's plans to reduce its balance sheet to the smallest level

consistent with efficient and effective implementation of monetary policy."  *Id.* at 8.  Moreover,

PTIEs like TNB could become an attractive investment for lenders in short-term funding

markets, such as the federal funds market, leading to increased volatility in the federal funds rate

that could require the FOMC to change its policy target on relatively short notice.  *Id.* at 9.  And

more generally, a large-scale migration of institutional cash investors to deposits at PTIEs like

---

[5] The Federal Reserve is not alone in expressing these concerns.  S. Cecchetti & K. Schoenholtz, *Pitfalls of a Reserves-only Narrow Bank*, Money & Banking (Sept. 24, 2018), *available at* https://www.moneyandbanking.com/commentary/2018/9/24/pitfalls-of-a-reserves-only-narrow-bank ("[W]e worry that [narrow banks] would shrink the supply of credit to the private sector and aggravate financial instability during periods of banking stress. Compared to what may be large costs, we suspect that the benefits would be small."); *see also* G. Selgin, *The Skinny on the Narrow Bank*, Alt-M (Sept. 10, 2018), *available at* https://www.alt-m.org/2018/09/10/the-skinny-on-the-narrow-bank/ ("were it to gain a charter, TNB could cause the Fed's present operating system, or a substantial part of it, to unravel").

TNB could lead to volatility that "could make it difficult for the Federal Reserve to control short-term rates more broadly as a means of implementing monetary policy."  *Id.* at 9.

The ANPR also sets forth concerns that the Board of Governors has about the effect a business model like TNB's may have on financial stability and financial intermediation.  *Id.* at 12 (concluding that entities like TNB "likely would have negative stability effects on net"); *id.* at 9 (expressing concern that entities like TNB "could raise the costs of private financial intermediation").  Those concerns include that (i) "in times of stress" investors would take assets out of entities that could make loans and put them in entities like TNB, thus "greatly amplify[ing the existing] systemic stress," *id.* at 12, and (ii) a shift in investment away from financial intermediaries to entities like TNB would occur that could raise the cost of both Treasury borrowing and credit provided by banks to households and businesses, *id.* at 10-11.

### C.   TNB Seeks an Injunction Compelling the New York Fed to Open a Master Account for It Despite the Fact that Its Application Remains Under Review

Notwithstanding that (i) its application for a master account is still under consideration, and (ii) the acceptance of deposits is discretionary under Section 13 of the FRA, 12 U.S.C. § 342, TNB filed the Complaint on August 31, 2018 seeking a declaratory judgment that the New York Fed is required to open a master account for it under Section 11A of the FRA, 12 U.S.C. § 248a, and a permanent injunction compelling the New York Fed to do so.  On October 16, 2018, the New York Fed sought the Court's permission to file this motion to dismiss.  The Court authorized the motion by order dated January 30, 2019.

## ARGUMENT

**I.    THE COURT SHOULD DISMISS THE COMPLAINT FOR LACK OF STANDING BECAUSE TNB HAS NOT SUFFERED AN INJURY IN FACT**

As a threshold matter, the Court should dismiss the Complaint because TNB cannot meet its burden to show that it has the standing necessary to seek a declaratory judgment under the "case or controversy" requirement of Article III of the Constitution and the DJA.  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 140 (2007) ("'party seeking a declaratory judgment has the burden of establishing the existence of an actual case or controversy'") (citation omitted).

 "First and foremost" among the requirements for standing to pursue a federal claim is that a plaintiff must allege an "'injury in fact'—a harm suffered by the plaintiff that is 'concrete' and 'actual or imminent, not conjectural or hypothetical.'"  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102-03 (1998) (citation omitted); *see also Vullo v. Office of the Comptroller of the Currency*, 17 Civ. 5374 (NRB), 2017 WL 6512245, at *7 (S.D.N.Y. Dec. 12, 2017) ("'[T]hreatened injury must be certainly impending to constitute injury in fact . . . allegations of possible future injury are not sufficient.'") (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  Together with causation and redressability, injury in fact "'constitutes the core of Article III's case-or-controversy requirement'" and its absence "suffices to defeat standing."  *U.S. Ecology, Inc. v. U.S. Dep't of Interior*, 231 F.3d 20, 24 (D.C. Cir. 2000) (citation omitted).

