**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

TNB USA INC.,

                                        *Plaintiff*,

              v.                                          18 Civ. 7978 (ALC)

FEDERAL RESERVE BANK OF NEW YORK,

                                        *Defendant*.

**OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS**

DEWEY PEGNO & KRAMARSKY LLP
777 Third Avenue – 37th Floor
New York, New York 10017
Tel. (212) 943-9000
Fax (212) 943-4325

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................... 1

BACKGROUND ...................................................................................................... 4

    A.    The Federal Reserve System .................................................................. 4

    B.    Depository Institutions Deregulation and Monetary Control Act of 1980 ............ 5

    C.    The IOER Program ................................................................................ 6

    D.    FRBNY's Existing Narrow Banking Operations .................................... 8

    E.    TNB's Charter and Master Account Application ................................... 8

    F.    The Board's Decision to Interfere in TNB's Master Account Application .......... 10

    G.    The Board Begins a Rulemaking Process to Shut Down TNB While TNB's Master Account Supposedly Remains "Under Consideration" .......................... 11

ARGUMENT .......................................................................................................... 13

I.    TNB HAS A STATUTORY RIGHT TO A MASTER ACCOUNT ........................... 14

    A.    Section 11A of the Federal Reserve Act Unambiguously Requires FRBNY to Open a Master Account for TNB ........................................................... 14

    B.    Section 13 of the Federal Reserve Act Does Not Permit Federal Reserve Banks to Withhold Master Accounts or Other Services ...................................... 17

    C.    Section 11A's Mandate Does Not Conflict with the FRA but the Board's Unlawful Intervention in FRBNY's Daily Operations Does ................................ 19

II.    THIS COURT HAS SUBJECT MATTER JURISIDICTION ................................... 20

    A.    TNB's Claims Are Ripe Because FRBNY Has Refused to Act on TNB's Application for a Master Account ......................................................... 21

    B.    TNB Has Standing to Challenge FRBNY's Ongoing Refusal to Open a Master Account Because Each Passing Day Adds to Its Losses .......................... 22

    C.    FRBNY Has Identified No Legal Authority or Sound Reason for the Court to Refuse Jurisdiction Under the Declaratory Judgment Act .............................. 23

III.    THE BOARD'S POLICY CONCERNS ARE IRRELEVANT AND BASELESS ... 24

CONCLUSION ....................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

*Amico v. New Castle Cty.*,
 553 F. Supp. 738 (D. Del. 1982) ........................................................................ 21

*Comm'n Full Emp't v. Blumenthal*,
 606 F.2d 1062 (D.C. Cir. 1979) ......................................................................... 23

*Dow Jones & Co., Inc. v. Harrods Ltd.*
 346 F.3d 357 (2d Cir. 2003) ............................................................................... 23

*Farmers' & Merchants' Bank of Monroe, N.C. v. Federal Reserve Bank of Richmond*,
 262 U.S. 649 (1923) ........................................................................................... 18

*Fourco Glass Co. v. Transmirra Prods. Corp.*,
 353 U.S. 222 (1957) ........................................................................................... 19

*Fourth Corner Credit Union v. Fed. Reserve Bank Kan. City*,
 154 F. Supp. 3d 1185 (D. Colo. 2016) ............................................................... 17

*Fourth Corner Credit Union v. Fed. Reserve Bank Kan. City*,
 861 F.3d 1052 (10th Cir. 2017) ................................................................... *passim*

*Fox News Network, LLC v. Bd. Governors Fed. Reserve Sys.*,
 601 F.3d 158 (2d Cir. 2010) ............................................................................... 20

*Greater Buffalo Press, Inc. v. Fed. Reserve Bank of N.Y.*,
 866 F.2d 38 (2d Cir. 1989) ................................................................................. 15

*Groome Res. Ltd., L.L.C. v. Parish of Jefferson*,
 234 F.3d 192 (5th Cir. 2000) ............................................................................. 21

*In re Idaho Conservation League*,
 811 F.3d 502 (D.C. Cir. 2016) ........................................................................... 23

*Jet Courier Servs., Inc. v. Fed. Reserve Bank of Atl.*,
 713 F.2d 1221 (6th Cir. 1983) ...................................................................... 15 n.22

*Lewis v. United States*,
 680 F.2d 1239 (9th Cir.1982) ............................................................................. 20

*Lopez v. Davis*,
 531 U.S. 230 (2001) ........................................................................................... 15

*Nat'l Org. for Marriage, Inc. v. Walsh*,
 714 F.3d 682 (2d Cir. 2013) ............................................................................... 21

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
    566 U.S. 639 (2012) ........................................................................................ 19

*Sayles Hydro Assocs. v. Maughan,*
    985 F.2d 451 (9th Cir. 1993) ...................................................................... 21, 22

*Simmonds v. INS,*
    326 F.3d 351 (2d Cir. 2003) ............................................................................. 22

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) .......................................................................................... 22

*Taboola, Inc. v. Ezoic Inc.,*
    17 Civ. 9909, 2019 WL 465003 (S.D.N.Y. Feb. 6, 2019) ................................ 13

*United States* ex rel. *Holbrook v. Brink's Co.,*
    336 F.Supp.3d 860 (S.D. Ohio 2018) .............................................................. 20

*United States* ex rel. *Kraus v. Wells Fargo & Co.,*
    No. 11 Civ. 5457 (BMC), 2018 WL 2172662 (E.D.N.Y. May 10, 2018) ......... 5, 20

*Vullo v. OCC,*
    17 Civ. 3574 (NRB), 2017 WL 6512245 (S.D.N.Y. Dec. 12, 2017) ................. 13

## Statutes

12 U.S.C. § 248a ................................................................................... *passim*

12 U.S.C. § 342 ............................................................................. 2, 17, 18, 25 n.33

12 U.S.C. § 461 ................................................................................. 5 n.3, 6

12 U.S.C. § 632 ...................................................................................... 20

12 U.S.C. § 1813 .................................................................................... 5 n.3

12 U.S.C. § 1815 .................................................................................... 5 n.3

## Rules

Fed. R. Civ. P. 12(b)(1) ............................................................................ 1, 13

Fed. R. Civ. P. 12(b)(6) ............................................................................ 1, 13

## Regulations

12 C.F.R. § 204 ........................................................................................ 6

**Other Authorities**

Bd. Governors Fed. Reserve Sys.,
    ANPR, Regulation D: Reserve Requirements of Depository Institutions,
    https://www.govinfo.gov/content/pkg/FR-2019-03-12/pdf/2019-04348.pdf ....... 12, 13, 21, 24

Bd. Governors Fed. Reserve Sys.,
    *Federal Reserve Statistical Release: Factors Affecting Reserve Balances* (Mar. 21, 2019),
    https://www.federalreserve.gov/releases/h41/current/ ...................................................... 8 n.11

Bd. Governors Fed. Reserve Sys.,
    Policies: The Federal Reserve in the Payments System (1990)
    http://www.federalreserve.gov/paymentsystems/pfs_frpaysys.htm. ............................. 16 n.23

Cmts. on H.R. 1585 and Regulatory Streamlining: Hr'g Before Subcomm. on Fin. Insts. &
    Consumer Credit of H. Comm. Banking & Fin. Servs. (May 12, 1999)
    (statement of Laurence H. Meyer, Governor, Bd. Governors Fed. Reserve Sys.),
    https://www.federalreserve.gov/boarddocs/testimony/1999/19990512.htm ..................... 7 n.5

Colo. Div. Banking, 107th Annual Report (2017),
    http://www2.cde.state.co.us/artemis/regserials/reg21internet/reg212016internet.pdf.... 12 n.18

Editorial Bd., *Narrow Odds for Narrow Banks*, Wall St. J. (Sept. 12, 2018),
    https://www.wsj.com/articles/narrow-odds-for-narrow-banks-1536793230 ................. 12 n.15

