## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

TNB USA INC.,

        Plaintiff,

    v.

FEDERAL RESERVE BANK OF NEW YORK,

        Defendant.

Civil Action No. 1:18-cv-7978-ALC

### DECLARATION OF YVONNE F. MIZUSAWA IN SUPPORT OF
### MOTION FOR LEAVE TO FILE A BRIEF AS *AMICUS CURIAE*

I, Yvonne F. Mizusawa, pursuant to 28 U.S.C. § 1746, hereby declares as follows:

1. I am Senior Counsel with the Board of Governors of the Federal Reserve System ("Board"), a non-party federal government agency.  I am a member in good standing of the bar of the District of Columbia and have filed a motion to appear *pro hac vice* as counsel for the Board in this action.

2. I submit this Declaration in support of the Board's Motion for Leave to file a Memorandum of Law as *Amicus Curiae* in the above-captioned action;

3. Attached hereto as Exhibit A is a true and correct copy of the Board's proposed Memorandum of Law as *Amicus Curiae*.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Washington, D.C.
March 25, 2019

_____
Yvonne F. Mizusawa

# Exhibit A

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

TNB USA INC.,

                Plaintiff,

     v.

FEDERAL RESERVE BANK OF NEW YORK,

                Defendant.

Civil Action No. 1:18-cv-7978-ALC

---

**MEMORANDUM OF LAW OF *AMICUS CURIAE* THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE IN SUPPORT OF DEFENDANT THE FEDERAL RESERVE BANK OF NEW YORK'S MOTION TO DISMISS**

Mark Van Der Weide, General Counsel
Katherine H. Wheatley, Associate General Counsel
Yvonne Mizusawa, Senior Counsel
Board of Governors of the Federal
  Reserve System
20th and C Streets, N.W.
Washington, D.C. 20551
 (202) 452-3436

*Counsel for Amicus Curiae Board of Governors
of the Federal Reserve System*

Date: March 25, 2019

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................... iii

IDENTITY AND INTEREST OF AMICUS CURIAE ............................................ 1

SUMMARY OF ARGUMENT ................................................................. 2

ARGUMENT ............................................................................. 4

I.  THE FEDERAL RESERVE ACT DOES NOT MANDATE THE GRANT OF
    A MASTER ACCOUNT TO TNB ......................................................... 4

    A.  Section 342 Expressly Grants Federal Reserve Banks Discretion Over
        Whether to Accept Deposits, Giving Federal Reserve Banks Discretion
        Over Whether to Open Master Accounts ........................................ 4

    B.  Section 248a(c) of the FRA Requires the Board to Publish Pricing
        Principles and a Proposed Schedule of Fees and Does Not Mandate that
        Federal Reserve Banks Open Master Accounts ................................... 8

        i.   The Plain Language of Section 248a(c) Demonstrates that the
             Provision Does Not Require Opening of Master Accounts ................... 8

        ii.  The Context and Legislative History of Section 248a(c)
             Further Demonstrate that FRBNY is not Required to
             Open a Master Account ................................................. 13

II. THE COURT SHOULD TAKE NO ACTION THAT WOULD INTERFERE
    WITH THE BOARD'S WEIGHING OF SIGNIFICANT POLICY CONCERNS
    REGARDING THE IMPACT OF TNB'S BUSINESS MODEL ON MONETARY
    POLICY IMPLEMENTATION, FINANCIAL INTERMEDIATION, AND
    FINANCIAL STABILITY ........................................................... 15

    A.  The Important Role of Interest on Balances at Federal Reserve Banks
        in Monetary Policy Implementation ........................................... 16

    B.  The Federal Reserve's Significant Concerns Regarding the Impact of
        TNB's Business Model on Monetary Policy, Financial Intermediation,
        and Financial Stability and Potential Inconsistencies with Congressional
        Intent ..................................................................... 19

i

CONCLUSION.............................................................................................................. 23

Page(s)

<u>CASES</u>

*Billings Utility Co. v. Advisory Comm. Board of Governors*,
    135 F.2d 108 (8th Cir. 1943) ......................................................................... 7

*Board of Governors of Fed. Res. Sys. v. First Lincolnwood*,
    439 U.S. 234 (1978)....................................................................................... 1

*Comm. for Monetary Reform v. Bd. of Governors of the Fed. Res. Sys.*,
    766 F.2d 538 (D.C. Cir. 1985) .............................................................. 1, 15

*Conn. Office of Prot. & Advocacy for Persons with Disabilities v. Hartford Bd. of Educ.*,
    464 F.3d 229 (2d Cir. 2006)......................................................................... 2

*Empresa Cubana del Tabaco v. Culbro Corp.*,
    541 F.3d 476 (2d Cir. 2008)......................................................................... 5

*Farmers and Merchants Bank v. Fed. Res. Bank of Richmond*,
    262 U.S. 649 (1923).............................................................................. 2, 5-7

*Fasano v. Fed. Res. Bank of New York*,
    457 F.3d 274 (3d Cir. 2006).......................................................................... 1

*First Bank and Trust Co. v. Board of Governors of the Fed. Res. Sys.*,
    605 F. Supp. 555 (E.D. Ky. 1984) ............................................................. 13

*FOMC v. Merrill*,
    443 U.S. 340 (1979).............................................................................. 1, 17

*Fourth Corner Credit Union v. Fed. Res. Bank of Kansas City*,
    861 F.3d 1052 (10th Cir. 2017) .................................................................... 8

*FR 8 Singapore Pte. Ltd. v. Albacore Mar., Inc.*,
    754 F. Supp. 2d 628 (S.D.N.Y. 2010)........................................................... 8

*Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*,
    841 F.3d 133 (2d Cir. 2016)............................................................ 9, 11, 13

*Greater Buffalo Press, Inc. v. Fed. Res. Bank of New York*,
    866 F.2d 38 (2d Cir. 1989)......................................................................... 13

*Greathouse v. JHS Sec. Inc.*,
    784 F.3d 105 (2d Cir. 2015).................................................................. 9, 13

*Jama v. Immigration & Customs Enforcement*,
543 U.S. 335 (2005) ................................................................................. 5

*Jet Courier Services, Inc. v. Fed. Res. Bank of Atlanta*,
713 F.2d 1221 (6th Cir. 1983) ................................................................. 14

*Kingdomware Technologies, Inc. v. United States*,
___ U.S. ___, 136 S. Ct. 1969 (2016) ............................................ 5, 9, 11

*Marx v. Gen. Revenue Corp.*,
568 U.S. 371 (2013) ................................................................................. 9

*Maryland v. Wilson*,
519 U.S. 408 (1997) ................................................................................. 8

