USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED:  __3/25/20_____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

   TNB USA INC.,                                          :

                                                         :

                                            Plaintiffs,  :

              -against-                                  :           1:18-cv-7978 (ALC)

                                                         :           <u>OPINION AND ORDER</u>

   FEDERAL RESERVE BANK OF NEW YORK,                     :

                                            Defendants.  :

                                                         :

                                                         :

-----------------------------------------------------------x

**ANDREW L. CARTER, JR., United States District Judge:**

### BACKGROUND

The Narrow Bank USA Inc. ("TNB") sued the Federal Reserve Bank of New York

("FRBNY") seeking a declaratory judgment, injunctive relief, and a prompt hearing under Fed.

R. Civ. P. 57. (Compl. at 24). TNB alleges that the FRBNY has refused to provide TNB with a

"master account" despite its statutory obligation to do so. (*Id.* at ¶ 122–23). The FRBNY now

moves to dismiss TNB's complaint pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter

jurisdiction, and pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim. (ECF No. 20).

For the reasons below, that motion is GRANTED on jurisdictional grounds.

**I. Federal Reserve System**

The Federal Reserve System is the Nation's central bank. It consists of twelve Federal

Reserve banks across the country, the Board of Governors, and the Federal Open Market

Committee ("FOMC"). (ECF No. 21 at 3; ECF No. 24 at 10). The Board of Governors "is a

United States government agency composed of seven members appointed by the President and confirmed by the Senate." (ECF No. 45 at 9). Pursuant to the Federal Reserve Act, the Board and the FOMC are charged "with conducting monetary policy to achieve the goals of 'maximum employment, stable prices, and moderate long-term interest rates.'" (*Id.*) (citing 12 U.S.C. § 225a). "The Board has statutory authority to promulgate rules implementing its powers under the FRA and other statutes, and that authority may not be delegated." (*Id.*) (citing 12 U.S.C. §§ 248(i)). As long as they are "reasonable and consistent with legislative intent[,]" "[t]he Board's interpretation[s] of federal banking statutes it implements [are] entitled to judicial deference[.]" (*Id.*).

The FRBNY is one of the twelve Federal Reserve banks operating in the United States. Like the Board, Federal Reserve banks "serve the public interest by providing the nation with a stable financial situation and by setting and implementing monetary policy." (ECF No. 21 at 11). Part of the way in which the banks implement monetary policy is through reserves. Reserves are "liquid assets that depository institutions maintain at Federal Reserve banks, including in the form of deposits held in accounts referred to as 'master accounts.'" (*Id.* at 13) (citing Federal Reserve Operating Circular No. 1 (Account Relationships) ("OC 1") at ¶ 1.0 (describing master accounts), *available at* https://frbservices.org/assets/resources/rules-regulations/020113-operating-circular-1.pdf). "A master account is, put simply, a bank account for banks. It gives depository institutions access to the Federal Reserve System's services, including its electronic payments systems.…Without such access, a depository institution is nothing more than a vault." *Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City*, 861 F.3d 1052, 1053 (10th Cir. 2017) (Moritz, J.) (internal quotation marks omitted).

The Federal Reserve requires that depository institutions maintain a minimum amount of reserves against certain of their liabilities ("required reserves"). (ECF No. 24 at 12; ECF No. 21 at

13) (citing 12 U.S.C. § 461; 12 C.F.R. pt. 204). "However, depository institutions may elect to maintain reserves beyond the required amount, which are referred to as excess reserves." (ECF No. 21 at 5; *see* ECF No. 24 at 12). The rate at which depository institutions lend excess reserves to one another overnight is known as the federal funds rate. (ECF No. 21 at 13; Compl. at ¶ 83). The federal funds rate is a benchmark for many other private market interest rates. (ECF No. 21 at 13; Compl. at ¶ 85).

The Federal Reserve uses the policy tools at its disposal to influence the federal funds rate. One critical tool is the Interest on Excess Reserves Rate ("IOER rate")—"the rate that Federal Reserve Banks pay to depository institutions on excess reserves." (ECF No. 21 at 13; *see* Compl. at ¶ 87). The higher the IOER, the more attractive maintaining excess reserves becomes to institutions. The supply of reserves in turn influences the federal funds rate and "helps the Federal Reserve System achieve its broader employment and inflation goals." (ECF No. 21 at 13–14; Compl. at ¶¶ 87–91, 108).