Here, TNB cannot meet its burden of establishing an injury in fact because the only alleged injury it identifies—the purported denial of its master account application—has not occurred and is therefore a contingent future event.  Critically, the Complaint is devoid of any allegation that the New York Fed informed TNB that its account application was denied.  Rather, TNB alleges that the New York Fed "informed TNB that the Board [of Governors] had become aware of TNB's intention to apply for a master account and wanted time to consider the potential

10

effects of TNB's business model."  Compl. ¶ 69.  That consideration of TNB's application and its broader impact *remains ongoing*.  Indeed, the Board of Governors issued an ANPR on March 6, 2019 seeking public comment on its concerns about Pass-Through Investment Entities like TNB.  While TNB alleges in conclusory fashion that the New York Fed has simply "refused" to act on its application, *id.* ¶¶ 11, 79, TNB alleges no requisite facts in support of that assertion, which is in any event contradicted by TNB's acknowledgment that the Board of Governors has concerns about its business model.[6]  This proceeding thus must be dismissed due to the "future oriented and speculative nature" of TNB's purported injury.  *Vullo*, 2017 WL 6512245, at *7.

## II.   THE COURT SHOULD DISMISS THE COMPLAINT BECAUSE TNB'S CLAIM IS NEITHER CONSTITUTIONALLY NOR PRUDENTIALLY RIPE

That TNB's account request is still under consideration also requires dismissal on ripeness grounds.  Under the ripeness doctrine, courts must limit their jurisdiction to causes of action that "present 'a real, substantial controversy, not a mere hypothetical question.'"  *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013) (citation omitted); *id.* (claims dependent on future event that may never occur are not ripe).  "The doctrine's major purpose 'is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.'"  *Id.* (citation omitted).  Courts recognize two types of ripeness—constitutional and prudential—and both preclude the adjudication of TNB's claim here.

*First*, TNB's claim is constitutionally unripe for the same reason TNB lacks standing—it has suffered no injury.  As the Court has noted, "constitutional ripeness is a subset of the injury-in-fact element of . . . standing."  *Vullo*, 2017 WL 6512245, at *8.  Thus the "constitutional

---

[6] TNB suggests that action should have been taken on its application by now because an application form states that "[p]rocessing may take 5-7 business days."  Compl. ¶ 5.  But even if "processing" meant "complete review and a decision," which it does not, the express permissive language in the form makes clear that some applications may *not* be processed in that timeframe.

ripeness analysis" the Court should apply here "is coterminous with [the] standing analysis" above requiring dismissal. *Id.* ("Constitutional ripeness . . . is really just about the first *Lujan* factor—to say a plaintiff's claim is constitutionally unripe is to say the plaintiff's claimed injury, if any, is not 'actual or imminent,' but instead 'conjectural or hypothetical.'" (citation omitted)).

*Second*, even if TNB had standing and its claim were constitutionally ripe, the action would still be subject to dismissal on prudential ripeness grounds. *See Simmonds v. INS*, 326 F.3d 351, 357 (2d Cir. 2003) (prudential ripeness is a discretionary tool that courts employ when "the case will be *better* decided later and … the parties will not have constitutional rights undermined by the delay") (emphasis in original). Courts assess the prudential ripeness of a case based on a two-pronged inquiry: (i) "the fitness of the issues for judicial decision," and (ii) "the hardship to the parties of withholding court consideration." *N.Y. Civil Liberties Union v. Grandeau*, 528 F.3d 122, 131-32 (2d Cir. 2008) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967). TNB cannot meet its burden of satisfying either prong of this test.