FDIC, Weekly National Rates and Rate Caps - Weekly Update (Mar. 25, 2019),
    https://www.fdic.gov/regulations/resources/rates/ .......................................................... 8 n.10

Fed. Reserve Bank Cleveland, *Who Is Holding All the Excess Reserves?* (Aug. 11, 2015),
    https://www.clevelandfed.org/newsroom-and-events/publications/economic-trends/2015-
    economic-trends/et-20150811-who-is-holding-all-the-excess-reserves.aspx ........... 7 n.7, 8 n.9

Fed. Reserve Bank N.Y., Annual Report: 1980 (1981),
    https://fraser.stlouisfed.org/files/docs/historical/frbny/1980_frb_newyork.pdf ... 6 n.4, 16 n.23

Fed. Reserve Bank St. Louis, *Excess Reserves of Depository Institutions [EXCRESNS]*,
    https://fred.stlouisfed.org/series/EXCSRESNS .................................................... 7 n.6, 24 n.29

Bd. of Governors of the Fed. Reserve Sys.,
    Federal Reserve's Key Policies for the Provision of Financial Services: About,
    https://www.federalreserve.gov/paymentsystems/pfs_about.htm ................................. 16 n.24

H.R. Conf. Rep. No. 96-842 (1980)....................................................................................... 19 n.27

H.R. Rep. No. 95-1590 (1978)............................................................................................... 19 n.27

John H. Cochrane, Hoover Inst., Stanford Univ., *Fed Nixes Narrow Bank* (Sept. 5, 2018),
    https://johnhcochrane.blogspot.com/2018/09/fed-nixes-narrow-bank.html ......... 1 n.1, 11 n.13

John H. Cochrane, *The Safest Bank the Fed Won't Sanction*, Chi. Booth Rev. (Nov. 30, 2018), http://review.chicagobooth.edu/finance/2018/article/safest-bank-fed-won-t-sanction... 11 n.13

Lalita Clozel, *Fed Backs Marijuana-Focused Credit Union*, Wall St. J. (Feb. 5, 2018), https://www.wsj.com/articles/fed-backs-marijuana-focused-credit-union-1517870188.... 2 n.2

Michael S. Derby, *Bank Sues New York Fed Over Lack of Account*, Wall St. J. (Sept. 5, 2018), https://www.wsj.com/articles/bank-sues-new-york-fed-over-lack-of-account-1536185523 ..... ......................................................................................................................... 12 n.14

Nat'l Savings & Invs., https://www.nsandi.com/why-save-with-us ...................... 12 n.16, 24 n.32

Paul H. Kupiec, *The Fed Refuses to Do Business with the Safest Bank on Earth—and Depositors Pay the Price*, Am. Enter. Inst. (Nov. 28, 2018), http://www.aei.org/publication/the-fed-refuses-to-do-business-with-the-safest-bank-on-earth-and-depositors-pay-the-price/ ...................................................................................... 12 n.15

Peter Conti-Brown, *The Fed Wants to Veto State Banking Authorities. But Is that Legal?*, Brookings Inst. (Nov. 14, 2018), https://www.brookings.edu/research/the-fed-wants-to-veto-state-banking-authorities-but-is-that-legal/ ......................................................................................................... 12 n.15, 20 n.28

Press Release, Bd. Governors Fed. Reserve Sys., Federal Reserve Board Announces Reserve Bank Income and Expense Data and Transfers to the Treasury for 2018 (Jan. 10, 2019), https://www.federalreserve.gov/newsevents/pressreleases/other20190110a.htm ............. 8 n.8

Reserve Trust Company, https://www.reservetrust.com/ ....................................... 12 n.17, 24 n.30

Rodney Johnson, *The Fed's Newest Double Standard*, Econ. & Mkts. (Sept. 26, 2018), https://economyandmarkets.com/economy/central-banks/the-feds-newest-double-standard/ ... ......................................................................................................................... 12 n.15

Safe Deposit Bank Nor., https://www.sdbn.com/ .................................................. 12 n.16, 24 n.32

Plaintiff TNB USA Inc. ("TNB") respectfully submits this memorandum of law in opposition to defendant Federal Reserve Bank of New York's ("FRBNY") motion to dismiss under Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure (ECF No. 20).

## **INTRODUCTION**

According to its motion, FRBNY answers to no one—not TNB, not Connecticut, not Congress, and not this Court. As a chartered state bank, TNB has a federal statutory right to open a master account with FRBNY. For well over a year, however, FRBNY has kept up the pretense that TNB's application for a master account is "under review," "slow walk[ing]" TNB to "regulatory death,"[1] while behind the scenes FRBNY, at the unlawful direction of the Federal Reserve Board (the "Board"), has plainly decided it does not want TNB to operate. As a result, TNB has and continues to suffer harm, which only this Court has the power to stop.

A master account is the gateway to Federal Reserve Bank payment services, which are the backbone of the national banking system. Without access to one, a bank cannot function. Until very recently, no bank had ever been forced to litigate its right to open one of these accounts. Then, in 2017, the Tenth Circuit took up the same question at issue here: must the Federal Reserve Banks open a master account for any qualified applicant? *See Fourth Corner Credit Union v. Fed. Reserve Bank Kan. City*, 861 F.3d 1052. The plaintiff there, Fourth Corner, was a state-chartered credit union that would provide financial services to marijuana-related businesses, in probable violation of federal drug laws. The Federal Reserve Bank of Kansas City ("FRBKC") had denied Fourth Corner's master account application on policy grounds and made virtually the same arguments as FRBNY does here. Though the judges on the panel diverged in

---

[1] John H. Cochrane, Hoover Inst., Stanford Univ., *Fed Nixes Narrow Bank* (Sept. 5, 2018), https://johnhcochrane.blogspot.com/2018/09/fed-nixes-narrow-bank.html

their reasoning, **not one** accepted those arguments, while Judge Bacharach dismantled each in detail.  After that decision, FRBKC agreed to open a master account for Fourth Corner.[2]

There is good reason for that.  *First*, Section 11A of the Federal Reserve Act ("FRA"), as amended by the Depository Institutions Deregulation and Monetary Control Act of 1980 (the "Deregulation Act" or the "Act"), 12 U.S.C. § 248a, commands FRBNY to make services available on an equal, non-discriminatory basis to all depository institutions.  The Act was intended to level the field between the larger member banks that until then had monopolized Federal Reserve Bank services, charging others for access to services they received free of charge, and the primarily smaller state-chartered non-member institutions that, forced to pay for access, were at a significant competitive disadvantage.  A master account is a prerequisite to all Federal Reserve Bank services.  Without equal access to master accounts, there can be no equal access to services—like the right to play tennis without the right to a racket.

**For almost forty years**, FRBNY and the Board consistently interpreted Section 11A as a mandate of equal access to services for all depository institutions.  Then, in *Fourth Corner*, the Board concocted the argument that FRBNY makes here: Section 11A imposes no duties at all, and Section 13 of the FRA, 12 U.S.C. § 342, gives Federal Reserve Banks the discretion to refuse deposits from any financial institution.  Section 13, however, gave Federal Reserve Banks discretion only with respect to **the types** of deposits to accept; not the right to decline **all deposits** from a qualified state bank.  Congress decided that chartered state banks like TNB should be able to open a master account and operate in the national financial system, and it is not for FRBNY or the Board to gainsay that decision.

---

[2] Lalita Clozel, *Fed Backs Marijuana-Focused Credit Union*, Wall St. J. (Feb. 5, 2018), https://www.wsj.com/articles/fed-backs-marijuana-focused-credit-union-1517870188.