*Raichle v. Fed. Res. Bank of New York*,
34 F.2d 910 (2d Cir. 1929) ...................................................................... 7

*Riegle v. FOMC*,
656 F.2d 873 (D.C. Cir. 1981) ............................................................... 15

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944) ................................................................................. 2

*U.S. ex rel Kraus and Bishop v. Wells Fargo & Co.*,
823 F.3d 35 (2d Cir. 2016), *vacated and remanded on other gnds*,
__ U.S. __, 137 S. Ct. 1067 (2017) .................................................. 1, 15

*U.S. v. Ron Pair Enters.*,
489 U.S. 235 (1989) ................................................................................. 9

*United States v. Rodgers*,
461 U.S. 677 (1983) ................................................................................. 5

*Whitman v. Am. Trucking Ass'n*,
531 U.S. 457 (2001) ............................................................................... 11

STATUTES

12 U.S.C. § 221 ......................................................................................... 1

12 U.S.C. § 225a .................................................................................. 1, 22

12 U.S.C. § 241 ......................................................................................... 1

12 U.S.C. § 248a ............................................................................ *passim*

12 U.S.C. § 248a(a) ................................................................................. 9

12 U.S.C. § 248a(b) ............................................................................ 9-10

12 U.S.C. § 248a(b)(8) ........................................................................... 11

12 U.S.C. § 248a(c) .............................................................................. 8-11

12 U.S.C. § 248a(c)(1)-(2) ..................................................................... 10

12 U.S.C. § 248a(c)(2) ................................................................. *passim*

12 U.S.C. § 248(i) .................................................................................... 1

12 U.S.C. § 248(k) ................................................................................... 1

12 U.S.C. § 342 ............................................................................ *passim*

12 U.S.C. § 348 .......................................................................... 6-7, 14

12 U.S.C. § 352a(a) .................................................................................. 7

12 U.S.C. § 391 ........................................................................................ 5

12 U.S.C. § 461(b)(1)(A) ................................................................. 16, 21

12 U.S.C. § 461(b)(12) ......................................................................... 16

12 U.S.C. § 461(b)(12)(C) ................................................................ 16, 21

Emergency Economic Stabilization Act of 2008, Pub. L. 110-343,
   122 Stat. 3796 (Oct. 3, 2008) ........................................................ 18

Financial Services Regulatory Relief Act of 2006, Pub. L. 109-351,
   120 Stat. 1966 (Oct. 13, 2006) ................................................. 16, 18

Monetary Control Act of 1980, Pub. L. 96-221,
   94 Stat. 132 (Oct. 1, 1980) ............................................................. 8

REGULATIONS

12 C.F.R. Part 204 .................................................................................. 3

12 C.F.R. § 204.2(y) ....................................................................................... 16

12 C.F.R. § 204.10 ......................................................................................... 16

73 Fed. Reg. 59482 (Oct. 9, 2008)................................................................. 18

84 Fed. Reg. 8829 (March 12, 2019) .................................................... *passim*

<u>OTHER AUTHORITIES</u>

Board of Governors of the Federal Reserve System (November 25, 2013), Reserve
    Maintenance Manual, https://www.federalreserve.gov/monetarypolicy/rmm/
    Chapter_4_Maintenance_of_Reserve_Balance_Requirements.htm............................ 14

Board of Governors of the Federal Reserve System (2014) "Federal Reserve Issues
    FOMC Statement on Policy Normalization Principles and Plans", Sept. 17.
    press release, https://www.federalreserve.gov/newsevents/pressreleases/monetary
    20140917c.htm...................................................................................................... 18-19

Board of Governors of the Federal Reserve System (2018) "Federal Reserve Board
    Approves Fee Schedule for Federal Reserve Bank Priced Services" (2019 fee
    schedule) (eff. Jan. 2, 2019), press release, https://www.federalreserve.gov
    /newsevents/pressreleases/other20181116a.htm.......................................... 10

Board of Governors of the Federal Reserve System (2019), FOMC Communications
    Related to Policy Normalization, https://www.federalreserve.gov/monetary
    policy/policy-normalization.htm ............................................................... 18-19

Federal Reserve Bank Operating Circular 1, (Account Relationships) (eff. Feb. 1, 2013),
    https://www.frbservices.org/assets/resources/rules-regulations/020113-operating
    -circular-1.pdf .......................................................................................... 4-6

Federal Reserve Bank Operating Circular 5, Governing Electronic Access to Services
    (eff. November 15, 2018), https://www.frbservices.org/assets/resources/
    rules-regulations/111518-operating-circular-5.pdf ..................................... 12

*The Federal Reserve System: Purposes and Functions*, (10th ed. Oct. 2016),
    *available at* http://www.federalreserve.gov/pf/pf.htm........................... *passim*

Kohn, Donald L., Member, Board of Governors of the Federal Reserve System (2006),
    Prepared Statement in *Consideration of Regulatory Relief Proposals*, *hearing*
    *before the Senate Committee on Banking, Housing and Urban Affairs*, Mar. 1,
    2006, S. Hrg. 109-993, 109th Cong., 2d Sess. 113 (Washington: Government
    Printing Office) ........................................................................................ 17

Strong Jr., Benj., Governor, Federal Reserve Bank of New York (1914), letter to
    cashier, November 11, https://fraser.stlouisfed.org/title/466/item/14823 .................... 11

**Identity and Interest of *Amicus Curiae***

The Board of Governors of the Federal Reserve System ("Board") is a United States government agency composed of seven members appointed by the President and confirmed by the Senate. 12 U.S.C. § 241; *Comm. for Monetary Reform v. Bd. of Governors of the Fed. Res. Sys.*, 766 F.2d 538, 539-40 (D.C. Cir. 1985). The Board, together with the twelve regional Federal Reserve Banks ("Federal Reserve Banks") and the Federal Open Market Committee ("FOMC"), are the major components of the Federal Reserve System, established in 1913 pursuant to the Federal Reserve Act, 12 U.S.C. §§ 221, *et seq.* ("FRA") as our nation's central bank. *Comm. for Monetary Reform*, 766 F.2d at 539. The FRA charges the Board and the FOMC with conducting monetary policy to achieve the goals of "maximum employment, stable prices, and moderate long-term interest rates." 12 U.S.C. § 225a; *see Fasano v. Fed. Res. Bank of New York*, 457 F.3d 274, 277 (3d Cir. 2006); *The Federal Reserve System Purposes and Functions* 21 (10th ed. Oct. 2016) ("*Purposes and Functions*").[1]