## II. Facts

TNB began the process of opening an account with the FRBNY in August 2017. (Compl. at ¶ 5). TNB has not opened for business yet. Its board of directors and management have spent over two years preparing for its opening. (Compl. at ¶ 3). TNB stands for "the narrow bank," which describes the structure of the business TNB plans to establish. "TNB's sole business will be to accept deposits only from the most financially secure institutions, and to place those deposits into TNB's Master Account at the FRBNY, thus permitting depositors to earn higher rates of interest than are currently available to nonfinancial companies and consumers for such a safe, liquid form of deposit." (*Id.* at ¶ 2). TNB will earn a "modest profit" by paying its depositors interest at a "slightly lower rate." (*Id.* at ¶ 44). To carry out its business, TNB needs access to the

Federal Reserve payments system, which is available only to depository institutions with a master account. (*Id.* at ¶ 4).

To operate as a bank and obtain a master account at a Federal Reserve bank, TNB needed to obtain a state or federal charter. TNB went to the Connecticut Department of Banking ("CTDoB") to obtain a state charter. "TNB planned to forgo FDIC insurance and therefore would not be regulated by the FDIC. Instead, the CTDoB would be TNB's chartering authority and regulator, as provided under relevant state and federal law." (*Id.* at ¶ 49). The CTDoB issued TNB a temporary Certificate of Authority ("CoA") in August 2017. (*Id.* at ¶ 50). The CoA "set forth several conditions TNB was required to meet before the CTDoB would issue a final CoA." (*Id.*) One of these conditions was that TNB produce evidence that the FRBNY would open a master account for TNB." (*Id.* at ¶ 52).

According to TNB, the master account application process is typically straightforward and short. The applicant completes a one-page form agreement and waits "no more than one week" for a response. (*Id.* at ¶ 5). The agreement form provides that "[p]rocessing may take 5-7 business days" and that the applicant should "contact the Federal Reserve Bank to confirm the date that the master account will be established." (*Id.*; *see id.* at ¶ 54) To complete the form, however, TNB first needed to obtain an American Bankers Association ("ABA") routing number issued by Accuity, the ABA's official Registrar of Routing Numbers." (*Id.* at ¶ 55). "The only eligibility requirements" for an Accuity routing number "are that the applicant be chartered and eligible to maintain an account at a Federal Reserve Bank." (*Id.* at ¶ 56) (internal quotation marks omitted). "The Accuity application states that it takes approximately two weeks to process, and will be forwarded to the Federal Reserve in the applicant's district for verification." (*Id.* at ¶ 57) (internal quotation marks and brackets omitted). TNB submitted its application to

Accuity in August 2017 and Accuity forwarded it to the FRBNY for verification. (*Id.* at ¶¶ 58, 59).

Several weeks later, TNB still had not heard back about its application, so it spoke to an attorney with the FRBNY. The attorney attributed the delay to the "temporary" nature of TNB's CoA, explaining that "the FRBNY would not open TNB's master account without proof of a final CoA. The attorney also informed TNB that the FRBNY requires an institution to have at least $500,000 in deposits to obtain a Master Account, and TNB did not yet have any deposits." (*Id.* at ¶ 60). TNB explained the problem: the CTDoB required evidence that the FRBNY would establish a Master Account before it would issue a final CoA, but TNB's master account application was being held up because it had not obtained a final CoA. (*Id.* at ¶ 61). The attorney agreed to inform Accuity that TNB would be eligible for a master account upon issuance of a final CoA from the CTDOB and maintenance of $500,000 in deposits. (*Id.* at ¶ 62). Accuity issued a routing number to TNB in October 2017. (*Id.*)

The FRBNY attorney also informed TNB that because it was not insured and regulated by the FDIC, the FRBNY would need to do its "due diligence" before it could grant TNB's application. (*Id.* at ¶ 63). The attorney recommended that TNB wait to file its formal master account application until the FRBNY concluded its "due diligence." (*Id.*)