Under the fitness prong, courts look to "'whether the issues sought to be adjudicated are contingent on future events or may never occur.'" *Grandeau*, 528 F.3d at 132 (citation omitted). As explained above, the Federal Reserve's consideration of TNB's request for a master account is ongoing, thus rendering the factual predicate for TNB's claim wholly contingent on a hypothetical future event and prudentially unripe. *See Ahmed v. Cissna*, 327 F. Supp. 3d 650, 668 (S.D.N.Y. 2018) (prudentially unripe claims would "ripen" only after, *inter alia*, petitions seeking relief had been "denied"); *Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City*, 861 F.3d 1052, 1060 (10th Cir. 2017) (op. of Matheson, J.) (DJA action seeking to compel opening of master account was unripe where Reserve Bank had not yet acted on an application: "We cannot know what the facts would be, making this case premature.").

TNB also cannot satisfy the hardship prong, which turns on "whether the challenged action creates a direct and immediate dilemma" for the moving party. *Marchi v. Bd. of Coop. Educ. Svcs. of Albany*, 173 F.3d 469, 478 (2d Cir. 1999) (citation omitted). "The mere possibility of future injury, unless it is the cause of some present detriment, does not constitute hardship." *Simmonds*, 326 F.3d at 360. For the reasons detailed above, TNB will not suffer any immediate or significant hardship if the Court were to delay review because any injuries it can identify are contingent on future actions that the New York Fed may or may not take. *Vullo*, 2017 WL 6512245, at *9 (claim against OCC prudentially unripe "because any injuries [plaintiff] might suffer are contingent on future actions that the OCC may or may not take"). In the absence of any concrete hardship to TNB, this matter is not ripe for judicial review.

## III. THE COURT SHOULD EXERCISE ITS DISCRETION UNDER THE DECLARATORY JUDGMENT ACT AND DECLINE JURISDICTION OVER TNB'S ACTION BECAUSE IT IS CONTRARY TO THE PUBLIC INTEREST

The Court should also dismiss the Complaint by exercising its broad discretion to decline jurisdiction over DJA cases, particularly those that are contrary to the public interest. The DJA states that "any court of the United States . . . *may* declare the rights and other legal relations of any interested party." *See* 28 U.S.C. § 2201(a) (emphasis added). "Courts have consistently interpreted this permissive language as a broad grant of discretion to district courts to refuse to exercise jurisdiction over a declaratory judgment action," *Dow Jones & Co., Inc. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003), such as those that would frustrate the public interest, *Eccles v. Peoples Bank of Lakewood Vill., Cal.*, 333 U.S. 426, 431 (1948) ("A declaratory judgment, like other forms of equitable relief, should be granted only as a matter of judicial discretion, exercised in the public interest.").

Here, TNB's request for a declaratory judgment asks the Court to prematurely terminate the Federal Reserve's careful consideration of the impact TNB's business model could have on

the Federal Reserve's ability to implement critical, statutorily mandated policy objectives.  As detailed above, the Board of Governors has expressed numerous concerns about the effect that entities like TNB could have on the central bank's ability to keep the economy stable and carry out its monetary policy goals.  *Supra* at 8-9.  The Court should allow the ANPR process to run its natural course and should decline to exercise its discretion over this action because doing so could jeopardize the national public interest while benefiting only a private, profit-seeking litigant.  *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995) ("In the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration.").

## IV.  THE COMPLAINT SHOULD BE DISMISSED FOR FAILING TO STATE A CLAIM TO RELIEF BECAUSE THE FEDERAL RESERVE ACT DOES NOT ENTITLE TNB TO A MASTER ACCOUNT

To the extent the Court does not dismiss the Complaint on jurisdictional grounds, the Court should dismiss it on the merits because the declaration TNB seeks—that Section 11A of the FRA entitles TNB to a master account at the New York Fed—rests on an incorrect interpretation of the FRA, which in fact creates no such right to a master account.