FRBNY's argument, in the end, is that the Federal Reserve can nullify federal statutes—an extreme and untenable position. And FRBNY **knows that**; it was prepared to fulfill its duty to open a master account for TNB until the Board intervened and imposed the standstill that led to this litigation. That intervention was unlawful: Congress did not give the Board authority to direct the daily operations of the Federal Reserve Banks, and discovery will surely reveal that the Board and FRBNY have improperly colluded in violation of their legal duties.

*Second*, unable to rebut TNB's statutory interpretation, FRBNY resorts to technical arguments: standing and ripeness. Because it has not formally denied TNB's application after more than **eighteen months**, FRBNY argues there is no harm to TNB and the Court should give FRBNY more time to decide. This is an obvious ruse. Consistent with the statutory scheme, master accounts are typically granted in mere days. Meanwhile, there is no sign that TNB's application is "under review," and the Board has begun an agency rulemaking process specifically to **shut down** TNB's business even if its application is granted. All the while, TNB, unable to function, has suffered considerable and ongoing harm. Not surprisingly, courts have flatly rejected challenges to standing and ripeness in similar circumstances.

*Finally*, though irrelevant to TNB's statutory rights, the Board's and FRBNY's policy concerns are obviously overblown. "TNB" stands for "the narrow bank." Its sole business will be to take deposits from financially secure institutions, place the funds in a master account at FRBNY to earn interest at the Interest on Excess Reserves ("IOER") rate available only to banks, and take a small spread for that service. TNB's excess reserves will be a modest fraction of the **$1.5 trillion** in excess reserves currently parked at the Federal Reserve Banks—mostly by large commercial and foreign banks, who have pocketed almost all the IOER payments issued by the Federal Reserve Banks (which came to approximately **$38.5 billion** in 2018 alone). TNB's

business, at the margins at least, will push against that trend, with potential benefits for ordinary savers who have not benefited from recent rate increases.

FRBNY's attempts to make TNB out as a greedy arbitrageur for "special interests" are ironic, then, because the practical implication of FRBNY's position is that too-big-to-fail banks should make *billions* off the IOER program without passing on *any* earnings to customers, while TNB should be barred from making *far less* while passing on *far more*—the very kind of outcome the Deregulation Act was meant to prevent.  Recognizing this, FRBNY stoops lower, resorting to baseless innuendo that TNB poses a "danger" akin to "facilitating illegal activity." This is absurd.  TNB underwent an intensive diligence review by the Connecticut Department of Banking ("CTDoB")—which is how TNB was chartered in the first place—and still more diligence by *FRBNY itself*.  None of these reviews revealed any such risks.  FRBNY is not a chartering authority and should not try to make itself one by flouting the law.

There is no looming policy disaster here; narrow banks operate in other countries without incident, and indeed FRBNY has two virtually identical operations of its own.  FRBNY's position is especially arbitrary because FRBKC has *already* granted a master account to another state-chartered financial company with a business model very similar to TNB's.  Congress has made clear that the Board may not implement its policy preferences by arbitrarily singling out individual state banks for exclusion from the national payments system, and this Court should enforce that restriction.

The motion should be denied.

## **BACKGROUND**

### A.    **The Federal Reserve System**

FRBNY is one of twelve Federal Reserve Banks that, with the Board, form the nation's central bank.  FRBNY is a corporate instrumentality of the United States with its own board of

directors.  The Board is a federal agency that "provides broad, general policy supervision" of the Federal Reserve Banks.  *United States* ex rel. *Kraus v. Wells Fargo & Co.*, No. 11 Civ. 5457 (BMC), 2018 WL 2172662, at *6 (E.D.N.Y. May 10, 2018).  The FRA defines the duties and powers of the Board and the Federal Reserve Banks.  12 U.S.C. §§ 221 *et seq.*

### B.    Depository Institutions Deregulation and Monetary Control Act of 1980

The Federal Reserve payments system is a collection of services provided by the Federal Reserve Banks that are "indispensable for all financial institutions."  *Fourth Corner*, 861 F.3d at 1064 (Bacharach, J.).  These include the ability to clear checks and make wire transfers, currency and coin services, and others.  *See* 12 U.S.C. § 248a(b).  Without those services, a "depository institution is nothing more than a vault."  *Fourth Corner*, 861 F.3d at 1053 (Moritz, J.).

Before 1980, the payments system was unequal.  Larger banks who were Federal Reserve members exercised exclusive access.  (Complaint (Aug. 31, 2018) ("Compl.") ¶ 20 & n.2, ECF No. 1.)  These banks charged non-member banks under private pricing regimes—often at a significant markup—for services that members received for free.  (*Id.* ¶ 21.)  Smaller, state-chartered financial institutions like the emerging thrift industry—savings and loans, mutual savings banks, and credit unions—were at a great competitive disadvantage.  (*Id.* ¶ 22.)

In the late 1970s, the United States Department of Justice challenged this regime with a pair of successful antitrust suits.  (*Id.* ¶¶ 23–24.)  Those victories created a right of access to Federal Reserve Bank services for the thrift industry and led Congress to act.  (*Id.* ¶¶ 24–25.)

The result, in 1980, was the Deregulation Act, which created a right of access to Federal Reserve services for all qualified "depository institutions," including all state-chartered banks, by adding Section 11A to the FRA.[3]  (*Id.* ¶ 25.)  The Act required transparency:  the Board had to

---

[3] *See* 12 U.S.C. §§ 461(b)(1)(A)(i), 461(b)(1)(B), 1813(a), 1815(a)(1).

"publish . . . pricing principles" and "put into effect a schedule of fees . . . based on those principles." 12 U.S.C. § 248a(a). The fee schedule had to cover existing services and "any new services which the Federal Reserve System offers." *Id.* § 248a(b). Critically, the Act also required equal treatment: one "pricing principle" commands that "[a]ll Federal Reserve bank services covered by the fee schedule ***shall be available*** to nonmember depository institutions." *Id.* § 248a(c)(2) (emphasis added). In its annual report that same year, FRBNY wrote that the Act "will have a significant effect on this and other Reserve Banks' services. . . . Beginning in 1981, these services will be available equally to ***all depository institutions*** . . . ."[4]

### C.     The IOER Program

In 2008, Congress began allowing Federal Reserve Banks to pay IOER, at a rate set by the Board. (Compl. ¶ 88.) The IOER rate is one of many policy tools the Board may use to carry out one aspect of monetary policy: influencing the "federal funds rate." (*Id.* ¶¶ 82–92.)

The Board requires depository institutions to maintain minimum levels of "required reserves" in their master accounts against certain liabilities; however, depository institutions may deposit additional reserves ("excess reserves"). *See* 12 U.S.C. § 461(b)(2); 12 C.F.R. § 204. The federal funds rate is the interest rate at which banks lend excess reserves to each other overnight, which is a benchmark for many other private-market interest rates. (Compl. ¶ 83.)

The Board does not control the federal funds rate directly. Rather, the Federal Open Market Committee ("FOMC")—majority-controlled by the Board—sets a target range, and the Board uses policy tools to try to bring the effective federal funds rate prevailing in the market in line with the FOMC's target. (*Id.* ¶¶ 84, 87.) One of those tools is the IOER rate: raising or

---

[4] Fed. Reserve Bank N.Y., Annual Report: 1980, at 35 (1981) (emphasis added), *available at* https://fraser.stlouisfed.org/files/docs/historical/frbny/1980_frb_newyork.pdf.

lowering the IOER rate can make it more (or less) attractive to hold excess reserves, leading banks to charge more (or less) to lend those reserves to other banks.  (*Id.* ¶¶ 88–91.)