The Board has statutory authority to promulgate rules implementing its powers under the FRA and other statutes, and that authority may not be delegated. 12 U.S.C. §§ 248(i) and (k). The Board's interpretation of the federal banking statutes it implements is entitled to judicial deference as long as the interpretation is reasonable and consistent with legislative intent. *Board of Governors of Fed. Res. Sys. v. First Lincolnwood*, 439 U.S. 234, 251 (1978) ("courts should defer to an agency's construction of its own statutory mandate … particularly when that construction accords with well-established congressional goals") (internal citations

---

[1] The Board's *Purposes and Functions* publication, available at http://www.federalreserve.gov/pf/pf.htm, has been relied upon by courts, including the Supreme Court and the Second Circuit, to describe Federal Reserve System operations. *See, e.g., FOMC v. Merrill*, 443 U.S. 340, 342 n.2 (1979); *U.S. ex rel. Kraus and Bishop v. Wells Fargo & Co.*, 823 F.3d 35, 39 (2d Cir. 2016), *vacated and remanded on other gnds*, __ U.S. __, 137 S. Ct. 1067 (2017).

omitted); *Conn. Office of Prot. & Advocacy for Persons with Disabilities v. Hartford Bd. of Educ.*, 464 F.3d 229, 239 (2d Cir. 2006) (granting deference to agency interpretations articulated in *amicus* briefs "on account of the 'specialized experience' and information available to the agency" and other factors) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 139 (1944)).

The Board has a significant direct interest in this case because, as detailed further below, Plaintiff TNB USA, Inc. ("TNB") asks the Court to adopt an incorrect interpretation of the FRA that could interfere with the Federal Reserve's implementation of its statutory policy mandates.

## SUMMARY OF ARGUMENT

Contrary to the position of TNB, the FRA does not mandate that the Federal Reserve Bank of New York ("FRBNY") grant TNB's request for a master account. A master account is a deposit account maintained at a Federal Reserve Bank. As such, master accounts are governed by section 13 of the FRA, 12 U.S.C. § 342, which expressly gives Federal Reserve Banks discretion over whether to open such accounts. The relevant language of the statute includes the permissive "may," providing that "Any Federal reserve bank *may* receive from any of its member banks, or other depository institutions … deposits ...." *Id.* The courts, notably including the Supreme Court, have long held that such language denotes a discretionary power. *See, e.g., Farmers and Merchants Bank v. Fed. Res. Bank of Richmond*, 262 U.S. 649, 662 (1923) (section 342's provision that a Federal Reserve Bank "may receive" deposits from a member bank of checks for collection is discretionary: "neither § 13, nor any other provision of the Federal Reserve Act, imposes upon reserve banks any obligation to receive checks for collection. The act merely confers authority to do so.").

By contrast, section 11A of the FRA, 12 U.S.C. § 248a, upon which TNB relies, has no relevance to the topic of master accounts. That section is directed at the Board of Governors, not the Federal Reserve Banks, and requires the Board to adopt pricing principles for priced services offered by the Federal Reserve Banks to depository institutions. Master accounts are not among the priced services covered by section 248a, and nothing in that section suggests that every institution that seeks one is entitled to a master account.

The Federal Reserve has important reasons for not yet having acted on TNB's request for a master account. Approval of that request would mean that TNB – and indirectly its customers – would immediately receive interest on excess reserves ("IOER") at the rate otherwise payable only to the limited class of institutions designated by Congress as eligible to receive IOER. As the Board has articulated in its recent Advance Notice of Proposed Rulemaking, Regulation D: Reserve Requirements of Depository Institutions, 12 CFR Part 204, 84 Fed. Reg. 8829 (March 12, 2019) ("ANPR"), paying IOER at the currently prevailing rate to narrowly-focused institutions like TNB – institutions that exist only to invest their depositors' funds in Federal Reserve Bank accounts and earn IOER – could complicate the implementation of monetary policy, disrupt financial intermediation, and negatively impact our nation's financial stability.

The ANPR sets out the myriad concerns the Board has regarding paying the current IOER rate to such institutions, and seeks public comment on whether to amend the Board's Regulation D, 12 C.F.R. Part 204, to lower the rate of IOER paid to such institutions – including potentially lowering the rate to zero. Until the Board determines, through the notice-and-comment process, whether to revise its regulation, premature granting of a master account to an entity like TNB has the potential to create the kinds of harms discussed in the ANPR.

For this reason, the Board urges the Court to refrain from holding that TNB has a right to a master account and to dismiss TNB's Complaint. A contrary ruling would be inconsistent with the statutory language of the Federal Reserve Act, and could have negative policy implications that could not easily be remedied.

**ARGUMENT**

I. **THE FEDERAL RESERVE ACT DOES NOT MANDATE THE GRANT OF A MASTER ACCOUNT TO TNB**

   A. *Section 342 Expressly Grants Federal Reserve Banks Discretion Over Whether to Accept Deposits, Giving Federal Reserve Banks Discretion Over Whether to Open Master Accounts*

Contrary to TNB's claim that "the governing statutes command that TNB receive a Master Account," *see* TNB Pre-Motion Letter (Docket Entry ("DE") 15 at 2), section 13 of the FRA, 12 U.S.C. § 342, expressly gives Federal Reserve Banks discretion over whether or not to accept deposits, giving them discretion to grant *or* deny a request for a master account such as TNB's.[2] That provision, which in pertinent part is virtually unchanged since enactment of the FRA in 1913, authorizes Federal Reserve Banks to accept deposits, enabling them to open master accounts. Section 342 provides:

> Any Federal reserve bank *may* receive from any of its member banks, or other depository institutions, and from the United States, deposits of current funds in lawful money, national-bank notes, Federal reserve notes, or checks, and drafts, payable upon presentation or other items, and also, for collection, maturing notes and bills; ….

12 U.S.C. § 342 (emphasis added).

---

[2] A master account is a deposit account where all the "financial rights and obligations" of the account holder and the Federal Reserve Bank are recorded. *See* Federal Reserve Banks Operating Circular 1, Account Relationships (Feb. 1, 2013), ¶ 2.2(e) (definition of Master Account), available at https://www.frbservices.org/assets/resources/rules-regulations/020113-operating-circular-1.pdf (last visited March 6, 2019); *see also* Complaint (DE 1) ("Compl.") ¶ 2 ("TNB's sole business will be to … place [funds from its customer institutions] into TNB's Master Account at the FRBNY").