Beginning in September 2017 and continuing through November 2017, TNB received a series of document and information requests from the FRBNY. The later requests focused on creditworthiness and anti-money laundering issues. (*Id*. at ¶¶ 65–66). TNB provided complete and timely responses. (*Id.*) The FRBNY completed its inquiries in early November 2017. (*Id.* at ¶ 68). An FRBNY attorney told "TNB that the FRBNY was prepared to communicate to the CTDoB that TNB would be permitted to open a Master Account following the issuance of a final

CoA from the CTDoB and the maintenance of $500,00 in non-trust deposits (which TNB had lined up)." (*Id.*) However, the attorney also informed TNB that The Board of Governors of the Federal Reserve System had learned "of TNB's intention to apply for a Master Account and wanted time to consider the potential effects of TNB's business model." (*Id.* at ¶ 69).

In early December 2017, the FRBNY contacted TNB and communicated that it expected the Board to sign off on TNB's Master Account the following week. (*Id.* at ¶ 70). However, that same day, the FRBNY informed TNB that after hearing from the Board, the FRBNY did not think that TNB should expect approval any time in the near future. (*Id.*) "The FRBNY did not provide a specific reason for the Board's delay, but TNB's principals understood that it related to the impending replacement of the Board's Chairperson. The Board's staff was unwilling to decide on TNB's Master Account until the new Chairperson was seated." (*Id.* at ¶ 71).

On February 1, 2018, TNB heard from the FRBNY again. The Board's new chairperson had been confirmed by the Senate a week earlier, but the President and CEO of the FRBNY informed TNB that the Board had "policy concerns" about TNB's application. (*Id.* ¶ 72). TNB understood the FRBNY to be indicating that it was "pessimistic that the Board would allow the FRBNY to issue a Master Account to TNB." (*Id.*)

After learning of the Board's concerns, TNB set up a meeting in Washington, D.C. with members of the FRBNY and the Board's staff, including its General Counsel. (*Id.* at ¶ 74). At this February 14, 2018 meeting, the FRBNY and Board's staff stated that it would continue its analysis. (*Id.*) TNB attempted to contact the Board again on March 27, 2018, but was "unable to reach the Board's decision-making authorities," so TNB met with the FRBNY. (*Id.* at ¶ 75). At this meeting, TNB "provid[ed] a point-by-point response to all policy concerns expressed by the Board staff during the February 14, 2018 meeting." (*Id.*) The FRBNY representatives told TNB

they would convey TNB's responses to the Board's Chairperson and staff. (*Id.*) TNB submitted a "comprehensive written response" to the Board's policy concerns to both the Board and the FRBNY on April 26, 2018. (*Id.* at ¶ 77).

On April 27, 2018, TNB formally filed its application requesting a master account. (*Id.* at ¶ 78). TNB's temporary CoA was set to expire by its terms in early 2019, so presumably, it has expired at this point. (*Id.* at ¶ 80).

## III. Procedural Posture

On August 31, 2018, TNB filed its one count complaint alleging the FRBNY's violation of Section 11A of the Federal Reserve Act, 12 U.S.C. § 248a(c)(2). (*Id.* at ¶ 120–124). For relief, TNB requests a declaratory judgment that it is entitled to a master account and that the Federal Reserve Act, 12 U.S.C. §§ 221, *et seq*, requires the FRBNY to open a Master Account for it, and an injunction compelling the FRBNY to open a master account on its behalf. (*Id.* at 24).

On October 16, 2018, the FRBNY filed a letter requesting a pre-motion conference concerning its anticipated motion to dismiss TNB's complaint. (ECF No. 14). In that letter, the FRBNY provided that TNB's application "remains under review." (*Id.* at 1). The parties submitted a joint briefing schedule for the proposed motion, (ECF No. 18), and the FRBNY filed its motion to dismiss on March 8, 2019. (ECF No. 20).