"To survive a motion to dismiss" under Federal Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 717 (2d Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)); *see also Iqbal*, 556 U.S. at 678 (claim facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged") (citation omitted).[7]  In the context of a declaratory judgment action where a plaintiff asks the Court to "declare the legal

---

[7] Factual allegations must be accepted as true, but the Court need not credit purported facts "supported by mere conclusory statements."  *Iqbal*, 556 U.S. at 678.

rights" of the parties, to establish a claim to relief the plaintiff must establish "a valid legal predicate" for the right that it asserts. *Chevron Corp. v. Naranjo*, 667 F.3d 232, 244-45 (2d Cir. 2012) ("DJA is 'procedural only'" and "'does not create an independent cause of action'" or "'create substantive rights'") (citations omitted). Thus where, as here, a plaintiff claims a statutory right but "[the Act] does not" in fact "provide that legal predicate," the claim must be dismissed. *Id.*

### A. The Opening of Master Accounts Is Discretionary Under the FRA

#### 1. Section 13 of the FRA Permits Federal Reserve Banks to Reject Deposits— and Thus Deposit Account Requests—from Depository Institutions

The FRA is a comprehensive federal statutory scheme that created and delineated the powers and duties of the various components of the Federal Reserve System, including Federal Reserve Banks. *See* 12 U.S.C. § 221, *et seq.* The statutory framework governing the "Powers and Duties of Federal Reserve Banks" is contained in Subchapter IX of the FRA, 12 U.S.C. §§ 341-364. There, FRA Section 13, 12 U.S.C. § 342, makes clear that Federal Reserve Banks have discretion over whether to accept deposits from a given depository institution.

Specifically, Section 13 states that "[a]ny Federal reserve bank *may* receive from any of its member banks, or other depository institutions . . . deposits of current funds in lawful money" or various other types of assets. *Id.* (emphasis added). Consistent with the principle that statutes are to be interpreted according to their "ordinary, common-sense meaning," *United States v. Rowland*, 826 F.3d 100, 108 (2d Cir. 2016), the United States Supreme Court held shortly after the FRA was enacted that the permissive phrase "may receive" in Section 13 does not "impose[] upon reserve banks any obligation to receive," rather it merely "confers authority to do so." *Farmers & Merchants Bank of Monroe, N.C. v. Fed. Reserve Bank of Richmond, VA*, 262 U.S. 649, 662 (1923) ("[T]he words used were 'may receive'—words of authorization merely.").

15

The Supreme Court noted that although the word "'may' is sometimes construed as 'shall' . . . . where the context, or the subject-matter compels," that is not the case in Section 13 of the FRA. *Id.* As the Court noted, the FRA "appears to have been drawn with great care" and "[t]hroughout the act the distinction is clearly made between what the board and Reserve Banks 'shall do' and what they 'may' do." *Id.* at 263 & n.6 (citing 21 provisions in FRA containing both "may" and "shall" as well as seven provisions that contain only "shall"); *see also Weinstein v. Albright*, 261 F.3d 127, 137 (2d Cir. 2001) ("[W]hen the same [statute] uses both 'may' and 'shall,' the normal inference is that each is used in the usual sense—the one act being permissive, the other mandatory.") (citation omitted). The unambiguous text of Section 13 therefore makes clear that while Federal Reserve Banks have the *authority* to accept deposits—and thus to open deposit accounts, such as master accounts—they are not *required* by the FRA to do so.

While the text of the FRA alone should end the Court's inquiry into whether the FRA gives the New York Fed discretion to deny deposit account requests, the legislative history lends additional support to the conclusion that it does. *See Rowland*, 826 F. 3d at 108 ("If the [statute's] meaning is plain, the inquiry ends there. . . . We resort to legislative history only if, after consulting canons of statutory construction, the meaning remains ambiguous.") (citations omitted). A House Report that accompanied the FRA in 1913 made clear that the permissive "may receive" language in Section 13 "authorized" Federal Reserve Banks "to receive current deposits from their stockholders [i.e., banks that are members of the Federal Reserve System]." H.R. Rep. No. 63-69, at 48 (1913). The legislative history nowhere suggests the receipt of deposits is in any way mandatory.