In public testimony before Congress advocating for the IOER program and an end to the prohibition on paying interest on corporate checking accounts, the Board said that, together, these measures would increase competition and benefit depositors.  For example, Laurence H. Meyer, then a member of the Board, predicted that the "higher costs to banks will be partially offset by interest on reserve balances, and over time, these measures should help the banking sector attract liquid funds in competition with nonbank institutions and direct market investments . . . .  Small banks in particular should be able to bid for business demand deposits on a more level playing field . . . ."  He also predicted that "benefits . . . will likely be distributed rather widely among bank customers," with small businesses the "biggest winners."[5]

Governor Meyer was trying, in part, to assuage the concern that the IOER program would be a giveaway to large banks.  His predictions have not proved true.  In the decade since the IOER program began, banks have deposited trillions of dollars in excess reserves—around $1.5 trillion in February 2019.[6]  "The largest banks . . . hold the greatest share of excess reserves, and this share has grown substantially over time," while foreign banks are also a "large contributor."[7]

---

[5] Cmts. on H.R. 1585 and Regulatory Streamlining: Hr'g Before Subcomm. on Fin. Insts. & Consumer Credit of H. Comm. Banking & Fin. Servs. (May 12, 1999) (statement of Laurence H. Meyer, Governor, Bd. Governors Fed. Reserve Sys.), *available at* https://www.federalreserve.gov/boarddocs/testimony/1999/19990512.htm.

[6] Fed. Reserve Bank St. Louis, *Excess Reserves of Depository Institutions [EXCRESNS]*, https://fred.stlouisfed.org/series/EXCSRESNS (last accessed Mar. 25, 2019).

[7] Fed. Reserve Bank Cleveland, *Who Is Holding All the Excess Reserves?* (Aug. 11, 2015), https://www.clevelandfed.org/newsroom-and-events/publications/economic-trends/2015-economic-trends/et-20150811-who-is-holding-all-the-excess-reserves.aspx.

The Federal Reserve Banks have paid billions of dollars in IOER: as much as $38.5 billion in 2018 alone.[8]  Most of that money has "concentrated on the balance sheets of the largest banks."[9]  (*See also* Compl. ¶¶ 95–97 & nn.17–18.)  While excess reserves now earn 240 basis points (2.4%), "jumbo" deposits—more than $100,000—now earn as little as ten basis points (0.10%) from savings accounts, and six basis points (0.06%) from checking accounts.[10]

### D.    FRBNY's Existing Narrow Banking Operations

Two other mechanisms available to the Federal Reserve system to influence the federal funds rate are the Overnight Reverse Repurchase Agreement Facility ("ON RRP") and Foreign Repo Pool ("FRP").  (*Id.* ¶ 102.)  Each serves an economic function very similar to TNB's, providing an overnight investment backed directly (or indirectly) by central bank liabilities that passes on relatively high interest rates to a wider circle of participants than those eligible for IOER, such as money market funds (ON RRP) and foreign central banks (FRP).  (*See id.* ¶¶ 102–19.)  Each program has attracted billions of dollars in investments; in March 2019, for example, foreign banks parked as much as $245 billion with the FRP program.[11]

### E.    TNB's Charter and Master Account Application

TNB was founded in 2016 by experienced financial professionals and economists.  (*Id.* ¶¶ 38–42.)  Its business plan is to provide ultra-safe depository services for institutional money

---

[8] Press Release, Bd. Governors Fed. Reserve Sys., Federal Reserve Board Announces Reserve Bank Income and Expense Data and Transfers to the Treasury for 2018 (Jan. 10, 2019), https://www.federalreserve.gov/newsevents/pressreleases/other20190110a.htm.

[9] Fed. Reserve Bank Cleveland, *Who Is Holding All the Excess Reserves?* (Aug. 11, 2015), https://www.clevelandfed.org/newsroom-and-events/publications/economic-trends/2015-economic-trends/et-20150811-who-is-holding-all-the-excess-reserves.aspx.

[10] FDIC, Weekly National Rates and Rate Caps - Weekly Update (Mar. 25, 2019), https://www.fdic.gov/regulations/resources/rates/.

[11] Bd. Governors Fed. Reserve Sys., *Federal Reserve Statistical Release: Factors Affecting Reserve Balances* (Mar. 21, 2019), https://www.federalreserve.gov/releases/h41/current/.

market investors by holding all assets with FRBNY, earning interest at the IOER rate, and paying interest to customers at a slightly lower rate, thereby earning a small spread. (*Id.* ¶¶ 43–44.)  In this way, TNB hopes to give customers higher rates of interest than are currently available in the market and exert competitive pressure on existing banks to raise their deposit rates. (*Id.* ¶¶ 44–45, 98–100.)  TNB's excess reserves will be modest compared to the more than a trillion dollars of excess reserves currently on deposit. (*See id.* ¶¶ 82, 98, 114.)

In July 2016, TNB began the process to obtain a charter from CTDoB so that TNB could qualify for a master account. (*Id.* ¶ 48.)  This led to a rigorous year-long diligence review of TNB's business plan, after which TNB received a temporary Certificate of Authority ("CoA") from CTDoB. (*Id.* ¶¶ 49–50.)  Before issuing a final CoA, CTDoB asked for evidence that FRBNY would open a master account for TNB. (*Id.* ¶ 52.)

In August 2017, TNB began the typically routine process of opening a master account with FRBNY. (*Id.* ¶¶ 58–59.)  The "application" is a single-page form agreement, asking only for basic information about the applicant. (*Id.* ¶¶ 53–54.)  The form states that processing "may take 5-7 business days." (*Id.* ¶ 54.)  To complete the form, however, TNB needed an American Bankers Association routing number issued by a company called Accuity. (*Id.* ¶ 55.)

TNB applied for a routing number in August 2017. (*Id.* ¶ 58.)  The only requirements were that TNB have a valid state or federal charter and be eligible to maintain an account at a Federal Reserve Bank. (*Id.* ¶ 56.)  Accuity forwarded TNB's routing number request to FRBNY for verification that TNB would be eligible for a master account. (*Id.* ¶ 59.)

FRBNY told Accuity that TNB would be eligible for a master account after the issuance of a final CoA from CTDoB and maintenance of $500,000 in deposits. (*Id.* ¶¶ 60–62.)  On that basis, Accuity issued a routing number to TNB in October 2017. (*Id.* ¶ 62.)

TNB was now ready to submit a master account application but was told by an FRBNY attorney that FRBNY wanted to conduct diligence of its own before proceeding because TNB would not be insured and regulated by the FDIC. (*Id.* ¶ 63.) The attorney advised TNB not to make a formal application until after FRBNY's diligence review. (*Id.*)

FRBNY requested documents and information from TNB in September 2017 and made more requests over the next few months. (*Id.* ¶¶ 65–68.) The requests focused on operational issues already examined by CTDoD, such as creditworthiness and anti-money laundering protections. (*Id.* ¶ 66.) TNB gave prompt, comprehensive responses. (*Id.* ¶¶ 65–66.)

### F.     The Board's Decision to Interfere in TNB's Master Account Application

In November 2017, FRBNY completed its review and told TNB that FRBNY was prepared to inform CTDoB that TNB could open a master account once it received a final CoA and maintained at least $500,000 in non-trust deposits. (*Id.* ¶ 68.) At the same time, FRBNY said that the Board had learned of TNB's intentions and wanted time to consider the policy implications of TNB's business model. (*Id.* ¶ 69.)

In early December 2017, FRBNY informed TNB that the Board was also prepared to approve TNB's master account—only to call back later the same day to say that TNB should not expect approval any time soon. (*Id.* ¶ 70.) In February 2018, FRBNY told TNB that the Board had "policy concerns" and likely would not allow TNB to open a master account. (*Id.* ¶ 72.)

Though TNB need not have done so, given its statutory rights, it made many efforts to explain to the Board and FRBNY why any concerns were unfounded, including in-person meetings with the Board and FRBNY and a formal written submission. (*Id.* ¶¶ 72–77.) By April 2018, TNB suspected that FRBNY and the Board knew they had no legal basis to deny TNB's application and were trying to delay until TNB gave up. (*Id.* ¶ 76.)