As the Supreme Court has held, Section 342's language is expressly discretionary. *Farmers and Merchants Bank v. Fed. Res. Bank of Richmond*, 262 U.S. 649, 662 (1923). Accordingly, it does not require a Federal Reserve Bank to accept a deposit, or open a master account, for any entity.[3]  As the Second Circuit has held, Congress's use of "[t]he word 'may' [in a statute] customarily connotes discretion." *Empresa Cubana del Tabaco v. Culbro Corp.*, 541 F.3d 476, 478 (2d Cir. 2008) (quoting *Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 346 (2005)); *see also Kingdomware Technologies, Inc. v. United States*, ___ U.S. ___, 136 S. Ct. 1969, 1977 (2016) ("The word 'may,' when used in a statute, usually implies some degree of discretion.") (quoting *United States v. Rodgers,* 461 U.S. 677, 706 (1983)). Here, the use of "may" in section 342 makes clear Congress's intent that Federal Reserve Banks have authority to accept deposits or open deposit accounts – such as master accounts – but are not required to do so.

The Board and the Federal Reserve Banks have long interpreted this authority to be discretionary: the Federal Reserve Banks' Operating Circular 1 ("OC 1"), which establishes the terms and conditions applicable to master accounts, expressly provides that "[e]ach Master Account Agreement" executed by a financial institution "is subject to approval by the Financial Institution's Administrative Reserve Bank," OC 1 at ¶ 2.6, and that "[a] Reserve Bank may terminate a Master Account Agreement … or any Other Account Agreement at any time." *Id.* at ¶ 2.10 (available at https://www.frbservices.org/assets/resources/rules-

---

[3] A different provision of the FRA, by contrast, *requires* the Federal Reserve Banks to accept deposits of moneys from the general fund of the U.S. Treasury: such funds "may, *upon the direction of the Secretary of the Treasury*, be deposited in Federal reserve banks, which banks, when required by the Secretary of the Treasury, *shall* act as fiscal agents of the United States . . .." 12 U.S.C. § 391 (emphasis added); *see Empresa*, 541 F.3d at 478 (the conclusion that "may" connotes discretion "'is particularly apt where … "may" is used in contraposition to the word "shall."'") (quoting *Jama*, 543 U.S. at 346).

regulations/020113-operating-circular-1.pdf).  Indeed, OC 1, ¶ 2.11, explicitly refers to the first

paragraph of section 13 of the FRA, 12 U.S.C. § 342, further demonstrating that the Federal

Reserve interprets section 342 as governing account relationships such as creation of a master

account.

This interpretation is consistent with interpretations of section 342 by courts, including

the Supreme Court, and the interpretation of similar, permissive language in section 13A of the

FRA, 12 U.S.C. § 348, by the Second Circuit.  Interpreting section 342 shortly after passage of

the FRA in 1913, the Supreme Court in *Farmers and Merchants* rejected an argument similar

to TNB's that "the Federal Reserve Bank of Richmond is obliged to receive for collection any

check upon any North Carolina state bank."  262 U.S. at 662.  Interpreting section 342's

language that, "solely for the purposes of collection," a Reserve Bank "may receive from any

nonmember bank . . . deposits of checks . . . payable upon presentation," the Court held,

> neither § 13, nor any other provision of the Federal Reserve Act, imposes upon reserve
> banks any obligation to receive checks for collection.  The act merely confers authority
> to do so.

*Id*.  The Court noted that Congress had from time to time enlarged the "the class of cases" to

which the Federal Reserve Banks' authority under section 342 applied, *id.*, "[b]ut in each

amendment, as in § 13, the words used were 'may receive' – words of authorization merely."

*Id.* (quoting FRA).

The Supreme Court in *Farmers and Merchants* observed that the FRA "appears to have

been drawn with great care.  Throughout the act the distinction is clearly made between what

the Board and the reserve banks 'shall' do and what they 'may' do."  *Id.* at 663 (quoting FRA).

In a footnote, the Court listed some twenty-one provisions of the original FRA where both

"may" and "shall" were used, and an additional seven provisions where only "shall" was used,

to illustrate the care Congress took to delineate among actions the Board and Federal Reserve Banks were allowed to take and those they were required to take. *Id.* at 663 n.6; *see also Billings Utility Co. v. Advisory Comm. Board of Governors*, 135 F.2d 108, 111 (8th Cir. 1943) (listing provisions of the FRA in which Congress distinguished what a Federal Reserve Bank "may" do from what it "must" do, and holding that the "may" provisions "seem so clearly to be permissive as to make any other construction of them by interpretation or construction judicial legislation").

Other courts, including the Second Circuit, have also held that the word "may" as used in the FRA was permissive only, giving the Reserve Bank discretion to take or not take the specified action. In *Raichle v. Fed. Res. Bank of New York*, 34 F.2d 910, 914 (2d Cir. 1929), the Second Circuit, interpreting the phrase "any Federal Reserve Bank *may* … discount notes, drafts, and bills of exchange," in section 13A of the FRA, 12 U.S.C. § 348 (emphasis added), held "it is important to note that [the Federal Reserve Bank] is not under any compulsion to rediscount eligible paper, for the words of the act in respect to rediscounting are wholly permissive." *See also Billings Utility*, 135 F.2d at 111 (phrase "may make loans" in section 13b(a) of the FRA, 12 U.S.C. § 352a(a) [later repealed], "is permissive, and the [Reserve Bank] was vested with the right, in its judgment, to make or refuse to make such loans").

Here, section 342 unambiguously uses permissive language in providing that Federal Reserve Banks "may receive" deposits from member banks or other depository institutions. The Supreme Court has construed that provision to mean that Federal Reserve Banks are authorized, *but not required*, to take deposits. Because the opening of a master account is intrinsically a deposit-taking activity, *see, e.g.,* Compl. ¶¶ 2, 15, TNB's allegation that the FRBNY is obligated to open a master account for it, DE 15 at 2, Compl. ¶¶ 1, 14, must be

rejected based on the language of section 342. Section 342 grants the FRBNY discretion to either grant or deny that request upon completion of review.

TNB's assertion that a Tenth Circuit opinion supports a contrary conclusion is wrong. DE 15 at 2 (citing *Fourth Corner Credit Union v. Fed. Res. Bank of Kansas City*, 861 F.3d 1052 (10th Cir. 2017)). In an opinion not adopted by the majority, *one panel member* concluded that section 342 "does not affect [a depository's institution's] entitlement to a master account" because it "does not address which institutions can access Federal Reserve services; that subject is governed instead by § 248a(c)(2)." *Id.* at 1074 (opinion of Judge Bacharach). However, as explained below, a master account is not a priced service to which section 248a(c)(2) applies, but rather a deposit-taking activity, governed by section 342. The misplaced views of a single panel member are not binding precedent in the Tenth Circuit, let alone persuasive authority that this Court should follow. *See Maryland v. Wilson*, 519 U.S. 408, 412-13 (1997) (a statement in a concurrence does not "constitute[] binding precedent"); *FR 8 Singapore Pte. Ltd. v. Albacore Mar., Inc.*, 754 F. Supp. 2d 628, 636 n.4 (S.D.N.Y. 2010) (declining to follow "concurring opinion" which was not the "controlling majority opinion").