Shortly before the FRBNY filed its motion to dismiss, the Board "issued an advance notice of proposed rulemaking ("ANPR") that expresses the Board of Governors' policy concerns about entities with narrowly focused business models (Pass-Through Investment Entities" or "PTIEs") that, like TNB, would take deposits from institutional investors and invest all or substantially all of the proceeds in balances at Federal Reserve Banks." (ECF No. 21 at 15–16) (citing ANPR Regulation D: Reserve Requirement of Depository Institutions, *available at,* https://www.federalreserve.gov/newsevents/pressreleases/files/bcreg20190306a1.pdf); *see also*

(ECF No. 24 at 18) (citing Bd. Of Governors Fed. Reserve Sys., ANPR Regulation D: Reserve Requirements of Depository Institutions, *available at* https://www.govinfo.gov/content/pkg/FR-2019-03012/pdf/2019-04348.pdf)). TNB asserts that this ANPR indicates that "the Board intends to put TNB out of business with a discriminatory regulation even if TNB is successful" in court. (ECF No. 24 at 18–19).

On January 29, 2020, I granted the Board permission to file an amicus brief, (ECF No. 37), which it did on February 6, 2020. (ECF No. 45).

The FRBNY moved to dismiss TNB's complaint pursuant to Fed. R. Civ. P. 12(b)(1) and Fed R. Civ. P. 12(b)(6) on March 8, 2019. (ECF No. 20). The FRBNY argued first that this Court lacks subject matter jurisdiction in this matter because TNB lacks standing and TNB's claim is constitutionally and prudentially unripe. (ECF No. 21 at 18–21). Second, the FRBNY argued that the Court should decline to exercise its discretion under the Declaratory Judgment Act, 28 U.S.C. § 2201 to consider TNB's request for a declaratory ruling because the relief TNB seeks is incompatible with the public interest. (*Id.* at 21–22). Finally, the FRBNY asserts that TNB has failed to state a claim because the declaration TNB seeks (also the basis for TNB's requested injunction)—that Section 11A of the FRA entitles TNB to a master deposit account at the FRBNY—is a misreading of the statute. (*Id.* at 21–33).

## DISCUSSION

Because I conclude that TNB lacks standing to pursue its stated claim and its claim is both constitutionally and prudentially unripe, I will not reach the declaratory judgment and 12(b)(6) statutory interpretation issues in this opinion. I first consider the parties' dispute as to whether the FRBNY has reached either a formal or constructive decision on TNB's application,

concluding that it has not. I then address both standing and ripeness and explain why they are definitive in this matter.

## I. 12(b)(1) Standard

"Where a defendant moves for dismissal under Rule 12(b)(1) and 12(b)(6), the Court must address the 12(b)(1) motion first." *Vullo v. Office of the Comptroller of the Currency*, 17 Civ. 3574, 2017 WL 6512245, at \*5 (S.D.N.Y. Dec. 12, 2017) (citing *Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990)). Subject matter jurisdiction must be established by a preponderance of the evidence. *Id.* (citing *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). In considering the FRBNY's 12(b)(1) motion, I "accept as true all material facts alleged in the complaint and draw all reasonable inferences in [TNB's] favor." *See id.* (citing *Conyers v. Rossides*, 558 F.3d 137, 143 (2d Cir. 2009)).

## II. Pending Application

The parties dispute whether the FRBNY has actually or effectively reached a decision on TNB's application. The FRBNY consistently has maintained that TNB's application for a master account has not been decided and remains under consideration. (ECF No. 14 at 1; ECF No. 21 at 9). But TNB asserts that the FRBNY already effectively rejected its application and has not done so formally only for the "convenience" of its litigation position. (ECF No. 24 at 27). In support of its position, TNB references the fact that in February 2018, the FRBNY told TNB that the Board was unlikely to allow TNB to open a master account (Compl. at ¶ 72); that according to the application form, this process should have taken several days, and yet, for TNB, it has been over 18 months; that the Board has begun a rulemaking process that could destroy narrow banks like TNB (ECF No. 24 at 18–19); and that there has been no "noticeable action" taken on TNB's

account since May 2018, around the time the Board communicated to the FRBNY its view that TNB's application should not be approved. (ECF No. 24 at 27).

The February 2018 communication and lack of noticeable action suggest that TNB's application is unlikely to be approved, that likely TNB *will suffer* an injury. But that is not the same thing as a final decision. *See generally Vullo*, 2017 WL 6512245, at *5–7 (no final decision by OCC on whether to grant special purpose national bank charters to fintech companies despite issuance of several documents indicative of the OCC's inclination). The same principle applies to the advance notice of rulemaking. Although TNB may be correct that the FRBNY, via the Board, is hostile to banks like TNB, indicating that the FRBNY is unlikely to permit TNB an account, that is an assumption that I cannot make based on the facts before me.