Notably, when Congress later amended Section 13 as part of the Monetary Control Act of 1980 (the "MCA"), Pub. L. 96-221, 94 Stat. 132, 139 (1980), to permit Federal Reserve Banks to

16

receive deposits from "other depository institutions," in addition to member banks, Congress did *not* alter the permissive "may receive" language, notwithstanding the Supreme Court's interpretation of that phrase in the interim. Congress can therefore be presumed to have "accepted and ratified" the Supreme Court's reading of "may receive" in Section 13 as discretionary in nature. *Texas Dep't of Hous. and Cmty. Affairs v. Inclusive Communities Project*, 135 S. Ct. 2507, 2520 (2015); *see also Forest Grove School Dist. v. T.A.*, 557 U.S. 230, 244 n.11 (2009) ("When Congress amended [the Act] without altering the text [of the relevant provision], it implicitly adopted [the Supreme Court's] construction of the statute.").

Congress's decision to give Federal Reserve Banks the discretion to deny requests to deposit funds is not only consistent with the text, structure, and history of the FRA, but is also a matter of practical necessity. Inevitably some depository institutions seeking to deposit funds at a Federal Reserve Bank may pose unacceptable risks to that Reserve Bank or the Federal Reserve System as a whole. For example, an institution might be unable to cover account overdrafts or may have a track record of facilitating illegal activity such as money laundering (either intentionally or negligently through weak controls), which could expose the Federal Reserve to liability or put it in danger of furthering criminal acts. The FRA necessarily gives Federal Reserve Banks the discretion to decline to do business with entities that present such prohibitive risks, including the risks currently under review presented by TNB's business model.

Accordingly, as a matter of law, TNB is not entitled to the declaration it seeks stating that "TNB is entitled to open a Master Account with the [New York Fed]" under the FRA, Compl. ¶ 124, and the Court must dismiss the Complaint.

17

### 2. TNB Is Wrong that FRA Section 11A Overrides the Discretion Mandated by FRA Section 13

In support of its misplaced assertion that the FRA automatically entitles it to a deposit account at the New York Fed, TNB *wholly ignores* Section 13 of the FRA and alleges that Section 11A of the FRA governs its request and compels the New York Fed to open a master account for it.  *See, e.g.*, *id.* ¶¶ 26-33.  TNB is wrong.

As a threshold matter, TNB's assertion that Section 11A creates any duty at all for Federal Reserve Banks fails because Section 11A only creates obligations for the Board of Governors, not for Federal Reserve Banks.  Tellingly, Section 11A is contained in FRA Subchapter II, which, as its title suggests, is directed to the powers and duties of the "*Board of Governors of the Federal Reserve System*."  12 U.S.C. §§ 241-252 (emphasis added).  The express language of Section 11A thus directs only the Board of Governors to take certain actions, while saying nothing about what Federal Reserve Banks may or must do.  *See* 28 U.S.C. § 248a(a) ("the Board shall publish for public comment a set of pricing principles"); *id.* ("the Board shall . . . put into effect a schedule of fees for such services"); *id.* § 248a(d) ("The Board shall require reductions in the operating budgets of the Federal Reserve banks").

In direct contrast, Section 13 appears in the FRA Subchapter titled "*Powers and Duties of Federal Reserve Banks*," 12 U.S.C. §§ 341-364 (emphasis added), and explicitly speaks only to actions that may be taken by Federal Reserve Banks.  *See, e.g.*, 12 U.S.C. § 342 ("Any Federal reserve bank may receive" deposits); *id.* § 343 ("any Federal reserve bank may discount notes, drafts, and bills of exchange arising out of actual commercial transactions").  Had Congress intended for Section 11A to create an obligation for Federal Reserve Banks, it would have put Section 11A in the applicable Subchapter and included explicit language directed to Federal Reserve Banks.  The fact that Congress did not do so "undermines" TNB's misguided effort to

transform language directed at the Board of Governors into an affirmative duty of Federal

Reserve Banks.  *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008)

("statutory headings" are "informative" and are "tools" for interpreting statutes).