In late April 2018, TNB formally applied for a master account and wrote to FRBNY's general counsel asking that FRBNY comply with its statutory obligations at once and commit to opening TNB's master account.  (*Id.* ¶¶ 76–78.)  In May 2018, FRBNY's general counsel replied that FRBNY would not do so because "senior policy officials at the Board . . . have expressed the strong view that the New York Fed should not approve TNB's request . . . ."[12]

### G.    The Board Begins a Rulemaking Process to Shut Down TNB While TNB's Master Account Supposedly Remains "Under Consideration"

After another three months without action, in August 2018, TNB filed this lawsuit. Seven more months have now passed.  Neither FRBNY nor the Board has asked for more information, or given any status updates, regarding TNB's application.  FRBNY continues to insist to the Court, however, that the application is "still under review."  (Letter (Oct. 16, 2018) ("10/16/18 Letter") at 1, ECF No. 14; *see also* Mem. Law Supp. FRBNY Mot. Dismiss (Mar. 8, 2019) ("Br.") at 1–2, 9, 11–13, ECF No. 21.)  There is no evidence that such a "review" exists, but much else has happened in the meantime.

This lawsuit generated much public commentary—almost all sympathetic to TNB. TNB's business model is "an obvious boon to financial stability and efficiency," concludes one prominent commentator.[13]  A former top Federal Reserve staffer and current Dartmouth

---

[12] Letter from Michael Held, General Counsel, FRBNY, to Thomas E.L. Dewey, Dewey Pegno & Kramarsky LLP (May 16, 2018).

[13] John H. Cochrane, Hoover Inst., Stanford Univ., *Fed Nixes Narrow Bank* (Sept. 5, 2018), https://johnhcochrane.blogspot.com/2018/09/fed-nixes-narrow-bank.html; *see also* John H. Cochrane, *The Safest Bank the Fed Won't Sanction*, Chi. Booth Rev. (Nov. 30, 2018), http://review.chicagobooth.edu/finance/2018/article/safest-bank-fed-won-t-sanction.

economics professor believes the Board "should welcome banks like TNB."[14]  The Board may

not be "alone" in its concerns (*see* Br. at 8 n.5), but most commentators support TNB.[15]

There is ample basis for that support.  Narrow banks already operate abroad,[16] and TNB

has become aware of another state-chartered financial institution, the Reserve Trust Company

(the "Reserve Trust"), which recently received a master account from FRBKC.  Like TNB, the

Reserve Trust, which is neither FDIC-insured nor federally regulated, does not make loans or

otherwise leverage client funds.[17]  The Reserve Trust has been operating for more than two

years, while presumably earning IOER, without incident.[18]

Finally, just **three days** before FRBNY filed the motion, the Board issued advance notice

of proposed rulemaking ("ANPR") regarding narrow banks.[19]  An ANPR is the first step in the

agency rulemaking process.  The import of this one is not subtle: the Board intends to put TNB

---

[14] *Quoted in* Michael S. Derby, *Bank Sues New York Fed Over Lack of Account*, Wall St. J. (Sept. 5, 2018), https://www.wsj.com/articles/bank-sues-new-york-fed-over-lack-of-account-1536185523.

[15] *See, e.g.*, Paul H. Kupiec, *The Fed Refuses to Do Business with the Safest Bank on Earth—and Depositors Pay the Price*, Am. Enter. Inst. (Nov. 28, 2018), http://www.aei.org/publication/the-fed-refuses-to-do-business-with-the-safest-bank-on-earth-and-depositors-pay-the-price/; Peter Conti-Brown, *The Fed Wants to Veto State Banking Authorities. But Is that Legal?*, Brookings Inst. (Nov. 14, 2018), https://www.brookings.edu/research/the-fed-wants-to-veto-state-banking-authorities-but-is-that-legal/; Rodney Johnson, *The Fed's Newest Double Standard*, Econ. & Mkts. (Sept. 26, 2018), https://economyandmarkets.com/economy/central-banks/the-feds-newest-double-standard/; Editorial Bd., *Narrow Odds for Narrow Banks*, Wall St. J. (Sept. 12, 2018), https://www.wsj.com/articles/narrow-odds-for-narrow-banks-1536793230.

[16] Nat'l Savings & Invs., https://www.nsandi.com/why-save-with-us (last visited Mar. 25, 2019); Safe Deposit Bank Nor., https://www.sdbn.com/ (last visited Mar. 25, 2019).

[17] *See* Reserve Trust Company, https://www.reservetrust.com/ (last accessed Mar. 25, 2019).

[18] Colo. Div. Banking, 107th Annual Report at 16 (2017), http://www2.cde.state.co.us/artemis/regserials/reg21internet/reg212016internet.pdf.

[19] *See* Bd. Governors Fed. Reserve Sys., ANPR, Regulation D: Reserve Requirements of Depository Institutions, *available at* https://www.govinfo.gov/content/pkg/FR-2019-03-12/pdf/2019-04348.pdf.

out of business with a discriminatory regulation even if TNB is successful here.  The ANPR is rife with loaded characterizations of the potential effects of TNB's business model—though it acknowledges the "potential benefits" found by many writers—and concludes by insinuating that narrow banks like TNB should receive IOER at a rate of "zero."  This is not a fair-minded solicitation of views, but an order of execution—and implicit recognition that FRBNY's supposed case for refusing to open a master account for TNB is a pretextual rearguard action.

## LEGAL STANDARD

On either ground of FRBNY's motion—Rule 12(b)(1) or 12(b)(6)—the Court must accept the allegations in the complaint as true and draw all inferences in TNB's favor.  *Vullo v. OCC*, 17 Civ. 3574 (NRB), 2017 WL 6512245, at *5 (S.D.N.Y. Dec. 12, 2017) (Fed. R. Civ. P. 12(b)(1)); *Taboola, Inc. v. Ezoic Inc.*, 17 Civ. 9909, 2019 WL 465003, at *8 (S.D.N.Y. Feb. 6, 2019) (Fed. R. Civ. P. 12(b)(6)).  For Rule 12(b)(1), a preponderance of the evidence, from the pleadings or otherwise, must establish subject matter jurisdiction.  *Vullo*, 2017 WL 6512245, at *5.  For Rule 12(b)(6), the facts in TNB's complaint, including documents incorporated by reference, need only make out a plausible claim.  *Taboola*, 2019 WL 465003, at *8–9.

## ARGUMENT

TNB has a more than plausible claim, and this Court has power to hear it.  As a chartered state bank, TNB has a statutory right to a master account—the gateway to critical services that federal law requires FRBNY to make available to any qualified state bank.  For going on two years, at the unlawful direction of the Board, FRBNY has refused to open a master account for TNB, offering only the slender excuse that TNB's application—the review of which typically takes mere days—is "under consideration."  Meanwhile, TNB is out of business; FRBNY has effectively nullified all the resources that went into the intensive due diligence for TNB's

charter, while TNB continues to incur operating expenses.  FRBNY's refusal is especially

galling because the "policy" basis, though irrelevant, is demonstrably specious.

## I.  TNB HAS A STATUTORY RIGHT TO A MASTER ACCOUNT

Federal Reserve Banks once had the unbounded discretion that FRBNY claims here.  The

result was a monopoly on services that enriched large incumbent banks at the expense of smaller

state-chartered financial institutions.  So, almost forty years ago, Congress set definite limits on

that discretion by amending the FRA to mandate that Federal Reserve Banks make services

available equally to all qualified depository institutions.  FRBNY's position—that it may refuse

services to any qualified bank based on its or the Board's policy preferences—violates a clear

Congressional command, disregards the Board's and FRBNY's consistent statements since 1980,

and subverts the statutory structure of the Federal Reserve system.