**B.** ***Section 248a(c) of the FRA Requires the Board to Publish Pricing Principles and a Proposed Schedule of Fees and Does Not Mandate that Federal Reserve Banks Open Master Accounts***

**i.** ***The Plain Language of Section 248a(c) Demonstrates that the Provision Does Not Require the Opening of Master Accounts***

TNB misinterprets 12 U.S.C. § 248a[4] as a "statutory command" to open a master account. Compl. ¶ 123; *see also id.*, ¶¶ 6, 28; DE 15 at 2. That provision merely requires the Board – not Federal Reserve Banks – to publish pricing principles and a schedule of fees

---

[4] 12 U.S.C. § 248a, section 11A of the Federal Reserve Act, was added by section 107 of the Monetary Control Act of 1980, P.L. 96-221, 94 Stat. 132, 140 ("MCA").

applicable to specified Reserve Bank "priced services."  It contains no command to open a master account and, indeed, says nothing at all about master accounts – which are *deposit* accounts subject to section 342 and not *services* covered by section 248a.

The Court must analyze section 248a(c) by "begin[ning] with the statute's text because 'we assume that the ordinary meaning of the statutory language accurately expresses the legislative purpose.'"  *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 147 (2d Cir. 2016) (quoting *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 376 (2013)). In ascertaining plain meaning, the Court may consider "'the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'"  *Id.* (quoting *Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 111 (2d Cir. 2015)).  "'If the statutory language is unambiguous and the statutory scheme is coherent and consistent … the inquiry ceases.'"  *Id.* (quoting *Kingdomware*, 136 S. Ct. at 1976)); *U.S. v. Ron Pair Enters.*, 489 U.S. 235, 241 (1989) ("where, as here, the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms'").

Contrary to TNB's position, the plain language of section 248a(c)(2) is not a statutory command to Federal Reserve Banks to open a master account.  Rather, section 248a(c) is part of an overall section, 248a, which is addressed to "pricing of services" provided by Federal Reserve Banks to depository institutions.  Section 248a(a) requires the Board to publish a set of pricing principles and a schedule of fees for such services.  12 U.S.C. § 248a(a).  Section 248a(b) identifies the specific "services which shall be covered by the schedule of fees under subsection (a)."  12 U.S.C. § 248a(b).  Finally, section 248a(c), on which TNB relies, sets forth the "principles" on which "the schedule of fees prescribed pursuant to this section shall be based."  12 U.S.C. § 248a(c).  That one of these "principles" is that priced services be available

to nonmember institutions at the same prices charged to member banks, 12 U.S.C. § 248a(c)(2), does not convert the section into a statutory command that master accounts be opened to all comers.[5]  Rather, it requires only that nonmember institutions that *do* obtain Federal Reserve Bank services pay the same amount for those services as member banks.

Section 248a(c) provides in pertinent part:

The schedule of fees prescribed pursuant to this section shall be based on the following principles:

(1)  All Federal Reserve bank services covered by the fee schedule shall be priced explicitly.

(2)  All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks, except that nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks.

12 U.S.C. §§ 248a(c)(1)-(2).

By its explicit terms, section 248a(c)(2) applies only to "Federal Reserve Bank services covered by the fee schedule."  The services covered by the fee schedule are those identified in section 248a(b), which do not include the creation of a master account.[6]  *See* 12 U.S.C. § 248a(b) (listing services such as securities safekeeping and check clearing and collection).  The statutory language is thus clear that the opening or maintenance of a master account is not a priced service to which section 248a applies; therefore, the language of section 248a(c)(2) is

_____

[5] The term "member bank" refers to banks that are members of the Federal Reserve System, while "nonmember bank" denotes banks that are not.

[6] The Board publishes its fee schedule annually in the Federal Register and issues a press release announcing adoption of each new schedule.  *See, e.g.,* https://www.federalreserve.gov/newsevents/pressreleases/other20181116a.htm (2019 fee schedule) (last visited March 20, 2019).  While the fee schedule lists fees for various specifically enumerated services, there are no fees associated with the opening or maintenance of a master account.  *Id.*

irrelevant to TNB's claim.  *Friends of E. Hampton Airport*, 841 F.3d at 147-48 ("'[i]f the statutory language is unambiguous and the statutory scheme is coherent and consistent … the inquiry ceases.'") (quoting *Kingdomware*, 136 S. Ct. at 1976).

Nor is a master account a "new service" offered by Federal Reserve Banks as TNB suggests.  Compl. ¶ 27 (quoting 12 U.S.C. § 248a(b)(8)).  Indeed, although not initially called "master accounts," deposit accounts at Federal Reserve Banks substantially predate the MCA.  This is not surprising given that Federal Reserve Banks' authority to "receive … deposits" dates to enactment of the FRA in 1913.  12 U.S.C. § 342, 38 Stat. 263.  For example, a November 11, 1914 letter from the then-head of FRBNY to that Federal Reserve Bank's Cashier instructs "you are advised that this Bank will be prepared to receive such reserves … at its banking office …. It is recommended to the member banks that they transfer *at the time of making the deposit of their required reserve*, as large a part of their optional reserve as may be convenient."  Available at: https://fraser.stlouisfed.org/title/466/item/14823 (last visited March 22, 2019) (emphasis supplied).

It makes no sense, as TNB alleges, that Congress could have meant section 248a(c), enacted in 1980, to overturn the discretion permitted the Federal Reserve Banks since their inception in 1913 in accepting deposits by requiring Federal Reserve Banks to open master accounts for all comers without regard to risk or other considerations.  The Supreme Court has observed that "Congress … does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions – it does not, one might say, hide elephants in mouseholes."  *Whitman v. Am. Trucking Ass'n,* 531 U.S. 457, 468 (2001).  Here, it is illogical to conclude – as TNB alleges – that Congress would alter the Federal Reserve Banks'

fundamental discretion over the acceptance of deposits under the guise of a provision requiring the *Board* to publish a schedule of fees for Federal Reserve Bank services.

Moreover, even if a master account were a priced service, which it is not, TNB's reading that services covered by section 248a must be provided to *all* nonmember banks does not follow from the statutory text.  Section 248a(c)(2) states that "[a]ll Federal Reserve Bank services covered by the fee schedule shall be available to nonmember banks," 12 U.S.C. § 248a(c)(2), *not* that "[a]ll Federal Reserve Bank services covered by the fee schedule shall be available to *[all]* nonmember banks."  Congress's exclusion of the second "all" is significant, as it signals Congress's intent that services covered by the fee schedule be available to member and nonmember banks alike – as they generally are – but not that each and every nonmember bank, even those that do not meet minimum qualifications, are entitled to all services, as TNB would have the court read it.[7]

Accordingly, the plain language of section 248a(c)(2) cannot be read to mandate the opening of a master account.