As to the application form, TNB alleges that the master account agreement states that the form may take five to seven business days to be processed. (Compl. at ¶ 5). TNB argues that the form-provided timeline should serve as the anchor for assessing the significance of the FRBNY's delay. But the form is not statute, a rule, or even a guarantee on behalf of the FRBNY that TNB will receive a decision within a week. It is, at best, a guideline stated to provide applicants with an estimate for when they should expect a decision. But a guideline, even if it is representative of most applicants, or the typical applicant's experience, is not a promise to *every* applicant that once breached is akin to denial. Additionally, because the form does not define the meaning of "processing," the form's timetable may not be a guideline for decision-making. Processing could refer to the time it will take for the application to work its way up through the system to the FRBNY's actual review. In other words, the form could be informing applicants that their applications may not even be considered for up to a week post-submission. The form alone is

insufficient to establish that the FRBNY has acted so atypically that its delay should be equated to a formal denial of TNB's application.

TNB provides cases in which federal courts have determined that defendants' delay should be considered constructive denial.[1] (*See* ECF No. 24 at 27 (citing e.g. *Groome Res. Ltd., L.L.C. v. Par. of Jefferson*, 234 F.3d 192, 197–200 (5th Cir. 2000) (Fifth Circuit case where court found that the Parish's "indeterminate delay" in issuing a decision on Plaintiff's application for a reasonable accommodation "had the same effect of undermining the anti-discriminatory purpose of the FHAA where no decision had been issued over 50 days past the provided "target date" of decision, and "[d]eposition testimony revealed that there was no planned action on the application, and the district court found that the attorney in charge of the review process could not say what the current status of the application was, what if anything remained to be done to complete the process or when it might be done, and could not say who the ultimate decisionmaker would be.'"); *Amico v. New Castle Cty.*, 553 F. Supp. 738, 741–43 (D. Del. 1982) (County had not issued decision on whether to grant plaintiff a certification of compliance because needed first to determine whether plaintiff could demonstrate "existing use" of his business; plaintiff's application would not be granted if he could not establish "existing use," which the parties agreed he could not, thus, denial of his application was a *certainty*).

TNB argues that these cases support its argument that the FRBNY effectively has denied its application, thus establishing that TNB suffered an injury for standing purposes. However, these cases are not binding on this Court. Additionally, both cases are distinguishable. The FRBNY provided TNB with no target date for a decision. Its application form stated that

---

[1] TNB cited these cases in the section of its opposition brief arguing ripeness. However, they are cases in which courts found ripeness because defendants' delay constituted constructive denial. Thus, it seems appropriate to explain why these cases are distinguishable here.

processing "may" take up to a week, but again, what processing means is unclear. It is not necessarily coterminous with a decision. Also, contrary to TNB's arguments and as explained above, the outcome of TNB's application is not a certainty.

Based on my review of the record, I find that the FRBNY has not reached a decision on TNB's application, so I turn now to the FRBNY's arguments that TNB lacks standing and its claim is unripe.

### III. Standing

Article III of the Constitution constrains federal courts' jurisdiction to the resolution of actual cases and controversies. U.S. CONST. art. III, § 2. One element of the case-or-controversy requirement is standing. "The [standing] doctrine limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547 (2016).

"[T]he irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements for each claim asserted." *Vullo*, 2017 WL 6512245, at *7 (citing *Spokeo, Inc.*, 136 S. Ct. at 1547). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 136 S. Ct. at 1547 (citing *Lujan*, 504 U.S. at 560–61).

The FRBNY's argument for dismissal concerns the "injury in fact" element of standing. A satisfactory injury in fact invades "a legally protected interest which is (a) concrete and particularized…and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal citations and quotation marks omitted).

12

The FRBNY argues that any injury alleged by TNB is too conjectural to confer standing. (ECF No. 21 at 18–19). TNB's application is still under review by the FRBNY. Its denial and the consequences of that denial, the alleged injuries, are thus hypothetical as opposed to imminent. (*Id.*) In response, TNB effectively makes a constructive denial argument, arguing that a failure to act may be justiciable to the same degree as an affirmative denial of a legal right. (ECF No. 24 at 29). TNB also emphasizes that it is suffering harm "each passing day" because of the FRBNY's ongoing refusal to open a Master Account" on its behalf. (ECF No. 24 at 28–29). I find that the FRBNY has the stronger position.