Regardless, even if Section 11A did apply to Federal Reserve Banks, its text would

provide no support for TNB's sweeping assertion that Section 11A requires Federal Reserve

Banks to open master accounts and accept deposits from all depository institutions.  Section 11A,

titled "Pricing of Services," sets forth a list of Federal Reserve Bank "services"—such as "check

clearing and collection services," "wire transfer services," as well as "any new services" offered

by the Federal Reserve System—and requires the Board of Governors to publish a related

"schedule of fees" for those services.  12 U.S.C. § 248a(a).  The provision further states that the

schedule of fees "shall be based on" several enumerated "principles," one of which is that "All

Federal Reserve Bank services covered by the fee schedule shall be available to nonmember

depository institutions and such services shall be priced at the same fee schedule applicable to

member banks . . . ." 12 U.S.C. § 248a(c).

On its face, Section 11A says nothing about the acceptance of deposits by Federal

Reserve Banks or the opening of deposit accounts—nor would one expect it to do so because that

subject is expressly addressed in Section 13.  In a strained attempt to nonetheless read a right to

master accounts into Section 11A, TNB circularly alleges in conclusory fashion that master

accounts are a "new service" covered by the Section 11A because other "services" are

purportedly conditioned on having a master account and further contends that, as a nonmember

depository institution, it is entitled to an account under the principle stating that covered services

are "available to" such institutions.  *See* Compl. ¶¶ 28-33.  But the fact that a master account may

be a prerequisite to obtaining some Federal Reserve Bank services plainly does not mean that a

master account itself is therefore a service, much less a "new service."  Nor does Section 11A

command Federal Reserve Banks to provide the covered services to *any* nonmember depository

institution, let alone all such institutions.  Rather, the natural reading of the statute is that Section

11A simply lists services that Federal Reserve Banks can provide to depository institutions and

notes that those services shall be available to nonmember depository institutions at the same

price that they are available to members.

When Section 11A is read in conjunction with Section 13, it is clear that, under the FRA,

(i) Federal Reserve Banks have discretion to reject deposits—and thus master account requests—

from a given depository institution, per Section 13; and (ii) if a Reserve Bank elects to accept

deposits from a nonmember depository institution, then in accordance with Section 11A that

institution can seek access to any enumerated service that requires a master account at the same

price paid by member banks.  *Puello v. Bureau of Citizenship & Immigration Svcs.*, 511 F.3d

324, 329 (2d Cir. 2007) ("'[T]he preferred meaning of a statutory provision is one that is

consonant with the rest of the statute.'") (citation omitted).

This straightforward reading of Section 11A's plain language is consistent with the

legislative history of the MCA.  Prior to the MCA's enactment, Federal Reserve Banks were

authorized to accept deposits only from member banks and they provided related services to

member banks free of charge to "promote . . . membership" in the Federal Reserve System.

*Greater Buffalo Press, Inc. v. Fed. Reserve Bank of N.Y.*, 866 F.2d 38, 40 (2d Cir. 1989).  Then

in 1980, as noted above, via an amendment to Section 13, the MCA expanded the class of

institutions from which Federal Reserve Banks could receive deposits to include "other

depository institutions" (i.e., nonmember banks).  *Supra* at 16-17.

20

This increase in the number of entities eligible to seek to hold deposits at Federal Reserve Banks meant that Federal Reserve Banks would likely see an increase in demand for the related services they provided, which in turn would increase the costs Federal Reserve Banks would incur in providing those services.  To ensure that those costs were recovered in an equitable manner, the MCA, in the newly added Section 11A, directed the Board of Governors to publish a fee schedule for an enumerated list of services and noted that the services should be "available to nonmember depository institutions" and "priced at the same fee schedule applicable to member banks."  12 U.S.C. § 248a(c)(2); *see also id.* § 248(c)(3) (fees "shall be established on the basis of all direct and indirect costs actually incurred in providing Federal Reserve services").

Nothing in this sequence of events suggests that, by adding Section 11A to the FRA in 1980, Congress sought to override the Federal Reserve Banks' discretion over receiving deposits that had been in place since the FRA's enactment in 1913.  *See Farmers & Merchants*, 262 U.S. at 662.  To the contrary, Congress was simply ensuring that as the pool of entities eligible to receive Federal Reserve Bank services expanded, that expansion occurred in an equitable manner.  Notably the FRA—both before and after the MCA's enactment—is completely silent on the availability of services for member banks.  The notion that Congress gave nonmember banks a statutory right to Federal Reserve Bank services that member banks do not have in a statute meant to create equity, as TNB suggests here, defies logic and would lead to absurd results. *See Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available.") (citation omitted).