### A.  Section 11A of the Federal Reserve Act Unambiguously Requires FRBNY to Open a Master Account for TNB

The only sensible reading of the FRA, as amended by the Deregulation Act, is that

FRBNY must make services, including master accounts, available to any depository institution,

including TNB.[20]  Judge Bacharach extensively considered the arguments FRBNY makes here

and rejected them—as this Court should, too.  *See Fourth Corner*, 861 F.3d at 1067–74.

The terms of Section 11A are mandatory.  The Board "***shall*** publish . . . a set of pricing

principles . . . for Federal Reserve Bank services" and "a schedule of fees for such services . . .

based on those principles."  12 U.S.C. § 248a(a) (emphasis added).  Section 11A names the

"services which ***shall*** be covered by the schedule of fees," which include "any new services

which the Federal Reserve System offers."  *Id.* § 248a(b) (emphasis added).  "***All Federal***

---

[20] FRBNY concedes for purposes of this motion that TNB is a qualified "depository institution" under Section 11A.  (Br. at 7 n.4.)

***Reserve bank services*** covered by the fee schedule ***shall be available*** to nonmember depository institutions . . . ." *Id.* § 248a(c)(2) (emphasis added). Elsewhere, by contrast, Section 11A uses "may" to confer discretion. *See id.* § 248a(e). "Congress' use of the permissive 'may' contrasts with . . . use of a mandatory 'shall' in the very same section . . . to impose discretionless obligations." *Lopez v. Davis*, 531 U.S. 230, 241 (2001). One of those obligations is that Federal Reserve Banks[21] make services available to all "nonmember depository institutions."

It is irrelevant that "all" does not actually appear in the operative phrase because there is no restriction on the depository institutions to whom services shall be available. The only logical reading is that FRBNY's obligations extend to each and every one. *See Fourth Corner*, 861 F.3d at 1069–70 (Bacharach, J.) (collecting authorities); *see also Greater Buffalo Press, Inc. v. Fed. Reserve Bank of N.Y.*, 866 F.2d 38, 40 (2d Cir. 1989) ("check clearing services . . . to be made available to ***all banks***") (emphasis added); *Jet Courier Servs., Inc. v. Fed. Reserve Bank of Atl.*, 713 F.2d 1221, 1223 (6th Cir. 1983) (same).[22] FRBNY does not (and cannot) explain—other than invoking unanswerable discretion to interpret the Act as it sees fit—how the phrasing of Section 11A puts any limitation on the depository institutions who are entitled to services.

Unsurprisingly then, until very recently, FRBNY and the Board both interpreted Section 11A as a mandate to make Federal Reserve Bank services equally available to ***"all"*** qualified institutions. The year Congress passed the Act, FRBNY wrote that "services will be available

---

[21] FRBNY's insistence that Section 11A has no bearing on the obligations of the Federal Reserve Banks because its title is "directed to the powers and duties of the 'Board'" (Br. at 18) ignores that Section 11A explicitly refers to "***Federal Reserve bank*** services," 12 U.S.C. § 248a(c)(2) (emphasis added). "A statute's caption . . . cannot undo or limit its text's plain meaning." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 262 (2004).

[22] FRBNY tries to distinguish *Greater Buffalo* and *Jet Courier* but does not acknowledge that both held squarely that the Deregulation Act expanded Federal Reserve Bank services to ***"all"*** depository institutions. (*See* Br. at 22 n.8.)

equally to *all* depository institutions."[23]  *Even today*, the Board says on its website that the Act gives "*all* depository institutions access to the Federal Reserve's payment services."[24]  Thus, TNB's reading is not the idiosyncratic interpretation of a single Tenth Circuit judge—as FRBNY would have the Court believe (Br. at 21–22)—but *the Board's and FRBNY's own consistent understanding for almost forty years.*  The only mention of these past interpretations in FRBNY's brief is deeply misleading.  (*See id.* at 22–23.)  The Board and FRBNY did not "simply note[ ] that the [Deregulation Act] made Federal Reserve Bank services available to nonmember depository institutions as well as member depository institutions" (*contra id.*), but explicitly said, without limitation, the precise opposite of FRBNY's litigation position.

A master account is undoubtedly one of the services that FRBNY must make available. Simply put, "all services offered by the Federal Reserve System"—not merely "some" (*contra* Br. at 19)—"are conditioned on the issuance of master accounts," *Fourth Corner*, 861 F.3d at 1068–69 (Bacharach, J.); *accord id.* at 1053 (Moritz, J.).  To argue that a master account is not subject to the Act's mandate of equal access, as FRBNY does, is specious; like conceding the right to drive but denying the right to access the roads.  That interpretation is illogical and "flies in the face of Congress's unambiguous command."  *Id.* at 1069 (Bacharach, J.).

FRBNY's attempts to discredit Judge Bacharach's persuasive interpretation of Section 11A all fail.  (*See* Br. at 22–23.)  *First*, no court has yet followed Judge Bacharach's reasoning

---

[23] Fed. Reserve Bank N.Y., Annual Report: 1980, at 35 (1981) (emphasis added), *available at* https://fraser.stlouisfed.org/files/docs/historical/frbny/1980_frb_newyork.pdf; *accord* Bd. Governors Fed. Reserve Sys., Policies: The Federal Reserve in the Payments System (1990) ("Federal Reserve payment services are available to *all* depository institutions.") (emphasis added), *available at* http://www.federalreserve.gov/paymentsystems/pfs_frpaysys.htm.

[24] Bd. of Governors of the Fed. Reserve Sys., Federal Reserve's Key Policies for the Provision of Financial Services: About, https://www.federalreserve.gov/paymentsystems/pfs_about.htm (last updated Oct. 28, 2016) (emphasis added).

because—in a revealing historical detail—until *Fourth Corner*, in the near-forty-year history of the Deregulation Act, no qualified institution had ever had to litigate its right to a master account. *Second*, though Judge Bacharach wrote for himself, no other judge on the panel disagreed with his reading, and the district judge had necessarily reached the same conclusion.[25]  *See Fourth Corner Credit Union v. Fed. Reserve Bank Kan. City*, 154 F. Supp. 3d 1185, 1188–89 (D. Colo. 2016).  *Third*, for all the reasons above, Judge Bacharach did not ignore the purported "absence" of "all" from the statutory text or "misconstrue[ ]" the Board's and FRBNY's past pronouncements.  (*Contra* Br. at 22–23.)  Judge Bacharach addressed each issue at length, *see Fourth Corner*, 861 F.3d at 1069–72, and it is telling that FRBNY, almost two years later, does little more than repeat the same arguments that Judge Bacharach rejected, without addressing his rebuttals in any real detail.[26]

## B.  Section 13 of the Federal Reserve Act Does Not Permit Federal Reserve Banks to Withhold Master Accounts or Other Services

FRBNY argues that Section 13 of the FRA, which describes the ***types*** of deposits that Federal Reserve Banks may receive, should override the clear mandate of Section 11A, which specifically says which services "shall be available" and to whom.  Judge Bacharach considered this contention, too, and correctly rejected it.  *See id.* at 1067–74.

---

[25] Notably, Judge Moritz agreed with Judge Bacharach's conclusion that a master account is necessary to access all Federal Reserve Bank services.  *Fourth Corner*, 861 F.3d at 1053.

[26] FRBNY argues, for example, that Judge Bacharach "ignore[d]" that "the terms of master accounts have always made clear that master account agreements are 'subject to approval' by Federal Reserve Banks and may be terminated . . . 'at any time.'"  (Br. at 23.)  Even leaving aside that agency boilerplate cannot override the express will of Congress, the mere fact that FRBNY might, for unspecified reasons, reject a master account application or terminate a master account does not conflict with Section 11A's mandate.  For example, FRBNY might refuse to open an account after finding that the applicant was not in fact a qualified depository institution.