_____

[7] Indeed, Federal Reserve Operating Circulars make clear that Federal Reserve Banks may deny or terminate services for a variety of reasons.  For example, Operating Circular 5 (OC 5), governing electronic access to services, provides that Federal Reserve Banks "immediately may terminate" a depository institution's electronic connection "if the Reserve Bank, in its sole discretion, determines that continued use of the Electronic Connection poses a risk to the Federal Reserve Bank or others, or the Federal Reserve Bank believes that the Institution or its Service Provider is in violation of this Circular." Available at https://www.frbservices.org/assets/resources/rules-regulations/111518-operating-circular-5.pdf (last visited March 22, 2019) ("OC 5), ¶ 7.1.  OC 5 further provides that depository institutions accessing Reserve Bank services via electronic connection must take "commercially reasonable security measures … necessary to prevent fraud or unauthorized access," maintain computer equipment and software that "comply with Reserve Bank requirements," and take "commercially reasonable precautions … to prevent the introduction of Malware" as a condition to electronic access.  *Id.*, ¶¶ 1.4, 2.0, 4.8.

***The Context and Legislative History of Section 248a(c) Further Demonstrate that FRBNY is not Required to Open a Master Account***

The legislative history and context show that Congress enacted the MCA, including section 248a(c)(2), out of concern over the Federal Reserve's growing lack of control over the money supply, and its ramifications for the national economy, not, as TNB suggests, to ensure access to master accounts. *See Friends of E. Hampton Airport*, 841 F.3d at 147 (in ascertaining plain meaning, Court may consider "'the language itself, the specific context in which that language is used, and the broader context of the statute as a whole'") (quoting *Greathouse*, 784 F.3d at 111).

Prior to enactment of the MCA, Federal Reserve Banks provided services, such as check collection and wire transfers, free of charge to member banks in order to compensate them "for the costs associated with having to maintain non-interest bearing reserves with the Federal Reserve," which nonmember banks were not required to do. *See Greater Buffalo Press, Inc. v. Fed. Res. Bank of New York*, 866 F.2d 38, 40 (2d Cir. 1989). During the 1970s, the Federal Reserve experienced a decline in membership due to "the growing loss of profits occasioned by [the] Federal Reserve's relatively high percentage of required reserves." *First Bank and Trust Co. v. Board of Governors of the Fed. Res. Sys.*, 605 F. Supp. 555, 558 (E.D. Ky. 1984). This decline in membership "did not escape Congress' attention … [which] in 1979, [introduced] at least five bills … aimed at correcting the Federal Reserve's growing lack of control over the money supply." *Id.* Congress's efforts "to curb the rising tide of bank flight from the [Federal] Reserve System" resulted in enactment of the MCA in 1980. *Id.* at 565.

The MCA was enacted in large part to restore Federal Reserve control over the money supply by requiring nonmember as well as member banks to maintain reserves (balances) at

Federal Reserve Banks.  In exchange, the MCA provided that nonmember banks would be able to receive Federal Reserve Bank services "at the same fees charged member banks." *Jet Courier Services, Inc. v. Fed. Res. Bank of Atlanta*, 713 F.2d 1221, 1227 (6th Cir. 1983).  There is no indication that Congress intended the MCA as a mandatory right of access of all depository institutions to *master accounts* -- which are not even mentioned in the statute, and are not a priced service to which the fee schedule applies.[8]  Notably, the MCA amended section 348 to permit Reserve Banks to receive deposits from "other depository institutions" as well as from member banks, but did not change the permissive "may" language in that section to "shall", as it presumably would have done had it intended to require Reserve Banks to receive deposits from all depository institutions.

It would be anomalous for this Court to conclude that the MCA, which was enacted against a backdrop of rising Congressional alarm over the Federal Reserve's growing lack of control over the money supply and in recognition of the importance of monetary policy, mandates a right of access to master accounts even to institutions such as TNB that could complicate the Federal Reserve's ability to implement monetary policy effectively and negatively affect our nation's financial stability.

---

[8] Indeed, the MCA specifically permits banks to maintain reserves in the form of vault cash or in a correspondent's account at a Federal Reserve Bank, meaning that a bank may fulfill its reserve requirements without having a master account.  12 U.S.C. § 461(c)(1)(A), (B); *see also* https://www.federalreserve.gov/monetarypolicy/rmm/Chapter_4_Maintenance_of_Reserve_Balance_Requirements.htm (last visited March 22, 2019) (explaining that a depository institution may satisfy its reserve balance requirement "either directly with its Reserve Bank" or "through a correspondent's account").

## II. THE COURT SHOULD TAKE NO ACTION THAT WOULD INTERFERE WITH THE BOARD'S WEIGHING OF SIGNIFICANT POLICY CONCERNS REGARDING THE IMPACT OF TNB'S BUSINESS MODEL ON MONETARY POLICY IMPLEMENTATION, FINANCIAL INTERMEDIATION, AND FINANCIAL STABILITY

While the fact that TNB has no statutory right to a master account alone warrants dismissal of TNB's Complaint, dismissal is all the more important in these circumstances, given that the Board is currently weighing the policy considerations implicated by TNB's business model.

The Second Circuit has recognized that the Federal Reserve "is responsible for maintaining the stability of the U.S. financial system." *U.S. ex rel. Kraus*, 823 F.3d at 39.  In addition, "[a]mong the principal functions of the Federal Reserve System is the conduct of monetary policy, the aim of which is to promote national economic goals through influence on the availability and cost of bank reserves, bank credit and money."  *Comm. for Monetary Reform*, 766 F.2d at 539.  The courts have recognized that the "establishment of . . . bank reserve requirements" is one of the "basic mechanisms of monetary policy." *Riegle v. FOMC*, 656 F.2d 873, 875 (D.C. Cir. 1981); *see also Purposes and Functions* at 21 (monetary policy directly affects interest rates and indirectly affects stock prices, wealth, and currency exchange rates, thereby influencing spending, investment, production, employment and inflation in the United States).

Here, the Board has recently articulated in the ANPR, 84 Fed. Reg. 8829, that it has significant policy concerns regarding the impact TNB's narrow banking business model could have on the Federal Reserve's ability to implement monetary policy, and on financial stability and financial intermediation more generally.  Because the Board is in the process of taking public comment on these concerns, and is considering possible revisions to its regulation to

offset these effects, the Court should refrain from taking any action that would short-circuit this ongoing regulatory process.