The denial of TNB's application and the harms resulting from that alleged denial are not injuries that establish standing for the reasons discussed further below. To the extent that TNB is attempting to argue that the harm it is enduring currently—operating expenses, loss of profits, etc., is sufficient for standing injury purposes—I find this argument to be unpersuasive. As discussed above, I do not think that the FRBNY has constructively or formally decided on TNB's application. Accepting this premise, the current injuries TNB is enduring are those emanating from the FRBNY's *delay* in deciding on the application. But the FRBNY's delay is not TNB's cause of action. TNB is suing the FRBNY specifically over its *refusal* to provide TNB an account. Count One of TNB's complaint provides that "[t]he FRBNY is legally required to provide its services, including and especially the maintenance of a Master Account" to depository institutions like and including TNB pursuant to 12 U.S.C. § 461(b)(1)(A)(i). (Compl. at ¶ 122). It alleges that "[t]he FRBNY has refused to provide a Master Account to TNB notwithstanding the statutory command that it do so" and provides that "[a]ccordingly, Plaintiff seeks a declaration from this Court that TNB is entitled to open a Master Account with the FRBNY (*Id.* at ¶¶ 123–24).

Because the alleged injury is the FRBNY's denial, not delay, the current delay-induced injuries TNB cites are not the relevant injuries for the standing analysis. Further, because the denial has not occurred, TNB has no qualifying imminent injury and thus this case must be dismissed on standing grounds. Hypothetical injuries of this nature that are contingent upon a future event, are too "speculative to constitute an injury in fact. While a 'certainly impending' injury is sufficient for standing[,]" an injury that may never come to fruition is not. *Vullo*, 2017 WL 6512245, at *7.

To support its argument that is has the requisite standing, TNB cites two cases in which courts found an injury sufficient to support standing where defendants had failed to act. (ECF 24 at 29) (citing *In re Idaho Conservation League, et al.*, 811 F.3d 502 (D.C. Cir. 2016); *Comm'n for Full Emp't v. Blumenthal*, 606 F.2d 1062 (D.C. Cir. 1979)). *In re Idaho Conservation League* began when several environmental organizations filed a petition for a "writ of mandamus directing [the Environmental Protection Agency ("EPA")] to promulgate" rules and regulations required by a federal statute passed in 1980. 811 F.3d at 505–06. In 2015, when plaintiffs filed, the EPA had yet to issue any regulations. *Id.* 506. Plaintiffs "sought a declaration that EPA had unreasonably delayed in failing to issue any regulations…and an order directing EPA to issue" the required regulations by January 1, 2016. *Id.* Plaintiffs and the EPA then "filed a joint motion for an order on consent establishing an agreed upon schedule for a rulemaking…" *Id.* Before approving the joint motion, the D.C. Circuit Court considered whether it had jurisdiction. The court determined that at least one organizational member "suffered and continue[d] to be threatened with ongoing and certainly impending injuries-in-fact that [were] caused by EPA's failure to promulgate" regulations. *Id.* at 508–509.

*In re Idaho Conservation League* is distinguishable in two respects. First, the Court's language indicates that plaintiffs sued the EPA in the initial suit specifically over its *delay* in promulgating regulations as opposed to its *decision* to defy Congress by refusing to promulgate the statutorily mandated regulations. For example, the Court wrote that "because the joint motion resolves the issues presented by the petition for mandamus, the court has no occasion to decide whether EPA's *delay* in promulgating…regulations was unreasonable delay for which mandamus would lie." *Id.* at 506 (emphasis added).

The second distinction is that the delay in that case was 30 years. Although the over 18-month wait TNB has endured is concerning, it does not approach the 30-year mark. If TNB had been waiting 30 years for a decision, I would have no trouble finding that the FRBNY had constructively denied TNB's application, and thus that TNB had an injury in fact sufficient for standing.