In support of its contention that Section 11A entitles all depository institutions to master accounts, TNB repeatedly cites the opinion of a single Tenth Circuit judge who reached that

conclusion.  Compl. ¶¶ 12, 25 n.4, 30 n.5, 32-33 (citing *Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City*, 861 F.3d 1052, 1067-74 (10th Cir. 2017) (op. of Bacharach, J.).[8] But Judge Bacharach's opinion, which notably was not joined by the other members of the same panel and has not been followed by any other court, misread the FRA in several critical ways.

*First*, despite acknowledging that the "may receive" language in Section 13 "indicates that Federal Reserve Banks have discretion," Judge Bacharach erroneously concluded that "this discretion does not encompass the issuance of master accounts," 861 F.3d 1073-74, notwithstanding that Section 13's explicit language unequivocally applies to the acceptance of deposits and thus necessarily encompasses deposit accounts.  *Supra* at 15-17.  Forcing the New York Fed to accept TNB's deposits is precisely what TNB seeks to do here—in direct contravention of the express discretionary text of Section 13.

*Second*, Judge Bacharach misinterpreted Section 11A by concluding that it compels the provision of covered services to *all* nonmember depository institutions, 861 F.3d at 1068-70, despite the fact that the word "all" is conspicuously absent from that part of the provision and that such a construction would contravene the Supreme Court's reading of Section 13 by making the acceptance of deposits compulsory.

*Third*, Judge Bacharach improperly looked beyond the text of the FRA and misconstrued past statements by the Board of Governors and Federal Reserve Banks that simply noted that the MCA made Federal Reserve Bank services available to nonmember depository institutions as

---

[8] TNB also cites *Greater Buffalo*, 866 F.2d at 40 and *Jet Courier Servs., Inc. v. Fed. Reserve Bank of Atlanta*, 713 F.2d 1221, 1222-23 (6th Cir. 1983) in support of its position.  Neither of those decisions addresses the issue before this Court of whether a Federal Reserve Bank may be compelled to accept deposits by opening a master account.  They instead merely mention the undisputed fact that the MCA expanded the types of customers to which Federal Reserve Banks could provide covered services (as that term is used in the MCA, 12 U.S.C. § 248a(b)) to include nonmember depository institutions.

well as member depository institutions.  861 F.3d 1070-73.  This aspect of the opinion is

especially misguided because it ignores that the terms of master accounts have always made

clear that master account agreements are "subject to approval" by Federal Reserve Banks and

may be terminated by a Reserve Bank "at any time."  OC 1 ¶¶ 2.6, 2.10.  For all of these reasons,

the Court should decline to follow Judge Bacharach's standalone opinion, hold that the FRA

does *not* entitle depository institutions to master accounts, and dismiss the Complaint.

    **B.**    **TNB's Reading of Section 11A Would Create an Impermissible Conflict Here within the FRA's Statutory Scheme**

Even if Section 11A generally required the opening of master accounts for all

applicants—which it does not—Section 11A would not require the opening of such an account

for TNB here, because doing so would interfere with the Federal Reserve's ability to carry out its

statutory policy mandates.  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 121

(2000) (A court must "interpret[] [a] statute to create a symmetrical and coherent regulatory

scheme") (citations omitted).

The FRA, even by its official title (*An Act To provide for the establishment of Federal

reserve banks, to furnish an elastic currency, to afford means of rediscounting commercial

paper, to establish a more effective supervision of banking in the United States, and for other

purposes*), clearly is intended to advance the central bank's policy objectives.  The Act's

provisions spell out those policy objectives, including the FRA's mandates to advance monetary

policy and financial stability.  *See supra* at 3-6.  The FRA also vests the New York Fed with

authority to exercise all powers granted by the Act and "such incidental powers as shall be

necessary" to carry out such powers.  12 U.S.C. §341 (Seventh).