Section 13 provides that "[a]ny Federal reserve bank *may receive* from any of its member banks, or other depository institutions and from the United States, deposits of current funds in lawful money, national-bank notes, Federal reserve notes, or checks, and drafts, payable upon presentation or other items, and also, for collection, maturing notes and bills."  12 U.S.C. § 342 (emphasis added).  As Judge Bacharach recognized, Section 13 does no more than list "the *types* of monetary instruments that Federal Reserve Banks may receive for deposit," and not "which institutions can access Federal Reserve services"—a subject "governed instead by § 248a(c)(2), which establishes open access to Federal Reserve services for all nonmember depository institutions."  *Fourth Corner*, 861 F.3d at 1074 (emphasis added).

Unable to discredit that interpretation, FRBNY reaches back to the 1920s, relying heavily on *Farmers' & Merchants' Bank of Monroe, N.C. v. Federal Reserve Bank of Richmond*, 262 U.S. 649 (1923).  (*See* Br. at 15, 21, 24.)  This case predates the Deregulation Act by almost sixty years and in no way requires this Court to adopt FRBNY's preferred construction of the FRA.  There, the Supreme Court merely concluded, like Judge Bacharach, that the language of Section 13 was "permissive" with respect to the *types* of instruments Federal Reserve Banks may receive.  *Id.* at 662 ("neither section 13, nor any other provision of the [FRA], imposes . . . any obligation *to receive checks for collection*") (emphasis added).  The decision is silent about a Federal Reserve Bank's discretion (or lack thereof) to take deposits from particular institutions— a question settled by the Deregulation Act.  Whatever the state of the law in 1923, Congress's later intention to expand access to Federal Reserve Bank services is explicit in Section 11A.

There is no conflict, then, between Sections 11A and 13.  (*Contra* Br. at 20–21.)  It can be equally true that FRBNY has discretion to decide which types of deposits to receive and does *not* have discretion to deny services, including a master account, to a qualified depository

institution.  If, for example, FRBNY exercised its discretion under Section 13 to receive checks for collection, then Section 11A would require only that FRBNY did so on a non-discriminatory basis for all qualified depository institutions.[27]  (*Contra* Br. at 16–17.)

### C.   Section 11A's Mandate Does Not Conflict with the FRA but the Board's Unlawful Intervention in FRBNY's Daily Operations Does

There is also no inconsistency between Section 11A and the Federal Reserve's "statutory policy mandates."  (*Contra* Br. at 21–25.)  Section 11A **is one of those mandates**; Connecticut gave TNB the right to operate under a state charter, and TNB has the right to a master account.

FRBNY goes as far as arguing that, even if TNB is correct on the law, other "statutory policy mandates" give FRBNY the right to ignore Section 11A's mandate whenever FRBNY or the Board sees fit.  (Br. at 23.)  That position is as extreme as it is incorrect.  *First*, "it is a commonplace of statutory construction that the specific governs the general."  *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (quotation marks and citation omitted).  "However inclusive may be the general language of a statute, it will not be held to apply to a matter specifically dealt with in another part of the same enactment."  *Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 228–29 (1957) (quotation marks and citation omitted).  *Second*, "[t]he Fed is not a chartering authority and should not contort itself to become one," in the words of a prominent commentator.  "The kinds of existential banking concerns that

---

[27] The legislative history of the Deregulation Act, which FRBNY notably elides (*see* Br. at 20–21), supports this conclusion, *see, e.g.*, H.R. Rep. No. 95-1590, at 20 (1978) ("The [House Committee on Banking Finance and Urban Affairs] believes that the wide access to Federal Reserve services for nonmember banks authorized by this bill will insure [sic] that a basic level of services is available to **all banks throughout the country on a nondiscriminatory basis**.") (emphasis added); H.R. Conf. Rep. No. 96-842, at 73 (1980) ("House amendment includes a provision for the Federal Reserve to . . . open access to [Federal Reserve] services to **all depository institutions** on the same terms and conditions as member banks.") (emphasis added).

the Fed makes about Fourth Corner and TNB are for chartering authorities to evaluate. Connecticut and Colorado have already done this work."[28]

The Board, moreover, has no place in the master account process.  "Congress did not intend to give the federal government direction over the daily operation of the Reserve Banks." *Fox News Network, LLC v. Bd. Governors Fed. Reserve Sys.*, 601 F.3d 158, 161 (2d Cir. 2010) (internal quotation marks and citation omitted).  "The Board only provides broad, general policy supervision," while the Federal Reserve Banks determine "the manner of conducting general Bank business and appoint officers to implement and supervise daily [ ] activities," like "holding reserves for member banks." *Kraus*, 2018 WL 2172662, at *6 (quotation marks and citations omitted); *accord Lewis v. United States*, 680 F.2d 1239, 1241 (9th Cir.1982); *United States* ex rel. *Holbrook v. Brink's Co.*, 336 F.Supp.3d 860, 869–70 (S.D. Ohio 2018).

FRBNY was willing to open TNB's master account until the Board intervened.  (Compl. ¶¶ 68–70.)  The Board may not impose itself on FRBNY's routine operations to implement policy, and this case should proceed to discovery to determine whether the Board has done so.

## II.     THIS COURT HAS SUBJECT MATTER JURISIDICTION

FRBNY's standing and ripeness arguments fail as well.  This Court has original subject matter jurisdiction to hear suits against FRBNY, 12 U.S.C. § 632, and it is well settled that agencies may not avoid lawsuits by refusing to act on an application, as FRBNY has done here, causing undoubtable harm to TNB with each passing day.

---

[28] Peter Conti-Brown, *The Fed Wants to Veto State Banking Authorities. But Is that Legal?*, Brookings Inst. (Nov. 14, 2018), https://www.brookings.edu/research/the-fed-wants-to-veto-state-banking-authorities-but-is-that-legal/.

### A.  TNB's Claims Are Ripe Because FRBNY Has Refused to Act on TNB's Application for a Master Account

FRBNY argues that TNB's account request is not ripe because it is "still under consideration."  (Br. at 11.)  Not so.  FRBNY has had ***more than eighteen months*** to decide—when approval is mandatory and should have taken mere days.  This is a classic case of denial by delay, and courts routinely reject challenges to ripeness on similar facts.

After months of diligence, in December 2017, FRBNY told TNB that approval of its master account was forthcoming; then the Board countermanded that decision.  (Compl. ¶¶ 65–70.)  TNB met with the Board and made a written submission addressing its concerns.  The response in May 2018, as conveyed through FRBNY, was that it was the Board's "strong view that ***the New York Fed should not approve TNB's request***."  Since then, there has been no noticeable action on TNB's application.  Instead, ***mere days*** before FRBNY filed the motion, the Board issued an ANPR designed to eviscerate TNB's business should it ever receive a master account.  Clearly, FRBNY has ***already*** decided to bend to the Board's will and deny TNB's account—and has not formally done so only for the convenience of its litigation position.

A claim should be dismissed as ***constitutionally*** unripe only when it "depends upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013) (citation omitted).  That is not the case here.  Federal courts routinely reject ripeness challenges where the defendant's "indeterminate delay has the same effect as an outright denial."  *Groome Res. Ltd., L.L.C. v. Parish of Jefferson*, 234 F.3d 192, 198–200 (5th Cir. 2000) (defendant failed to either grant or deny a permit application for 82 days past target date and plaintiff's claim presented a purely legal question); *see also Sayles Hydro Assocs. v. Maughan*, 985 F.2d 451, 453–454 (9th Cir. 1993); *Amico v. New Castle Cty.*, 553 F. Supp. 738, 741–743 (D. Del. 1982) (same).

Nor does ***prudential*** ripeness give any basis for dismissal.  (*Contra* Br. at 12–13.)  Under that doctrine, a court may dismiss a claim that, while ***constitutionally*** ripe, "will be ***better*** decided later," so long as "the parties will [not] be made worse off on account of the delay." *Simmonds v. INS*, 326 F.3d 351, 357 (2d Cir. 2003).  There are two considerations:  "(1) whether an issue is fit for judicial decision and (2) whether and to what extent the parties will endure hardship if decision is withheld."  *Id.* at 359 (citation omitted).  Neither favors FRBNY.