### A. *The Important Role of Interest on Balances at Federal Reserve Banks in Monetary Policy Implementation*

Congress plainly authorized Federal Reserve Banks to pay interest on reserves ("IOR") not so that depositors may earn higher rates of interest, as TNB alleges, Compl. ¶¶ 2, 98, but as a critical tool of monetary policy implementation. As explained in the ANPR, section 19 of the FRA, 12 U.S.C. § 461(b)(12), permits Reserve Banks to pay interest on balances maintained by or on behalf of certain eligible institutions[9] in an account at a Reserve Bank at a rate not to exceed the general level of short term interest rates. 84 Fed. Reg. at 8829, col. 2. The Board first authorized payment of IOR in October 2008. *Id.* The Board's Regulation D, 12 C.F.R. § 204.10, specifies that interest may be paid on an institution's required reserve balances ("IORR") and on balances in excess of reserve requirements, IOER, at rates established by Board regulations. *Id.* at col. 3.

The legislative history of the Financial Services Regulatory Relief Act of 2006, Pub. L. 109-351, 120 Stat. 1966 (Oct. 13, 2006) ("2006 Act"), Title II of which authorized the payment of IOR,[10] shows that the authority to pay IOR was intended as a tool of monetary policy.[11] In

---

[9] Section 19, 12 U.S.C. § 461(b)(12)(C), provides that the Federal Reserve may pay interest on reserve balances maintained at Federal Reserve Banks by "depository institutions" (as that term is defined in 12 U.S.C. § 461(b)(1)(A)) and certain other institutions listed in section 461(b)(12)(C) (collectively, "eligible institutions"). *See also* 12 C.F.R. § 204.2(y)(defining "eligible institution"). Here, it is unclear whether TNB is a depository institution eligible to earn IOR under 12 U.S.C. § 461(b)(12)(C) and Regulation D. *See* ANPR at 84 Fed. Reg. 8829, col. 3, and n. 6; *see also* Compl., ¶ 47 (conceding that TNB "has not sought" deposit insurance (and therefore could not be an "insured" bank under that portion of the definition)).
[10] Codified at 12 U.S.C. § 461(b)(12).
[11] That Congress viewed Title II of the 2006 Act as enhancing the Federal Reserve's control over interest rates for monetary policy implementation purposes is also evident from its title, "Monetary Policy Provisions." 120 Stat. at 1966, 1968 (Oct. 13, 2006).

hearings before the Senate Banking Committee prior to introduction of the 2006 Act, then-Board governor Donald Kohn, explaining the Board's proposal regarding IOR, testified "[t]he first two of the Board's priority items relate to reserve requirements, *which exist to assist the Federal Reserve [in] conduct[ing] monetary policy*." *Consideration of Regulatory Relief Proposals*, Hearing Before the Senate Committee on Banking, Housing and Urban Affairs, 109th Cong., 2d Sess., 113 (Mar. 1, 2006) (S. Hrg. 109-993) (prepared Statement of Donald L. Kohn, Member, Board of Governors of the Federal Reserve System) (emphasis supplied). Governor Kohn explained, "[h]aving the authority also to pay interest on . . . excess reserve balances as well as required reserves would enhance the Federal Reserve's ability to efficiently conduct monetary policy." *Id.* "In order for the Federal Open Market Committee (FOMC) to conduct monetary policy effectively, it is important that a sufficient and predictable demand for balances at the Reserve Banks exist so that the Federal Reserve knows the volume of reserves to supply (or remove) through open market operations to achieve the FOMC's target Federal funds rate."[12] *Id.* "Having the authority to pay interest on excess reserves also could help mitigate potential volatility in overnight interest rates … [and] would act as a minimum for overnight interest rates, because banks generally would not lend to other banks at a lower rate than they could earn by keeping their excess funds at a Reserve Bank." *Id.* at 113-114.

The Board articulated the important role that IOER plays in achieving target interest rates in its 2008 Interim Final Rule amending Regulation D to require Reserve Banks to pay

---

[12] The federal funds rate "is the rate at which commercial banks are willing to lend or borrow immediately available reserves on an overnight basis" and is "particularly sensitive to changes in the availability of reserves." *Merrill*, 443 U.S. at 345 n.5. TNB concedes that the federal funds rate is the "benchmark for 'everything from credit card and auto loan rates to certificate of deposit yields;'" that "its influence on the broader U.S. and global economy is profound;" and that it is "'arguably the most important interest rate in the world.'" Compl. ¶ 85.

IORR and IOER.  The Interim Final Rule stated, "[t]he absence of interest on excess balances has meant that, when reserve supply significantly exceeds demand, the federal funds rate can fall to as low as zero."  Federal Reserve System, *Reserve Requirements of Depository Institutions*, 73 Fed. Reg. at 59482, 59482 (Oct. 9, 2008).  The Interim Final Rule explained the critical role of IOER in correcting this volatility in interest rates, stating, "[p]aying interest on excess balances will permit the Federal Reserve to expand its balance sheet as necessary to provide sufficient liquidity to support financial stability while implementing the monetary policy that is appropriate in light of the System's macroeconomic objectives of maximum employment and price stability.  Paying interest on excess balances should also help to establish a lower bound on the federal funds rate."  *Id.*

Indeed, the central role of IOER in achieving the target federal funds rate was underlined during the 2008 financial crisis when the Board – as authorized by Congress in section 128 of the Emergency Economic Stabilization Act of 2008, Pub. L. 110-343, 122 Stat. 3796 – amended Regulation D to require payment of IOER and IORR effective immediately, rather than in October 2011 as originally provided in the 2006 Act.  The Board explained that such payments "will permit the Federal Reserve to expand its balance sheet as necessary to provide sufficient liquidity to support financial stability while implementing a monetary policy that is appropriate in light of the System's macroeconomic objectives of maximum employment and price stability."  73 Fed. Reg. at 59482 (October 9, 2008).

The fundamental role that IOER plays in monetary policy implementation was on display after the FOMC's September 2014 meeting when it announced its approach to monetary policy normalization in the wake of the financial crisis.  The FOMC announced that "the Federal Reserve intends to move the federal funds rate into the target range set by the

FOMC *primarily by adjusting the interest rate it pays on excess reserve balances*."

https://www.federalreserve.gov/newsevents/pressreleases/monetary20140917c.htm (emphasis

supplied).  This policy was recently reiterated at the conclusion of the January 2019 FOMC

meeting, when the FOMC stated its intent "to continue to implement monetary policy in a

regime in which an ample supply of reserves ensures that control over the level of the federal

funds rate and other short-term interest rates is exercised primarily through the setting of the

Federal Reserve's administered rates."  https://www.federalreserve.gov/monetarypolicy/policy-

normalization.htm.  Thus, IOER was intended as a tool for use by the Board and FOMC in

achieving critical interest rate targets in order to achieve national economic goals, and not as a

possible source of enhanced earnings for institutional investors, as TNB would have the Court

believe.