In *Committee for Full Employment v. Blumenthal*, the D.C. Circuit considered whether plaintiff individuals and organizations had standing to pursue their complaint alleging that the Office of Revenue Sharing ('ORS") "failed to respond adequately to administrative complaints filed by appellants [plaintiffs], and has continued to fund recipient governments that allegedly violate the civil rights provisions of the Revenue Sharing Act." 606 F.2d at 1063. Plaintiffs alleged that they had filed charges against eight governments funded by the ORS and that "[t]he agency's procedural regulations, which are binding on the agency, entitle complainants to a review of their complaint by the Secretary and, if the complaint raises a colorable claim of violation, a prompt investigation." *Id.* at 1064–65. The Court determined that the complainants were injured because this "procedural right" was denied them. (*Id.* at 1065).

*Blumenthal* too is distinguishable. The ORS's delay explicitly violated its own promulgated regulations. Thus, Plaintiff's injury was the actual denial of that procedural right. I understand that TNB argues that it is entitled by statute to a master account, but even assuming that is correct, TNB has not alleged a right for the FRBNY to provide that account within a certain time period. TNB does not object, after all, to the fact that there is an application process for the accounts, and implicit in the acceptance of that process is the understanding that a decision will not be immediate. TNB asserts that the timeframe should mirror the application form, providing that the review "may take 5-7 days." But this language does not have the force of a regulation. It is nothing more than, at best, an estimate, a guideline for setting expectations, it does not grant TNB the right to a decision in a week.

## IV. Ripeness

"To be justiciable, a cause of action must be ripe—it must present 'a real, substantial controversy, not a mere hypothetical question.'" *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013) (quoting *AMSAT Cable Ltd. v. Cablevision of Conn.,* 6 F.3d 867, 872 (2d Cir.1993)). "A claim is not ripe if it depends upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Id.* (quoting *Thomas v. Union Carbide Agric. Prods. Co.,* 473 U.S. 568, 580–81 (1985)). The doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Id.* at 687 (quoting *Abbott Labs. v. Gardner,* 387 U.S. 136, 148 (1967), *overruled on other grounds by Califano v. Sanders,* 430 U.S. 99, 105 (1977)).

"Ripeness encompasses two overlapping doctrines concerning the exercise of federal court jurisdiction." *Entergy Nuclear Vt. Yankee, LLC v. Shumlin*, 733 F.3d 393, 429 (2d Cir. 2013). "Both are concerned with whether a case has been brought prematurely, but they protect

against prematureness in different ways and for different reasons." *Simmonds v. I.N.S.*, 326 F.3d 351, 357 (2d Cir. 2003). Constitutional ripeness "has as its source the Case or Controversy Clause of Article III of the Constitution, and hence goes, in a fundamental way, to the existence of jurisdiction." *Id.* "Constitutional ripeness 'is a specific application of the actual injury aspect of Article III standing." *Vullo*, 2017 WL 6512245, at *8 (quoting *Walsh*, 714 F.3d at 688).

Prudential ripeness, on the other hand, is a discretionary tool. A case may be prudentially unripe, but that "does not mean that the case is not a real or concrete dispute affecting cognizable current concerns of the parties within the meaning of Article III." *Simmonds*, 326 F.3d at 357. Whereas constitutional ripeness informs whether a court *can* decide a case before it, prudential ripeness allows courts to determine whether a case would "be *better* decided later and that the parties will not have constitutional rights undermined by the delay." *Id.* "Prudential ripeness is, then, a tool that courts may use to enhance the accuracy of their decisions and to avoid becoming embroiled in adjudications that may turn out to be unnecessary..." *Id.*

The FRBNY argues that TNB's claim is both constitutionally and prudentially unripe because it has not yet issued a decision on TNB's application for a master account. "Since constitutional ripeness is a subset of the injury-in-fact element of Article III standing, our constitutional ripeness analysis here is coterminous with our standing analysis above." *Vullo*, 2017 WL 6512245, at *8 (citing *Walsh*, 714 F.3d at 688; *and New York Civil Liberties Union v. Grandeau*, 528 F.3d 122, 130 n.8 (2d Cir. 2008). In short, because I determined TNB to lack the requisite standing to bring this case, I also conclude that TNB's claim is constitutionally unripe.

TNB's claim is also prudentially unripe. "Prudential ripeness is assessed based on a two-part inquiry: (1) the fitness of the issues for judicial decision; and (2) the hardship to the parties

of withholding court consideration." *Id.* (citing *Abbot Labs*, 387 U.S. at 149; *Grandeau*, 528 F.3d at 131–32).