Here, the Board of Governors has expressed the concern that, if entities such as TNB

were granted master accounts and paid interest on those accounts at the existing IOER rate, it

could disrupt the Federal Reserve's ability to effectively carry out these policy responsibilities. As discussed in the ANPR, paying interest on accounts of entities like TNB could "complicate the implementation of monetary policy," ANPR at 6, by:

    i. creating a framework in which changes to the IOER rate could "affect the FOMC's plans to reduce its balance sheet to the smallest level consistent with efficient and effective implementation of monetary policy" *id.* at 8;

    ii. injecting volatility into the federal funds rate, thereby "requir[ing] the FOMC to change its policy target on relatively short notice" and creating "spillover effects in many other markets," *id.* at 8-9; and

    iii. reducing trading volume in overnight money markets and creating related volatility in reference rates from those transactions, which would "make it difficult for the Federal Reserve to control short-term rates more broadly as a means of implementing monetary policy," *id* at 9.

Paying interest on such entities' accounts could also have a negative impact on financial stability and financial intermediation, which could amplify systemic financial stress. ANPR at 9-12.[9]

While TNB is incorrect in alleging that FRA Section 11A ordinarily requires the opening of master accounts, even if that were the case, there is "surely nothing" in the FRA to indicate that the New York Fed must provide TNB a master account here, where so doing would jeopardize the Federal Reserve's ability to fulfill its policy mandates. *See Farmers & Merchants Bank*, 262 U.S. at 657 ("There is surely nothing in the [FRA] to indicate that Reserve Banks must undertake the collection of checks in cases where it is impossible to obtain payment except by incurring serious expense."). Federal Reserve Banks must serve the public interest, rather than special interests. *See Starr*, 906 F. Supp. 2d at 243; *Corbin v. Fed. Reserve Bank of N.Y.*, 475 F. Supp. 1060, 1068 (S.D.N.Y. 1969), *aff'd* 629 F.2d 233 (2d Cir. 1980).

---

[9] TNB suggests that as a private, for-profit commercial enterprise, it should be allowed to compete with and "serve an almost equivalent economic function" as the Federal Reserve's important monetary policy tools. Compl. ¶¶ 109, 114; *see also id.* ¶¶ 116, 118 (claiming New York Fed is unfairly limiting competition with respect to policy tools such as IOER). But Congress clearly charged the Federal Reserve alone with implementing its monetary and financial stability goals. *See supra* at 3-6. As a private entity, TNB has no basis—statutory or otherwise—to seek to usurp that role.

Congress could not have intended to command Federal Reserve Banks, which "were created and are operated in furtherance of the national fiscal policy," *Fed. Reserve Bank of Bos. v. Comm'r of Corps. & Taxation of the Commonwealth of Mass.,* 499 F.2d 60, 62 (1st Cir.1974), to open master accounts even where doing so could prevent the Federal Reserve from carrying out its statutory policy duties.  "Absent a clear indication that Congress intended such a sweeping effect," a court should not "infer such a purpose nor . . . interpret a statute to effect that result." *Stafford v. Briggs*, 444 U.S. 527, 545 (1980).

Rather, Section 11A should be read in the context of the FRA as a whole, including its policy mandates, and should "not be strained by technical constructions to reach cases which Congress evidently could not have contemplated."  *Id.  See also Griffin*, 458 U.S. at 575; *United States v. Katz*, 271 U.S. 354, 357 (1926) ("[A] literal application of a statute, which would lead to absurd consequences, should be avoided whenever a reasonable application can be given to it, consistent with the legislative purpose.").  TNB's Complaint thus fails to state a claim as a matter of law and should be dismissed in its entirety.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint.

Dated:  March 8, 2019

Respectfully Submitted,

/s/ Michele Kalstein_____

Michele Kalstein
Michael M. Brennan
Federal Reserve Bank of New York
33 Liberty Street
New York, New York 10045
*Counsel for Defendant*
*Federal Reserve Bank of New York*

25