*First*, under the fitness prong, no new facts will enhance the Court's ability to resolve the issue of statutory interpretation presented by TNB's complaint.  Either FRBNY has the legal discretion to deny a master account on "policy" grounds or not.  The supposedly "ongoing" policy review—even if not a smokescreen—will yield no insight.  *See id.* (issues are prudentially ripe when they "would not benefit from any further factual development and . . . the court would be in no better position to adjudicate the issues in the future than it is now") (citation omitted).

*Second*, FRBNY's unlawful decision to subject TNB to a never-ending "policy" review is causing obvious hardship ***right now***, which will only compound with further delay.  FRBNY's plain intention is to hold off TNB long enough for the Board to ensure—though a rule-making process TNB believes is contestable in its own right—that even if granted a master account TNB will ***never*** have equal access to IOER.  The case for hardship is indisputable.  *See Sayles*, 985 F.2d at 454 ("The hardship is the process itself.  Process costs money.").

### B.   TNB Has Standing to Challenge FRBNY's Ongoing Refusal to Open a Master Account Because Each Passing Day Adds to Its Losses

FRBNY argues that TNB lacks standing because it has not alleged an "injury in fact" (Br. at 10–11)—"a harm . . . that is concrete and actual or imminent, not conjectural or hypothetical," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102–03 (1998) (internal quotations and citation omitted).  But the concrete and actual harm here is clear:  FRBNY has refused to honor

its statutory obligation and as a result TNB cannot operate its business.  This is a quintessential "case or controversy," and this Court has the power to resolve it.

FRBNY's notion that it can insulate itself from review and deny TNB recourse to the judicial system simply by withholding a formal denial of TNB's application is contrary to controlling law.  It is well-established that one party's denial of another's statutory right through a *failure* to act is justiciable to the same degree as a party's affirmative denial of a statutory right.  *E.g.*, *In re Idaho Conservation League*, 811 F.3d 502, 507 (D.C. Cir. 2016) (standing to challenge failure to promulgate required regulations where challenging party had suffered continuing harm due to delay); *Comm'n Full Emp't v. Blumenthal*, 606 F.2d 1062, 1064–65 (D.C. Cir. 1979) (standing to challenge ongoing inaction regarding civil rights complaints).

### C.   FRBNY Has Identified No Legal Authority or Sound Reason for the Court to Refuse Jurisdiction Under the Declaratory Judgment Act

Finally, FRBNY's throw-away argument that the Court should "decline jurisdiction" over TNB's claim for a declaratory judgment on "public interest" grounds must also be rejected.  (Br. at 13).  FRBNY gives no relevant authority for this theory, and a far more compelling precedent is at hand: *Fourth Corner*, in which the District of Colorado and the Tenth Circuit did *not* decline such jurisdiction.  This Court should take the same approach.

FRBNY does not even bother to apply the factors that should "guide the district court's exercise of discretion in Declaratory Judgment Act cases," which are "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty."  *Dow Jones & Co., Inc. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003) (citation omitted).  Thus, the Court's discretion hinges on whether a declaratory judgment will actually resolve this case—not whether the court should defer to the vaguely drawn policy preferences of the defendant.

FRBNY argues that the Court "should allow the ANPR process to run its natural course" (Br. at 13–14), but this is simply another way of saying that the Court should allow FRBNY to flout federal law until the Board can amend its regulations to put TNB out of business by other means. When any such regulations are issued, TNB (and the courts) can address them. In the meantime, FRBNY must follow the law.

## III. THE BOARD'S POLICY CONCERNS ARE IRRELEVANT AND BASELESS

For all the reasons above, the Board's "policy" concerns are no basis to deny TNB its statutory right to a master account—but those concerns are also highly exaggerated.

The Federal Reserve Banks collectively hold more than $1.5 trillion in excess reserves—most for large banks that on average pay paltry interest rates to their depositors.[29] What those large banks do with their billions in earnings from the IOER program apparently matters little to the Board or FRBNY. Yet the mere possibility that TNB might increase the number of excess reserves by a modest amount, while more broadly distributing earnings from IOER to depositors at a smaller rate of profit than the large banks, has now led the Board and FRBNY to believe the entire financial system is at stake. This is obviously hyperbole—especially because a financial institution very similar to TNB *already has a master account*;[30] FRBNY operates two similar facilities of its own through ON RRP and FRP (Compl. ¶¶ 102–19);[31] and narrow banks operate elsewhere in the world without calamitous consequences.[32]

---

[29] Fed. Reserve Bank St. Louis, *Excess Reserves of Depository Institutions [EXCRESNS]*, https://fred.stlouisfed.org/series/EXCSRESNS (last accessed Mar. 25, 2019).

[30] Reserve Trust Company, https://www.reservetrust.com/ (last accessed Mar. 25, 2019).

[31] FRBNY all but admitted as much in its letter request for a pre-motion conference. (*See* 10/16/18 Letter at 3 (citing, and not disputing, Compl. ¶¶ 109, 114, 116).)

[32] Nat'l Savings & Invs., https://www.nsandi.com/why-save-with-us (last visited Mar. 25, 2019); Safe Deposit Bank Nor., https://www.sdbn.com/ (last visited Mar. 25, 2019).

FRBNY, recognizing this, frames the "threat" posed by TNB in highly speculative and contingent terms:  TNB's business model has "***the potential*** to complicate the implementation of monetary policy"; banks like TNB "***could potentially*** attract a large quantity of deposits and maintain very large balances at Federal Reserve Banks."  (Br. at 8 (emphasis added).)  Of course, the Federal Reserve Banks ***already*** have a large quantity of excess reserves on hand, in no small part because large banks have taken advantage of the lack of competition for deposits to capture the vast majority of IOER earnings for themselves.  The Board said those earnings would radiate out to depositors, but that simply has not happened.  (*Id.* ¶¶ 94–97 & n.16.)  TNB will help change that by putting a ***modicum*** of competitive pressure on large banks to raise interest rates for deposits, improving the efficiency and fairness of IOER as a policy tool.  (*Id.* ¶¶ 100–01.)

TNB will not "jeopardize" the public interest.  (Br. at 24.)  FRBNY's efforts to associate TNB with illegality, insolvency, or "special interests" are unfounded smears.  (*See id.* at 17, 23–24.)  TNB's business model is undoubtedly lawful and underwent months of intensive diligence by CTDoB and FRBNY.  (*See* Compl. ¶¶ 48–52, 63–68.)  In *Fourth Corner*, the Tenth Circuit considered the application of Section 11A to a credit union that would ***actually*** support illegal activity.  Even in those extreme circumstances—in no way comparable to TNB's—not one judge accepted FRBNY's preferred interpretation of the FRA.[33]

## CONCLUSION

For the all the reasons above, FRBNY's motion should be denied.

---

[33] Judge Moritz, the only Tenth Circuit judge to conclude that illegality was a basis for dismissal of Fourth Corner's complaint, did not base her decision on the language of Section 13, but rather "[b]ecause the ***district court*** correctly declined to lend its equitable power to illegal activity." *Fourth Corner*, 861 F.3d at 1053 (emphasis added).

Dated: New York, New York                     **DEWEY PEGNO & KRAMARSKY LLP**
      March 26, 2019

                                         Thomas E.L. Dewey
                                         David S. Pegno
                                       Anders W. Pauley
                                         777 Third Avenue – 37th Floor
                                         New York, New York 10017
                                         Tel. (212) 943-9000
                                         Fax (212) 943-4325
                                         tdewey@dpklaw.com
                                         dpegno@dpklaw.com
                                         apauley@dpklaw.com

                                         *Attorneys for Plaintiff TNB USA Inc.*