    **B.** ***The Federal Reserve's Significant Concerns Regarding the Impact of TNB's Business Model on Monetary Policy, Financial Intermediation, and Financial Stability and Potential Inconsistencies with Congressional Intent***

The Board has now publicly detailed in the ANPR its significant concerns regarding the

impact TNB's narrow banking business model could have on its use of IOER as a tool of

monetary policy, on financial stability, and on financial intermediation generally.  It has also

identified some possible solutions to address those concerns.  The ANPR explains that pass-

through investment entities ("PTIEs") – such as TNB[13] – could "avoid the costs borne by …

eligible institutions, such as the costs of capital requirements [and] … federal regulation and

---

[13] As explained in the ANPR, PTIEs are entities with "narrowly focused business models that involve taking deposits from institutional investors and investing all or substantially all of the proceeds in balances at Reserve Banks."  *Id.* at 8829, col. 3; *see also* Compl. ¶ 2 (explaining that "TNB's sole business will be to accept deposits only from the most financially secure institutions, and place those deposits into TNB's Master Account at the FRBNY, thus permitting depositors to earn higher rates of interest").

supervision." ANPR at 8830, col. 1; *see also* Compl. ¶¶ 49, 63 (conceding that TNB would not be regulated by the Federal Deposit Insurance Corporation, but rather by the State of Connecticut). The ANPR articulated the Board's concern that PTIEs, "[a]voiding regulatory costs" borne by eligible institutions and "unconstrained by meaningful capital requirements," could extend the IOER rate to depositors that are not themselves eligible, and could "do so on a potentially very large scale." ANPR at 8830, col. 1. This has "the potential to complicate the implementation of monetary policy" and "could disrupt financial intermediation in ways that are hard to anticipate, and could also have a negative effect on financial stability." *Id.*

On the issue of monetary policy implementation, the Board stated "the potential benefits of PTIEs in enhancing monetary policy implementation appear to be quite modest," while "PTIEs could present significant challenges for monetary policy implementation." *Id.* at 8830, col. 2. The ability of PTIEs "to attract a very large amount of deposits at a rate above other key overnight … rates could affect the FOMC's plans to reduce its balance sheet to the smallest level consistent with efficient and effective implementation of monetary policy." *Id.* In particular, if the demand for reserve balances by PTIEs becomes large, "[i]n order to maintain the desired stance of monetary policy, the Federal Reserve would likely need to accommodate this demand by expanding its balance sheet and the supply of reserves." *Id.* Moreover, if current lenders in the federal funds market shift overnight investments to PTIEs, "the federal funds rate could become volatile." *Id.* This "could require the FOMC to change its policy target on relatively short notice," and might "have spillover effects in many other markets that are linked to the federal funds rate." *Id.* The volatility potentially caused by PTIEs "could make it difficult for the Federal Reserve to control short-term rates more broadly as a means of implementing monetary policy." *Id.* at 8830, col. 3.

On the issue of financial intermediation,[14] the ANPR states that PTIEs could "potentially reshap[e] the financial industry," *id.*, by "raising the overall cost of Treasury borrowing," "diminish[ing] the availability of funding for commercial banks," and "rais[ing] the cost of credit provided by banks to households and businesses." *Id.* Regarding financial stability, "the Board believes … that the emergence of PTIEs likely would have negative financial stability effects … by providing a nearly unlimited supply of very attractive safe-haven assets …." *Id.* at 8831, col. 1. "[I]n times of stress, investors that would otherwise provide short term funding to non-financial firms, financial institutions and state and local governments could rapidly withdraw that funding from those borrowers and instead deposit those funds at PTIEs … [which] could greatly amplify systemic stress." *Id.*

Finally, in addition to the potential negative impact of PTIEs on monetary policy implementation, financial intermediation, and financial stability, the payment of IOER to customers of PTIEs "that in many instances are not authorized to maintain balances at Reserve Banks," "could be viewed as inconsistent with the intent of Congress in providing the Federal Reserve with the authority to pay interest on balances maintained by the institutions specified in the Act." *Id.* at 8831, col. 2. As explained, *supra*, p. 16, n. 9, Congress carefully delineated in 12 U.S.C. §§ 461(b)(1)(A) and (b)(12)(C) the specific types of institutions eligible to earn IOER. The payment of IOER to "nonfinancial companies" that TNB concedes do not currently have access to it is a policy concern that merits careful scrutiny. Compl. ¶ 2.

While TNB claims that its business model will positively affect monetary policy by enhancing the efficacy of IOER as a policy tool, *id.*, ¶¶ 82, 101, the Board believes that

---

[14] "Financial intermediation" refers to the process, generally performed by banks, of taking in funds from a depositor and lending them out to a borrower. *See, e.g.,* Purposes and Functions at 55, Figure 4.1 (explaining the role of financial intermediaries).

"monetary policy implementation has been very successful in maintaining the federal funds rate within the target range established by the Federal Open Market Committee" without any role being played by PTIEs, and that PTIEs could, instead, "present significant challenges for monetary policy implementation."  ANPR at 8830, col. 2.  Because Congress vested in the Board and the FOMC responsibility for monetary policy, their views must control here.  *See* 12 U.S.C. § 225a.

In the ANPR, the Board sought public input on all aspects of these issues, as well as on possible solutions to the concerns raised by the PTIE business model.  Specifically, the Board asked for comment on whether it should lower the IOER rate for these types of institutions, potentially to zero.  ANPR at 8831, col. 3.  A premature ruling that TNB is entitled to a master account – and to the full IOER rate on its excess reserve balances – could have unforeseen and serious consequences for monetary policy, financial intermediation, and financial stability as set out in the ANPR.  The Board urges the Court not to take any action that would short-circuit the Federal Reserve's consideration of these important public policy issues, such as ordering the FRBNY to open a master account for TNB.

## CONCLUSION

For the foregoing reasons, the Board respectfully requests that TNB's Complaint be

dismissed.

Dated: Washington, D.C.
      March 25, 2019

                             Respectfully submitted,


                        /s/  Yvonne F. Mizusawa_____
Mark Van Der Weide, General Counsel
Katherine H. Wheatley
   Associate General Counsel
Yvonne F. Mizusawa, Senior Counsel
Board of Governors of the
   Federal Reserve System
Washington, D.C.  20551
Telephone:  (202) 452-3436
Facsimile:  (202) 736-5615
yvonne.f.mizusawa@frb.gov

*Counsel for Amicus Curiae Board of Governors*
*of the Federal Reserve System*