"[T]he 'fitness' analysis is concerned with whether the issues sought to be adjudicated are contingent on future events that may never occur." *Simmonds*, 326 F.3d 359. The factual predicate of TNB's claim is the FRBNY's denial of its application, not, by contrast, the FRBNY's delay in providing TNB a decision. For "fitness" purposes, this distinction is again significant. "[T]he issues sought to be adjudicated" in the present suit are "are contingent on future events that may never occur[,]" specifically the outcome of TNB's account application. The FRBNY could decide tomorrow to provide TNB a master account, rendering the entire case moot, and my interpretation of the Federal Reserve Act improper. Or, it could deny TNB's application for a procedural reason like the expiration of its temporary CoA, or for another reason not yet contemplated by the parties. Although the reasoning behind a potential denial may not prove relevant to adjudicating whether the FRA entitles banks like TNB to a master account, it could, and regardless, it is information a federal court should and can have before reaching a decision on the merits.

TNB argues that its claim is ripe because no new facts are necessary to adjudicate the statutory interpretation question at the heart of the claim. (ECF No. 24 at 28). TNB contends correctly that issues have been deemed ripe where they "would not benefit from any further factual development and…the court would be in no better position to adjudicate the issues in the future than it is now." (*Id.* (quoting *Simmonds*, 326 F.3d at 359)). But what TNB has identified is a tendency, not a rule or on-point precedent. If this rule were absolute, there would be nothing to prevent courts from *sua sponte* interpreting statutes, thereby ignoring the constitutional requirements of Article III and infringing upon the legislative branch.

Given the above analysis and conclusion that there has been no constructive denial of

TNB's application, I conclude that the "fitness" prong dictates against treating this case as ripe,

because any decision here would be premature and only advisory. *See Fourth Corner*, 81 F.3d at

1060 (Matheson, J.) (where "the Reserve Bank may issue a master account…there would be no

dispute and a decision here would be only advisory.")

Under the hardship prong, courts "ask whether the challenged action creates a direct and

immediate dilemma for the parties." *Marchi v. Bd. Of Coop. Educ. Serv. of Albany*, 173 F.3d

469, 478 (2d Cir. 1999). TNB argues that it experiences increasing hardship with each passing

day the FRBNY does not issue its decision, and that it will continue to suffer hardship if I

dismiss the case, allowing the FRBNY to continue to delay. (ECF No. 24 at 28–29). In

particular, TNB states that in the event of dismissal, the FRBNY will stall so as to allow the

Board to complete the rule-making process that would terminate with a rule dictating that, even

with a master account, banks like TNB cannot take advantage of the IOER. (ECF No. 24 at 28).

The hardship TNB identifies, however, is still contingent upon a future event. Just as the FRBNY

has not decided whether to grant TNB a master account, the Board has not definitively

promulgated the rule TNB fears. It is well-settled in this Circuit that "[t]he mere possibility of

future injury, unless it is the cause of some present detriment, does not constitute

hardship." *Simmonds,* 326 F.3d at 360; *see Vullo*, 2017 WL 6512245, at *9.

TNB also indicates that it experiences hardship from the process of continuing to operate

and pursue a master account and its business in the face of the FRBNY's delay. (ECF No. 24 at

28–29). It is fair to characterize TNB's continued operational and process costs, as well as its

potential loss of profits to be hardships that it will continue to experience because this case is

being dismissed. However, the scope and exact nature of the hardship is unclear and does not

outweigh the serious fitness concerns identified. *See Fourth Corner*, 861 F.3d at 1062–63 (Matheson, J.) (no prudential ripeness despite inability of plaintiff bank to "conduct legal business" where "scope of the hardship [was] far from clear" and "potential hardship does not overcome the fitness concerns outlined…").

## CONCLUSION

Because TNB lacks standing to pursue its claim, which is also constitutionally and prudentially unripe, the FRBNY's motion to dismiss the complaint in its entirety is GRANTED.

**SO ORDERED.**

Dated: March 25, 2020

   New York, New York                          **ANDREW L. CARTER, JR.**

                                               **United States District Judge**